RAYMOND J. FULLERTON, ESQ., SBN 219264
STERLING E. TIPTON, ESQ., SBN 259982
MAGDALENA R. MCQUILLA, ESQ., SBN 307578
GEARY, SHEA, O'DONNELL, GRATTAN & MITCHELL, P.C.
90 South E Street, Suite 300
Santa Rosa, California  95404
Telephone:  (707) 545-1660
Facsimile:  (707) 545-1876

Attorneys for Defendants
CITY OF ROHNERT PARK, DAVID SITTIG-WATTSON,
SEAN HUOT, MATT HUOT, MIKE WERLE and ERIC MATZEN

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER WROTH and MARNI WROTH, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF ROHNERT PARK, DAVID SITTIG-WATTSON, SEAN HUOT, MATT HUOT, MIKE WERLE, ERIC MATZEN and DOES 1-25, <br><br> Defendants. | CASE NO.:  17-cv-05339-JST <br><br> **DECLARATION OF GARY M. VILKE, M.D. IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date: April 18, 2019 <br> Time: 2:00 p.m. <br> Courtroom 9, 19th Floor |

I, GARY M. VILKE, hereby declare as follows:

1.      I am a medical consultant retained by the Defendants in the above-referenced matter. I have been requested to provide this declaration to submit in connection with the Defendants' Motion for Summary Judgment.  The matters set forth below are true and correct based on my own personal knowledge and opinions, unless otherwise indicated, and if called to testify in this action I could and would competently testify thereto.

2.      I am a board-certified emergency department physician with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science for over seven years. I am also an independent researcher on the effects of position and weight force on human physiology, physiologic effects of TASER electronic control

LAW OFFICES OF
**GEARY,
SHEA,
O'DONNELL
GRATTAN &
MITCHELL
P.C.**

1  devices (ECD's), and in-custody cardiac arrest and deaths.  A copy of my curriculum vitae is

2  attached as Exhibit A.

3      3.    In this matter, *Wroth, et al. v. City of Rohnert Park, et al.,* I have been asked to

4  review information and documentation relating to the case and the claims therein, and render

5  opinions and conclusions as to state of the medical and scientific literature as of the date of the

6  incident, May 12, 2017 and to consider and render expert opinion on whether the restraining process

7  including the use of the Taser were contributory to Mr. Branch Wroth's cardiac arrest and death.

8      4.    In connection with my investigation into this matter, I have reviewed numerous

9  documents, including but not limited to: the plaintiffs' Second Amended Complaint; the Sonoma

10 County Sherriff's Department Investigation Report (including all statements, photographs, narratives

11 and supplemental reports); the bodyworn camera footage of Officers David Wattson, Sean Huot,

12 Felicity Hartnett, and Sergeants Eric Matzen and Michael Werle (9 videos in total); the deposition

13 transcripts of Officers David Wattson, Sean Huot, Matt Huot, Sergeants Eric Matzen and Michael

14 Werle, Brian Morrow, David Letasi, Adam Dyck, Esa Ray Morgan Wroth, Marni Wroth, and

15 Christopher Wroth; Officer Wattson's Taser data download; the Rohnert Park Department of Public

16 Safety Report, including the Statement and Citizen's Arrest Form (Budget Inn security), Evidence/

17 Property Report and Background Event Chronology; written statements from the security guards,

18 Brian Morrow and David Letasi; medical records from Petaluma Valley Hospital relating to Branch

19 Wroth; EMS Run sheet from American Medical Response; autopsy and scene photographs of

20 Branch Wroth; photographs of the five involved officers and their injuries; a warrant worksheet; the

21 dispatch audio recording of May 12, 2017; the Autopsy Report by Dr. Arnold Josselson; the

22 Toxicology Report from NMS Laboratories; the video of the autopsy; the Forensic Neuropathology

23 Report of by Dr. Omalu; the Rule 26 expert report of Dr. Jay Chapman dated December 10, 2018;

24 the plaintiffs' discovery responses, which included numerous articles and publications relating to

25 positional asphyxia.

26     5.    From my review of the documentation, video and information reviewed and

27 researched, and my knowledge, training and experience as an emergency medical doctor, I have

28 reached the following opinions and conclusions as to medical literature, science and principles as of

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL
GRATTAN &
MITCHELL
P.C.

1   the date of the incident on May 12, 2017, and whether the restraining process including the use of
2   the Taser were contributory to Mr. Branch Wroth's cardiac arrest and death. All of my opinions and
3   conclusions in this declaration are stated to a reasonable degree of medical certainty.

4         6.    My opinions are based upon extensive clinical research I personally have performed
5   on human subjects who have been restrained in various positions and with various amounts of
6   weight which includes having been directly involved with hundreds of subjects being restrained and
7   studied, hundreds of patients restrained during my work in the emergency department, and I have
8   personally been restrained with weights placed on myself as well. I have co-authored recent
9   publications such as *Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths*
10  *and Deaths in Custody* (2017), specifically addressing in-custody deaths, including those occurring
11  during and after the restraining process. I have also recently authored "The Question of Positional
12  and Compression Asphyxia", a chapter within three recent publications from 2015, specifically
13  addressing the mechanics and effects of the restraining process on the body's respiratory system and
14  functions. I have authored numerous other articles and publications on this issue as described on
15  my curriculum vitae. I have lectured nationally and internationally on the subject of restraint and
16  positional asphyxia.

17        7.    First, in my opinion, the restraining process did not cause or contribute to Mr.
18  Wroth's cardiac arrest and death. Mr. Wroth was 41 years old, approximately 5'8" tall, and weighed
19  238 pounds. When Officers Sean Huot and Wattson attempted to handcuff Mr. Wroth, a physical
20  struggle began that lasted approximately 5 minutes, after which Mr. Wroth was handcuffed in a
21  prone position on the floor of the hotel. The time from when both Mr. Wroth's hands are
22  handcuffed to the time when officers determine he is not breathing is less than 2 minutes. A person
23  must be able to draw air into their lungs in order to blow air out and verbalize words and sounds. If
24  a person can speak and make sound, they do not have a complete airway obstruction. Mr. Wroth
25  was able to ventilate, demonstrated by his ability to talk and yell for at least 60 seconds after being
26  handcuffed. He did not have a complete airway obstruction. Being in a prone position and being
27  held from getting up for less than 2 minutes is not a sufficient time to asphyxiate an adult male of
28  Mr. Wroth's size and weight who does not have a complete airway obstruction.

LAW OFFICES OF
**GEARY,**
**SHEA,**
**O'DONNELL**
**GRATTAN &**
**MITCHELL**
**P.C.**

8.      Second, I have concluded that any weight or pressure placed upon Mr. Wroth during the handcuffing and restraint process did not prevent Mr. Wroth from breathing or ventilating. Modern research and studies demonstrate an adult male in a prone position can tolerate up to 220 pounds of weight on their back without any statistical change in heart rate, breathing or blood-oxygen levels.   The weight and pressure applied in this approximately 2-minute timeframe did not stop Mr. Wroth from ventilating, and would not have caused asphyxia.  Officer Wattson and Officer Sean Huot testified they were struggling with Mr. Wroth and that he was not fully on the ground in the prone position until the other three officers arrived and Mr. Wroth was handcuffed in a control hold.  This is confirmed on the bodyworn camera video where Officer Wattson and Sean Huot tell Mr. Wroth to get on his stomach on multiple occasions.  Once in the prone position, Officer Wattson has a knee on Mr. Wroth's upper left back, and testified he was bearing most of his own weight through his other knee on the ground, next to Mr. Wroth.  Officer Wattson intermittently places his hand upon Mr. Wroth's upper back, but then removes it.  Sergeant Matzen was applying the control hold to Mr. Wroth's legs.  Officer Sean Huot testified he did not recall placing any weight on Mr. Wroth after he was handcuffed.  Officer Sean Huot can be seen standing away from Mr. Wroth next to Sergeant Werle during this time.  Officer Matt Huot places his hands near the top of Mr. Wroth's shoulders, but this is also intermittent, as the video shows him removing and replacing his hands. Based on the testimony of the five officers and the bodyworn camera video, the amount of time that any weight was placed on the upper back and shoulders during the handcuffing process was less than 30-40 seconds.  This modest weight on Mr. Wroth's weight and shoulders would not limit ventilation to the point of asphyxia.

9.      Third, I have also concluded that Officer Wattson's use of the Taser did not cause or contribute to Mr. Wroth's death.  I understand that plaintiffs' retained medical expert is Dr. Jay Chapman.  Based upon my review of Dr. Jay Chapman's Rule 26 report dated December 10, 2018, it appears he also agrees that the Taser did not cause or contribute to Mr. Wroth's death.

//

//

//

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL
GRATTAN &
MITCHELL
P.C.

1        10.    Fourth, the methamphetamine use along with the extreme exertion in combination

2    with his enlarged heart is the probable cause of Mr. Wroth's sudden cardiac arrest.  As discussed in

3    the autopsy report, Mr. Wroth's heart was enlarged, weighing 500 grams.  A normal, adult male

4    heart typically weighs 300-350 grams, sometimes up to 400 grams depending on body size.  Mr.

5    Wroth's heart was at least 20% larger than a typical adult male heart.  An enlargement of the heart

6    places an individual at risk for sudden cardiac arrest both because of an irregular, abnormal

7    heartbeat.  The prolonged physical altercation between Mr. Wroth and the police officers would

8    have compounded and increased the risk of cardiac arrest and death in light of his enlarged heart.

9        11.    Chronic methamphetamine abuse leads to progressive increases in heart size and

10   acute use causes increases in heart rate and blood pressure and can cause changes in cardiac rhythm.

11   A review of Mr. Wroth's medical records and the depositions of his friend, Adam Dyck and his

12   family, Marni Wroth, Chris Wroth and Esa Wroth, all indicate that Mr. Wroth was a chronic user of

13   methamphetamine for several years before 2017.  Medical records from Petaluma Valley Hospital

14   show Mr. Wroth was hospitalized twice at that facility because of methamphetamine abuse, on

15   December 8, 2016, and again on April 1, 2017.

16       12.    Methamphetamine use itself can cause confusion, anxiety, hallucinations, cardiac

17   arrhythmias, hypertension, hyperthermia, circulatory collapse, convulsions, and sudden death.  The

18   NMS Laboratories toxicology report confirmed the presence of 820ng/ml in Mr. Wroth's system at

19   the time of his death.  This is a significant quantity of methamphetamine, which was most likely the

20   cause of Mr. Wroth's erratic behavior when dealing with the police officers.  I agree with Dr. Jay

21   Chapman's statement within his report dated December 10, 2018, that the effects of

22   methamphetamine most likely caused Mr. Wroth to struggle with the police officers.

23       13.    In my experience of working in the emergency department for 20 years at the San

24   Diego Medical Center, I have treated thousands of patients for methamphetamine abuse.  I have seen

25   numerous methamphetamine-related deaths in the emergency room due to cardiac dysrhythmia and

26   cardiac arrest in individuals with toxicity levels similar if not identical to the levels found in Mr.

27   Wroth at the time of his death.

28   //

LAW OFFICES OF
**GEARY,**
**SHEA,**
**O'DONNELL**
**GRATTAN &**
**MITCHELL**
**P.C.**

Declaration of Gary M. Vilke in Support of Defendants' Motion for Summary Judgment

1    14.    As such, in my opinion, Mr. Wroth died as a result of his taking a significant amount

2  of methamphetamine combined with the physiological effects on his body caused by his violent

3  struggle against the officers.  The mechanism of death was likely due to circulatory collapse with a

4  cardiac dysrhythmia.

5

6    I declare under penalty of perjury under the laws of the State of California that the foregoing

7  is true and correct.  Executed this 26 day of February, 2019, at SAN DIEGO , California.

8

9                                                       GARY M. VILKE

Declaration of Gary M. Vilke in Support of Defendants' Motion for Summary Judgment

LAW OFFICES OF
GEARY,
SHEA,
O'DONNELL
GRATTAN &
MITCHELL
P.C.