1   John Houston Scott (SBN 72578)
    Lizabeth N. de Vries (SBN 227215)
2   **SCOTT LAW FIRM**
    1388 Sutter Street, Suite 715
3   San Francisco, CA 94109
    Tel:   (415) 561-9601
4   Fax:  (415) 561-9609
    john@scottlawfirm.net
5   liza@scottlawfirm.net

6   Izaak D. Schwaiger (SBN 267888)
    130 Petaluma Avenue, Suite 1A
7   Sebastopol, CA  95472
    Tel. (707) 595-4414
8   Fax: (707) 581-1983
    izaak@izaakschwaiger.com
9
    Attorneys for Plaintiffs CHRISTOPHER WROTH
10  AND MARNI WROTH

11

12                  **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14

15  CHRISTOPHER WROTH and MARNI          Case No. 3:17-cv-05339-JST
    WROTH,
16                                        **DECLARATION OF IZAAK SCHWAIGER**
                                          **IN SUPPORT OF PLAINTIFFS'**
17         Plaintiffs,                    **OPPOSITION TO DEFENDANTS'**
                                          **MOTION FOR SUMMARY JUDGMENT**
18  v.

19  CITY OF ROHNERT PARK, DAVID          Date:  April 18, 2019
    SITTIG-WATTSON, SEAN HUOT, MATT      Time:  2:00 p.m.
20  HUOT, MIKE WERLE, ERIC MATZEN and    Courtroom:  9, 19th Floor
    DOES 1-25,                           Judge:  The Honorable Jon S. Tigar
21
           Defendants.
22

23

24

25

26

27

28

I, Izaak D. Schwaiger, declare as follows:

1.      I am an attorney licensed to practice law in all the courts of the State of California. I am counsel of record for the plaintiff in this matter. I have personal knowledge of the following facts and would testify competently thereto if called as a witness, except as to those matters stated on information and belief and as to those matters, I believe them to be true. This declaration is made in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

2.      POST Learning Domain 34 states that "There are numerous possible causes that could lead to inadequate breathing and potential respiratory arrest (when breathing stops completely), including: …body positioning that restricts breathing (i.e. positional asphyxia).

3.      POST Learning Domain 35 further states that "Officers should be completely familiar with agency policy regarding positional asphyxiation."

4.      On October 29, 2018, Plaintiffs served Defendants with a request for production of "all writings, documents and things used for training by the Rohnert Park Department of Public Safety regarding positional asphyxiation during the past five years." In response, Defendants provided thirty-five pages of training slides "relating to Weaponless Instructor Training." This document is attached as Exhibit A.

5.      Page 14 of Exhibit A indicates that the Rohnert Park Department of Public Safety trained it's officers that, "There is little scientific evidence to support the notion that prone restraint results in life-threatening respiratory compromise or asphyxia." The handwritten notes on p. 14 read, "No scientific evide [sic] to support positional asphyxiation." Defendants' expert, Gary Vilke, is cited as authority for this position. Page 15 of Exhibit A includes a slide titled "*Conclusions of Prone Restraint Study*" which inform the student that "*Prone & weight on back did NOT create risk*", "*…prone, weight on back & continue to resist, did not create adverse risk*", "*Handcuffed & hobbled & weight applied did not place subject at adverse risk*", and "*No level of control or restraint produced adverse risk.*"

6.      On August 16, 2018, Plaintiffs served Defendants with a request to admit that 1) "an administrative review was conducted by RPDPS into the events surrounding the death of

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

1

Branch Wroth", that 2) "Chief Masterson administratively reviewed the incident and determined that the officers involved all acted within policy", and that 3) RPDPS administratively reviewed the incident and determined that the officers involved all acted within policy." On September 18, 2018, Defendants denied each request for admission.

7.      On September 11, 2018, I convened the deposition of Brian Masterson, Director of Rohnert Park Department of Public Safety at the time of Branch Wroth's death and until August 22, 2018. Director Masterson testified that no official administrative review of the incident had been conducted, but that "in conversation with the city attorney and the city manager, we talked about having an official administrative review. In our conversation we discussed the fact that we felt it would be best to use an outside subject expert." See Masterson Deposition, 34:5-37:21, attached hereto as Exhibit B. Masterson further testified that he was unaware on September 11, 2018, of any plan for that review to take place. Id. at 38:24-39:8. The testimony demonstrates that Mr. Masterson reviewed the incident, including the video evidence, and "unofficially" concluded that the officers acted within policy. The testimony further demonstrates the lengths at which Director Masterson went to avoid saying that he had officially ratified anything. Id. at 38:24-56:16.

8.      Unbeknownst to Plaintiffs, on September 12, 2018, Command Consulting & Investigations, Inc. was hired by the City of Rohnert Park to conduct an administrative review/internal affairs investigation of the incident.

9.      On November 30, 2018, fact discovery closed.

10.     Also unbeknownst to Plaintiffs, On January 8, 2019, Command Consulting & Investigations completed their administrative review/internal affairs investigation, ratifying the conduct and concluding that individual defendants actions were all within policy, and used "good judgment and restraint."

11.     The defendants did not supplement and revise their earlier responses to requests for admission as required by Rule 26(e)(1), and did not otherwise inform plaintiffs' counsel of the existence of this report.

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

2

12.     On February 19, 2019, I emailed defense counsel to request an updated status of Plaintiffs' "earlier discovery requests which pertained to administrative investigations or reviews conducted by [their] client or its agents." I received no reply.

13.     On February 20, 2019, I received an unsolicited communication from a journalist that their news agency had obtained a copy of the January 8th report. That journalist provided me a copy of the redacted report that same day. A true and correct copy of what I was provided is attached hereto as Exhibit C.

14.     On March 1, 2019, Defendants filed their motion for summary judgment.

15.     On March 4, 2019, I again requested an update from defense counsel via email. Shortly thereafter, defense counsel responded that they would "try to get back to [me] later in the week or early next week."

16.     On March 7, 2019, defense counsel emailed me that they would "review the disclosures/discovery and update as appropriate." As of the date of this writing, I have still not received any updates in response to my request, and the defense has still not provided with the administrative review or its conclusions.

17.     I have prepared a transcript of the audio portion of the body-worn camera of Officer Wattson which was submitted as Exhibit F(i) to the Declaration of Aaron Johnson in Support of Defendants' Motion for Summary Judgment (Dkt. 67). This transcript is attached hereto as Exhibit D. Recognizing that recording itself is the best evidence, this transcript is submitted to assist the court in its analysis of that evidence. The transcript is true and correct to the best of my ability. Timestamps are provided for reference where most helpful.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of March, 2019 in Santa Rosa, California.

IZAAK D. SCHWAIGER

SCOTT LAW FIRM
1388 SUTTER STREET, SUITE 715
SAN FRANCISCO, CA 94109

3

# Exhibit A

2/18/2016

## Weaponless Defense Instructor

Basic Course
2016
POST Cert #21635
STC Cert #008086

## Introductions

- Name & agency.
- Tenure as a peace officer.
- Status of department DT program. Number of hours per month/year etc.
- Number of current instructors.
- Use of force instructors?
- What do you hope to take back from this course?

## Course Objectives

- Certified as in house WDI/DT/MAB instructor.
- Learn/teach basic arrest/control techniques.
- Learn/teach basic handcuffing/uncuffing.
- Learn/teach known hostage officer escapes.
- Learn/teach basic ground control.
- Learn/teach basic weapon retention & takeaways.

1

2/18/2016



The Force Wheel



Dynamic Resistance-Response Model

### Penal Code Use of Force Authorities

- 835: Person may be subject to restraint.
- 835a: Reasonable force to effect arrest.
- 834a: Duty of person to refrain from using force/weapon to resist arrest.
- 854: pursue & retake prisoner.
- 196: justifiable homicide by officers.

2

2/18/2016

## Penal Code Use of Force Authorities Continued

- 831.5(f): Custodial officer may use reasonable force.
- 831.6(d): Transportation officer may use reasonable force.
- 846: Disarm prisoner, take weapons.
- 843: Force permissible under warrant.
- 723: Seizing, arresting, & confining persons resisting. Posse;

## Penal Code Use of Force Authorities continued

- 836.5(b): No public officer or employee shall be deemed an aggressor or lose his or her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or overcome resistance.

## 42 U.S. Code Section 1983
### 403 U.S. 388 (1971)

- Civil rights statute by which agencies and officers are held liable for excessive force and "respondeat superior" actions.
- Federal officers are held responsible under Bivens v. Six Unknown Federal Agents 403 US 388, 91 S.Ct. 1971.

3

2/18/2016

## 4ᵗʰ Amendment

- The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

## Use of Force Report Writing Basics

- 1. Officer Arrival.
- 2. Aproach.
- 3. Subject's actions.
- 4. Officer's actions.
- 5. Transport procedures.
- 6. Witness observations & statements.

## Other Cues for Use of Force Report Writing

- Weapons known or believed involved.
- Size of officer v. subject.
- Physical condition of officer(s) v. subject(s).
- Perceived martial expertise of subject.
- Friends & associates present.
- Terrain (footing).
- Drugs &/or alcohol.
- Initial reason for contact.

4

2/18/2016

## Indicators of Aggression
## Cues to Escalation

- Bladed stance.
- Folded arm stance.
- Hands on hips.
- Invasion of personal space.
- Finger pointing (poking, in your face).
- Wandering attention.
- Ignoring verbal commands.

## More Cues to Escalation

- Turn & walk away.
- Spitting.
- Grabbing the groin area.
- Emotional mood swings.
- Target seeking or glancing.
- Parroting.
- Fists clenched, teeth clenched.
- Pacing, tiger walk.

## Eyes, Cues to Escalation

- Thousand yard stare.
- Gaze avoidance.
- Dilated or constricted pupils.
- Eyebrow flash.
- Furrowed eyebrows.
- Widening of the eyes.
- Darting eyes.
- Blink rate.

5

2/18/2016

## Nose & Mouth, Cues to Escalation

- Jaw clenching or biting especially with a drawn breath.
- Chin up or down again with a slow, deep breath.
- Flushed skin, redness in face & ears.
- Shoulder shrugs with a lot of head movement.
- Rapid breathing seen in chest rising.
- Happy feet.

## Lack of Movement

- Lack of any body movement or sudden cessation of movement could be an attempt to hide a weapon or mask body language.
- Some decision(s) is/are being made; fight, flight, or surrender.
- Short or choppy hand movements with angry or hostile verbiage could be a sigh of impending attack.

## Spotting a Hidden Gun
### Body Language

- Asymmetrical Gait; weight of gun causes shorter stride on carry side, also restricted arm movement that side.
- Upper Body Shift; on officer approach will turn gun side away. Might also pull arm in on gun side.
- Quick Adjustment; circular movement of hand/forearm to adjust gun position especially during vertical body movement.
- Running w/gun; likely to support gun w/hand or arm while running or moving quickly.
- Clothing issues; uneven fit, hand rests on gun, holster bulge or printing, styles don't match, inappropriate for weather, repeatedly adjusting clothing, shirt tail partly out on only one side.

6

2/18/2016

---

### Psychomotor Domain
### Blooms Taxonomy Updated

- Imitating: student sees a skill & attempts to repeat it.
- Manipulating: student does the skill in recognizable fashion.
- Refining: student can do the skill with exactness or near perfection.
- Articulating: student adapts the skill into new situations, combining more than one skill.
- Naturalizing: student does multiple skills with ease & little mental or physical exertion.

---

### Adult Learning Theory
### Physical Skills

- Students must be able to do three things:
- See it.
- Understand it.
- Do it.

---

### Types of Physical Skills Students

- One way connect. They see it & do it.
- One way disconnect. They see it but do something else.
- Two way disconnect. They see it, think they see something else & do that instead.
- Three way disconnect. They see it, think they see something else, & do something still different.

*[handwritten: VERBALLY]*
*[handwritten: → CORRECT PHYSICALLY FORWARD & BACKWARD]*

7

2/18/2016

## Four Steps of Instruction
### Classical Education

- Introduction of the topic/material.
- Presentation of the topic/material.
- Application of the topic, material or information.
- Testing/confirmation that the material/topic or information was understood and received in a useable form.

## Learning Styles

- Somewhere between 3-4 basic learning styles.
- Additional 4-7 learning style preferences.
- Personality types can impact learning styles.
- Many students combine more than one learning or preference style.

## 4 TYPES Basic Learning Styles
### (Types of Learners)

- Visual learners (through seeing).
- Auditory learners (through hearing).
- Kinesthetic learners (through doing). — WILL START BY INSTRUCTION
- Rhythmical learners (through patterns, beats).

2/18/2016

## Pre-Course Documentation
### (Lesson Plans)

- Topical outline.
- Hour outline or distribution sheet.
- Expanded outline.
- Narrative outline.
- Safety plan.
- Instructor resume (CV).

*TIME LINE BLOCK*

*I A*

---

## Post Course Documentation

- Course roster.
- Attendance roster.
- Examination/test results.
- Remediation attempts/reports/results.
- Injury reports.
- Evaluations.
- Pass/fail sheet/Certificates.

*COURSE WHO SIGNED UP*

*ATTEDANCE WHO ACUTUALLY SHOWED UP*

---

## P.O.S.T. Learning Domain 20
### Use of Force

- Be familiar with it.
- *Any officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. Page 1-3.
- Peace officers are responsible for becoming familiar with & complying with their agency's policies & guidelines regarding the use of force.
- Lists the force options recognized by POST.



*836.5*



9

2/18/2016

## LD 20 Force Options Page 2-8

- Verbal Commands/Instructions/Command Presence.
- Control Holds/Takedowns.
- Impact Weapons.
- Electronic Weapons.
- Chemical Agents.
- Firearms.
- Body Weapons.
- Impact Projectile.
- Carotid Restraint Control Hold.

---

## Resistance Defined
## LD 20 Page 2-6

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Compliant | Subject offers no resistance | Mere professional appearance. Non-verbal actions. Verbal requests and commands. |
| Passive non-compliant | Does not respond to verbal commands but also offers no physical form of resistance | Officer's attempt to take physical control, including lifting/carrying. Verbal holds and techniques to direct movement or immobilize a subject. |
| Active resistance | Physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, running away or verbally signaling an intention to avoid or prevent being taken into custody | Control holds and techniques to control the subject and to make an arrest. Use of personal weapons in self-defense and to gain advantage over the subject. Use of devices to secure compliance and ultimately gain control of the situation. |

---

## Resistance Defined
## LD 20 Page 2-7

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Assaultive | Aggressive or combative; attempting or threatening to assault the officer or another person | Use of devices and/or techniques to secure compliance and ultimately gain control of the situation. Use of personal body weapons in self-defense and to gain advantage over the subject. |
| Life-threatening | Any action likely to result in serious injury or possibly the death of the officer or another person | Utilizing firearms or any other available weapons or action in defense of self and others. |

2/18/2016

## Ground Controls LD 33
### TTS LD 33 2/1/14

VIII. Learning Need

Peace officers must be familiar with the basic movements & Arrest & Control techniques associated with ground control.

LEARNING OBJECTIVE

A. Discuss various ground positions & their associated risks

B. Demonstrate basic ground control positions when controlling a subject

C. Demonstrate a defense against a takedown attempt

D. Demonstrate defenses from choke holds.

E. Demonstrate escape and/or reversal skill(s) on the ground including the following positions:

1. Top mount
2. Back mount
3. Side mount
4. Guard

F.    Demonstrate weapon retention from various positions on the ground

---

## P.O.S.T. Learning Domain 33
### Arrest Methods/Defensive Tactics

- Principles of Defensive Tactics.
- Person Searches.
- Controlling Force: Control Holds & Takedowns.
- Carotid Restraint Control Hold.
- Restraint Devices.
- Firearm Retention & Takeaways.
- Use of Impact Weapons.
- Transporting Prisoners.

---

 LD 33 Chapter One Page 1-5

- Distractions can separate the mind from the body. When officers become distracted, they become vulnerable as do suspects. Distractions may be a valuable part of the arrest/detention process.

11

2/18/2016

## Control Defined LD 33
### Page 1-11

- **General Control** is the degree of **influence** that peace officers must exert over subjects in order to take them safely into custody. The subject may still have options for movement while under the general control of a peace officer.
- **Physical Control** is the application of specific control holds or other techniques applied by a peace officer which allows the subject to move only in the direction and manner the peace officer chooses.

## Personal Body Weapons LD 33
### Page 1-15

- Some body parts may be used as personal weapons against peace officers by a combative subject.
- Peace officers may also use personal weapons to strike available targets during an arrest/detention to control a combative and/or resistive subject, especially during ground control encounters.

## Controlling Force LD 33
### Page 3-4

- The primary goal of using force is to gain control of a subject. Officer considerations for using force include, but are not limited to, the;
- immediate threat to the safety of peace officers or others
- actively resisting or attempting to flee
- severity of the crime at issue
- Intense, uncertain and rapidly evolving circumstances.

2/18/2016

## LD 33 V 4.1 4/1/14 (p. 8-1)
### Overview Chapter 8 Ground Control

**Learning need:**
Peace officers must be familiar with the basic movements and Arrest and Control techniques associated with ground control.
The chart below identifies the student learning objectives for this chapter.

**Learning Objectives:**
After completing study of this chapter, the student will be able to:

Discuss the various ground positions and their associated risks.
Demonstrate basic ground control positions when controlling a subject.
Demonstrate a defense against a takedown attempt.
Demonstrate defenses against a choke holds.
Demonstrate escape and/or reversal skills on the ground including the following positions: Guard-Top mount-Back mount-Side mount
Demonstrate weapon retention from various positions on the ground.

---

## Ground Positions p. 8-3

**Introduction**
During altercations Peace officers may find themselves on the ground in various positions. This chapter will describe common ground positions of control.

**Objective**
Ground altercations are inherently high risk for peace officers with the potential for serious injury or death. Peace officers should be familiar with various ground control positions in order to establish control and survive a violent encounter.

If a peace officer is unable to establish or maintain control in a ground position, the peace officer should attempt to move to a standing position of advantage which would allow the peace officer access to other force options.

---



13

2/18/2016

## Choke Escapes p. 8-8

- Peace officers must recognize being strangled by a suspect could result in serious bodily injury or death. Peace officers should be able to defend themselves against a variety of "choke" attacks from multiple positions.
- The critical nature of this type of attack may leave a peace officer unable to defend themselves or others. The peace officer must react quickly to regain a position of advantage.
- The peace officer should be aware of the suspect accessing the officer's equipment.
- The peace officer should consider other force options to assist them in escape techniques.

---

### Analyzing The Science & Outcome of Prone Restraint

- Darrell L. Ross, Ph.D. Valdosta State Univ.
- "There is little scientific evidence to support the notion that prone restraint results in life-threatening respiratory compromise or asphyxia." (Dr. Ted Chan, '12; Dr. Tom Nueman, '12; Dr. Pansecu, '12; Dr. Laposta, '12; Dr. Vilke, '12; Dr. DiMaio, '06; Dr. Karch, '12.)
- "Cannot quantify the exact amount of weight, but it is faulty to theorize weight on back, in the prone position creates asphyxia sufficient to cause death." (Dr. Nueman, '05; Dr. Ho, '11)

*NO SCIENTIL EVIDE TO SUPPRT*
*POSITIONAL ASPHYXIATION*

---

### Nature of the Ross Prone Restraint Study

- 1 year multi-site study.
- January to December 2013.
- Institution Research Bureau approved.
- 20 agencies approached.
- 18 voluntarily agreed to participate (CEO & legal).
- Unanimity guaranteed to all agencies.

14

2/18/2016

## Conclusions of Prone Restraint Study

- NO ONE DIED!!! NOT ONE SUBJECT DIED!!!
- Officers used reasonable control measures.
- Prone restraint for high levels of resistance & violence.
- Used in less than <1% of reported arrests!
- Prone & weight on back did NOT create risk.
- CEW, prone, weight on back & continue to resist, did not create adverse risk.
- Handcuffed & hobbled & weight applied did not place subject at adverse risk.
- No level of control or restraint produced adverse risk.
- 80% no injury to subject; injury likely due to subject's own resistance.

## Officer Safety & Force Response

- Use Team Takedown due to extreme strength.
- Ground, control & restrain quickly.
- Prone & control arms, legs, & head.
- Control wrists with 3 sets of cuffs.
- Control/restrain legs as needed.
- Summon command personnel & EMS.
- Monitor for medical & functional consciousness.
- Once controlled, turn over to EMS.
- EMS transport to medical facility.

USE RADIO TRANSMISSIONS TO TIMESTAMP

BODYTEMP RECORDED @ TIME OF DEATH

## Conclusions from Prone Restraint Study

- No techniques or equipment completely risk free.
- Shows officers appropriately responded to subject resistance.
- Shows prone restraint is safe, preferred, & injury minimal. NO ONE DIED!
- No reliable scientific human study found evidence that PA & prone restraint cause death.
- No reliable scientific human study found evidence that CED application cause death.

15

2/18/2016

FALSE   NUMOUS STUDIES ON CAROTID

## Carotid Related Studies

- Archives of Neurology & Psychology 1943 50:510-528.
- "Acute Arrest of Cerebral Circulation in Man."
- Lt. Ralph Rossen U.S.N.R. & Herman Kabat MD, PhD & John Anderson.
- 126 normal young male subjects (inmates) and 11 schizophrenic patients.
- NO deleterious effects were observed from repeated tests on these subjects.
- Periods of acute arrest of cerebral circulation for as long as one hundred seconds appear to be well tolerated & followed by rapid & uneventful recovery.

STUDY:

RESTRICTED   110 SEC

NO   DELETERIOUS EFFECTS

## Carotid Control Restraint Studies
### (Vascular Neck Restraint)

- Physiological Studies on Choking in Judo, Ikai, M. Et al. 1958.
- Medical Studies on Choking in Judo, Suzuki, E. 1958.
- Choking in Judo, Special Reference to Electroencephalographic Investigation, Suzuki, E. 1958.
- The Choke Hold Controversy, Pat Zaharopoulos, circa 1984.
- Medical Analysis of Police Choke Holds & General Neck Trauma, Kornblum, R., M.D., 1986.

CORN BLUME STUDY

## Carotid Control Studies
### continued

- Custody Death Task Force, City of San Diego, 1992.
- Principles of Judo Choking Techniques, Ohlenkamp, Neil, 1996.
- Medical Aspects of Criminal Strangling/Choking, McClane, G. M.D., 1996.
- Deaths Allegedly Caused by the Use of Choke Holds (Shime-Waza), Koiwai, E.K. M.D., 2002.

16

2/18/2016

AVAL ON-LINE

### Carotid Control Studies
continued

- Technical Report TR-01-2007 Calgary Police Service Neck Restraint Literature Review. Barrows, N., August 2006.
- Technical Report TR-03-2007 National Study on Neck Restraints in Policing, Hall, C. M.D. NSc FRCPC, June 2007.

NO VALID DEATH FROM
PROPERLY APPLIED CAROTID

VAGUS NERVE
### Vasovagal Syncope

- A reflex of the involuntary nervous system that causes the heart to slow down.
- Vagus nerve is over stimulated by physical or psychological distress.
- The heart puts out less blood, the blood pressure drops, & what blood is circulating tends to go into the legs rather than the head.
- The brain is deprived of oxygen & the fainting episode occurs.
- Most common cause of fainting. Occurs when body overreacts to triggers, such as sight of blood or extreme emotional distress.
- Other triggers: standing for long periods; heat exposure of dehydration; fear of bodily injury; straining, injury or shocking accident; pain; poor physical condition; fasting; heart disease.

NOTE ON BOOK PRWORK

TEST QUESTION
### Hazards of the Carotid Control

- Frontal pressure, stay off of the throat!
- Time of application; no longer than 30 seconds of sustained pressure.
- Age of the suspect; not to the very young or the very old.
- Vagus nerve stimulation; *not more than once in a 24 hour period, unless exigent circumstances; properly documented.

DIFF COMMON REACTIONS

17

2/18/2016

### Common Side Effects of Properly Applied Carotid

- Unconsciousness.
- Involuntary muscular convulsions.
- Lose of control of bowel/bladder.
- Bleeding from nose or eye ducts.
- Eyes roll back.
- Vomiting.

TEST

### Owens v. Haas
### 601 F.2d 1242 (1979)

- Individual officers must be trained to perform the requirements of their job.
- Members of the public, officers, or suspects can sue for negligent training, supervision, or retention.
- Training needs to be "street real" as much as safety will allow.

### Anderson v. Creighton
### 483 U.S. 635, 107 S.Ct. (1987)

- Reasonably well trained officer is the standard by which liability will be examined.
- If the officer meets the standard, a qualified immunity applies.
- Makes a distinction between "specially & reasonable trained."
- Like or similar officer standard.

18

2/18/2016

### Hays v. Jefferson County, Kentucky
#### 665 F.2d (1982)

- Unstructured training may not fulfill responsibilities to train.
- The nature, scope, and quality of training must be documented and its relevance to job performance identified.

### Whiteley v. Warden
#### 401 U.S. 560

- If it isn't documented, it didn't occur.
- If information is to the agency's benefit and it is not already documented, it did not occur.

REPORT WRITING

✱ REMEMBER

### Sager v City of Woodland Park
#### 543 F.Supp. 282 (1982)

- Established Instructor to Administration & Administration to Instructor responsibilities for training.
- 1. Student/officer (Direct Liability).
- 2. Instructor/supervisor (Indirect/Vicarious Liability).
- Division Head/Administration/Governing Body (Respondeat Superior).

3 AREAS OF LIABILITY

INSTRUCTOR LIABLE for instructor
STUDENT

19

2/18/2016

### Harris v. City of Canton Ohio
109 S.Ct. 1197 (1989)

- Established a standard of **Deliberate indifference to a recognized training need.**
- Failure to train can be a basis for municipal liability.
- Lack or inadequacy of training manifests deliberate indifference to constitutional rights in recurrent citizen-police contacts.

### Bordanaro v. McLeod (City of Everett)
871 F.2d 1151 (1st Cir. 1989)

- **Expanded the deliberate indifference standard to the areas of recruitment, training, retention, supervision and discipline.**
- Court found that the incident involved the entire night watch of the PD & the chief should have known of the unconstitutional arrest practice.

### Doe v. Borough of Barrington
729 F.Supp. 376 (D.N.J. 1990)

- **Extended the theory of deliberate indifference to projected training needs.**
- The court found the failure to provide officers with any training at all on the subject-despite the knowledge that other agencies had-amounted deliberate indifference to privacy rights.

2/18/2016

### District of Columbia v. Parker
850 F.2d 708 (1988) Docked S.Ct.

- The agency is responsible to ensure the officer is in good physical condition and provide the means to maintain their condition.
- Agencies must provide training in required tasks, specifically; general physical skills, disarmament training, subduing a suspect with physical force instead of deadly.

*TEST*

### Graham v. Conner
109 S.Ct. 1865 (1989)

- All Arrests/Detentions are governed by 4th amendment and **objective reasonableness standard (objectively reasonable force).**
- Facts & circumstances known to the office at the time force was used.
- Officer's state of mind will not be taken into consideration.

### Factors of Objective Reasonableness to be Considered

- Scope of the intrusion (degree & extent of force).
- Manner of intrusion (type of force used).
- Place where the force was used.
- Need to perform official duties.
- Justification for the use of force.
- Facts and circumstances.
- Severity of the crime involved.
- Suspect pose an immediate threat to officer/others?
- Suspect actively resist or flee?

 MOST IMPORTANT

21

2/18/2016

## Excessive Force Investigations

- Do you KNOW your use of force policy?
- Does your policy match statutory law & state & federal court precedent?
- Does it match POST standards/training?
- Are your instructors up to date and in line with current industry wide standards?
- Don't abdicate your authority/responsibility to make the ultimate decision.

## Investigative Steps

- Who initiated the complaint?
- Decision maker aware of current training of officers?
- Primary investigator framing of questions.
- Have departmental instructors (experts) had input?
- If video(s) available, have they been enhanced?

## Eyewitness Testimony

- Wells et al. (1998) study; 40 people convicted later cleared by DNA. 90% of cases false eyewitness identification.
- Rattner (1988)study 205 wrongly convicted; 52% inaccurate eyewitness testimony.
- Brandon & Davies(1973)study; 70 wrongly convicted due to inaccurate eyewitness testimony.

22

2/18/2016

## Eyewitness Accuracy

- Behrman & Davey (2001) Analyzed 271 cases
- Compared accuracy of identification with extrinsic evidence.
- Results:
- Field show ups: 76% accurate.
- Photographic line ups: 48% accuracy.
- Live line ups: 50% accurate.



## Forrester v. San Diego
### 25 F.3d 804 (9th Cir. 1994)

- Officers are <u>not required to use the least intrusive degree or force possible, but rather, required to use reasonable force.</u>
- Less painful, less injurious options not an issue.
- Officers acted reasonably in using pain compliance techniques on demonstrators.

NOT REQUIRED TO USE LEAST
AMOUNT OF UOF.
PAIN RELEASED UPON
COMPLIANCE

## Scott v. Henrich
### 39 F.3d 912 (9th Cir. 1994)

- Officer is not required to use the least intrusive alternative when confronted with a deadly force threat.
- Appropriate inquiry is whether officers acted reasonably, not whether they had less intrusive alternatives available to them.

23

2/18/2016

---

### Reed v. Hoy
#### 909 F.2d 324 (9th Cir. 1990)

- Officer has no duty to retreat in a self-defense situation. (835a PC)
- Personnel must be trained on the constitutional limits on the use of force.

NO RETREAT DUTY

---

### Elliot v. Leavitt
#### 99 F.3d 640 (4th Cir. 1996)

- Constitution simply does not require police to gamble with their lives in the face of a serious threat.
- Cuffed suspect in front seat of patrol car arms himself with small handgun, finger on trigger.
- Officers challenge, and then fire 22 shots killing the suspect.

---

### Adams v. City of Fremont
#### 68 Cal. App. 4th 243 (1998)

- No duty to act reasonably to prevent suicide when police officer kills armed 5150.
- No legal duty if their conduct failed to prevent the threatened suicide.
- Officers did not act with bad faith or reckless indifference to the consequences of their actions.

24

2/18/2016

KEY CASE

### Hainze v. Richards
No. 99-50222, 207 F.3d 795 (5th Cir. 2000)

- Once the scene is secure and no threat exists, then there is a duty to reasonably accommodate a person's disability, not before.
- Officer's use of deadly force appropriate.
- Deadly force to restrain mentally disabled individuals who assaulted others with deadly weapons was not actionable as a denial of benefits to disabled persons.

### Hainze v. Richards
continued

- Title II of ADA does not apply to an officer's on the street responses to reported disturbances or other similar incident, whether or not those calls involve subjects with mental disabilities.
- Complying with ADA in exigent situations prior to securing the safety of themselves & others would pose an unnecessary risk to innocents.

LD37 OFFICERS DO
NOT NEED TO COMPLY
W/ADA UNTIL
SCENE IS SAFE
AND THERE IS NO MORE
THREAT

### Pham v. City of San Jose et al.
5:11-CV-01526-EJD (9/30/13)

- The emergency originates in police officers' caretaking function & allows them to respond to situations that endanger lives or threaten personal injury.
- Warrantless entry is justified in order to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.
- This circuit (9th) has rejected the notion that there is a per se rule requiring mentally disabled persons to be treated differently.
- That officers had "less intrusive alternatives available to them" & perhaps should have used a different tactical plan, officers need only act "within that range of conduct...identified as reasonable."

2/18/2016

### Levine v. City of New York
#### N.Y. Bronx County Superior Court (Dec. 1995)

- $1 million settlement reached prior to trial.
- Suspect suffered nerve damage due to tight handcuffing, resulting in his loss of employment as a carpenter.
- Arrested as a result of a traffic stop.

### LaLonde v. County of Riverside
#### 98-55887 (9th Cir. 2000)

- LaLonde complained for 20-30 minutes about the tightness of the handcuffs & OC spray.
- District court was reversed in all respects and case returned for jury trial/consideration of facts.
- it was difficult, if not impossible, to say that the only reasonable conclusion the evidence permitted was that the force was reasonable.

### Kostrzewa v. City of Troy
#### 00-1037 U.S. App. LEXIS 7362 (6th Cir. 2001)

- Overly tight application of handcuffs on nonviolent detainee may be excessive force.
- To make a blanket statement that the use of handcuffs on detainees in all cases is objectively reasonable is at odds with the Graham case.
- The facts in each case must be examined when determining reasonableness.

26

2/18/2016



### Samaan v. Robbins
173 F.3d 1150 (9ᵗʰ Cir. 1999)

- Officer admittedly grabbed suspect, pushed him to the ground & administered a single kick to his rib cage to knock the wind out of him and incapacitate him.
- Found the officer's split second judgment in a tense, uncertain & dangerous situation objectively reasonable.

_____
_____
_____
_____
_____
_____



### Burns v. Honolulu
District Ct. #79-0274, #81-4665 (9ᵗʰ Cir. 1982)

- The use of a carotid control hold makes post arrest medical care mandatory.
- Frequent checks should be performed over a period of several hours, since application of the hold may cause death hours later from physiological factors.

POST CAROTID MEDIC IS
MANDATED
_____
_____
_____
_____
_____

### City of Los Angeles v. Lyons (1983)
461 U.S. 95 (103 S.Ct. 1660, 75 L.Ed. 2d 675)

- Injunction placed against LAPD from using "choke hold" in less than deadly situations.
- Supreme Court overturns injunction issued against LA police regarding use of choke holds.
- The technique should be regulated by the agency and not the court system.

_____
_____
_____
_____
_____
_____

27

2/18/2016

### Nava-Bennett v. CHP
C931309 CW, LA Daily Journal (1994)

- Officer should be trained to take care of an unconscious suspect after application of the carotid.
- Officer should be trained when to release the carotid to prevent infliction of frontal throat damage & alternate methods of positioning the suspect for application of the hold.
- Officer needs specific training on positioning & controlling the suspect during & after application.

### Nava v. City of Dublin
05-16209 453 (9th Cir. 1997)

- Federal appeals court overturns injunction against California Highway Patrol officers using carotid hold except when necessary to prevent death or serious bodily injury.
- Active, not passive (step by step) training.
- Post carotid first aid.
- Apply from different positions.

### Ann Price et al v. County of San Diego
CIV-1917-R(AJB) (1998)WL 16007 (S.D. Cal.)

- Positional Asphyxia is refuted by the UC at San Diego Medical Center study.
- Hogtie restrains DO NOT affect blood oxygen or carbon dioxide levels & does NOT lead to asphyxia.
- Dr. Reay's studies, by all accounts, are wholly flawed.
- The hogtie restraint is "physiologically neutral".

28

2/18/2016

## Tatum v. C. & C. of San Francisco
### CV02-04785 SBA (9th Cir. 4/3/2006)

- 9th Cir. Affirms District Court summary judgment.
- "Restraining a person in a prone position is not, in and of itself, excessive force, when the person restrained is resisting arrest."
- Objectively reasonable to position Fullard on his stomach for approximately 90 seconds.
- No evidence that officers applied crushing pressure to Fullard's back or neck as he lay prone.

## Smith v. City of Hemet
### No. 02-56445 (9th Cir. 1/10/05)

- Vera Cruz v. Escondido overturned in 8-3 decision.
- Deadly force has the same meaning as other federal circuits.
- Deadly force is force that creates a substantial risk of causing death or serious bodily injury.
- Smith engaged in at least 3-4 acts of PC148 (a)(1) before officers used force.

## Headwaters Forest v. Humboldt County
### 9817250 (9th Cir. 5/4/2000)

- Remanded for a new trial on the facts.
- Our opinion in Forrester suggests that the nature & uncontrollable pain caused by pepper spray distinguishes it from "pain compliance technique."
- District court trial determined that OC force was reasonable but method of application was inappropriate & excessive force. No long term injuries to plaintiffs.
- $1.00/plaintiff awarded. $750,000 in fees split between 10 attorneys.

29

2/18/2016

## Deorle v. Rutherford (Butte County)
### 99-17188 (9th Cir. 2001)

- Deliberately shooting an unarmed individual with a less lethal bean bag round at close range w/o warning is excessive force in violation of the 4th Amendment.
- "Cloth cased shot" constitutes force that carries a significant risk of serious injury, to be used only when a strong governmental interest compels so high a degree of force.

## Bryan v. McPherson
### 08-55622 (9th Cir. 2009)

- Officer's use of taser was unconstitutionally excessive & violation of rights.
- Jury could find that Bryan presented no immediate danger to officer & no force necessary.
- Tasers/Stun guns are non-lethal force.
- High levels of pain, foreseeable risk of physical injury, physiological effects lead us to conclude that X26 & similar devices are a greater intrusion than other non-lethal methods of force.
- Unlike police nunchakus the pain delivered by X26 is far more intense, not localized, external, gradual, or within the victim's control.

## Mattos v. Agarano
### 08-15567 (9th Cir. 1/12/2010)

- The 4th amendment does not require an officer to use the minimum amount of force necessary.
- The severity of the crime, threat to the officers & magnitude of the resistance tips decisively in officers' favor.
- We view the officers' safety as the most important of the three Graham factors.
- We are left with evidence that the Taser is more than a non-serious or trivial use of force, but less than deadly force.
- The officers did not violate Jayzel's constitutional rights.
- We cannot conclude that the officers used excessive force.
- Taser was a serious intrusion into the 4th amendment.

30

2/18/2016

## Brooks v. City of Seattle
### 08-35526 (9th Cir. 3/26/10)

- Taser in drive stun mode causes temporary, localized pain only.
- Drive stun mode is painful, but also temporary, localized, w/o incapacitating muscle contractions or significant lasting injury.
- Unlike the force used in Bryan v. McPherson.
- Force here was more on par with pain compliance techniques, which this court has found involve a "less significant" intrusion upon an individual..., even when they cause pain & injury.
- We find the quantum of force here to be less than intermediate.

---

## Mattos v. Agarano & Brooks v. Seattle en banc 9th Cir. Ruling (10/17/11)

- Plaintiff's in both cases have alleged constitutional violations, officers are entitled to qualified immunity, because the law was not clearly established at the time of the incidents.
- We reverse the district court's denial of qualified immunity.
- In Brooks, we affirm district court's denial of immunity on state law assault & battery claims against officers.
- We apply Graham by 1)how severe the crime at issue is, 2)suspect pose an immediate threat to safety of officers/others, 3)suspect actively resisting arrest or attempting to evade arrest.
- We examine the totality of circumstances, "Whether specific factors may be appropriate in a particular case, whether or not listed in Graham.

---

## En Banc Statement Regarding Taser Use in Brooks Case

- Officers used excessive force. The record is not sufficient for us to determine what level of force is used when a Taser is deployed in stun gun mode.
- We have no difficulty deciding that driving 32 mph in 20 mph zone & refusing to sign citation are not serious offenses.
- Brooks was initially compliant, never verbally threatened officers, no indication of being armed & behind wheel of her car she was not physically threatening. Once car keys were on floor board, she was not even a potential threat, much less immediate one.
- Brooks resistance did not involve violence towards officers, she did not attempt to flee, no exigent circumstances.

31

2/18/2016

## En Banc Statement Regarding Taser Use in Mattos v. Agarano

- Officers used excessive force against Jayzel Mattos. Her interference did not rise to level of obstruction.
- Jayzel posed no threat to officers. We draw a distinction between a failure to facilitate an arrest & active resistance to arrest.
- The officer gave no warning to Jayzel before tasing her pushes this use of force far beyond the pale. An officer's failure to warn when it is plausible, weighs in favor of finding a constitutional violation.
- **A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest, that standing alone, justifies the use of force that may cause injury.**

## Chief Justice Alex Kozinski's Comments in Dissent

- Brooks & Mattos breached the covenant of cooperation by refusing to comply with police orders. When citizens do that, police must bring the situation under control.
- As a result (of these decisions) officers face an ever present risk that routine police work will suddenly become dangerous.
- The Taser is a safe alternative: it's effective at a range 15-35 feet, so officers can use it without engaging in personal combat.
- Officers deployed Tasers & were able to defuse situations without anyone getting seriously hurt. We Can't' be sure the results would have been as good had the police used other methods.
- The majority is reduced to counting the seconds between Tasings, finding Brooks had no time to recover & reconsider. BULL PUCKY!

## Chief Justice Kozinski's Comments Continued

- Jayzel's husband was combative & Jayzel came to his defense instead of letting the police do their work.
- Officers must maintain a defensive posture throughout their investigation, operating under the assumption that "violence may be lurking & explode with little warning."
- The danger was obvious: It came from the out of control drunken husband. He needed to be subdued at once. By interfering Jayzel wasted precious time.
- A citizen has no right to refuse to follow reasonable police orders to tie up police resources endlessly or to interfere with an arrest by standing in the way & insisting that the police leave the scene of the crime.

2/18/2016

### Mark Young v. County of Los Angeles
#### 09-56372 (9th Cir. 2011)

- Use of intermediate force is unreasonable when officer has detained suspect for minor infractions & poses no threat to officer or public.
- Both OC spray & baton blows are force capable of inflicting significant pain & causing serious injury, both are regarded as "intermediate force."
- It must be justified by a commensurately seriuos state interest.
- It is rarely necessary for an officer to employ substantial force w/o warning against a suspect for minor offenses, not resisting arrest, doesn't pose threat to officer or public.

---

\* Case For Trainer

### Liu v. City & County of San Francisco
#### Cal.App. 1st Dist. (12/11/12) Cal.App. LEXIS 1248

- Court held that sworn officers filling administrative roles may be called upon in emergencies to perform physically demanding police work.
- Ability to make arrest, pursue fleeing suspects & respond to emergencies is an essential function of even administrative positions.

---

### Bushnell v. Japanese American Religious & Cultural Center & Concord Judo Club

- 50 Cal. 2d 671-43  Cal. App. 4th 525
- Student must assume the risk of injury in a physical class designed to improve the student's skills.
- Instructor is not responsible for incurred injury.

33

2/18/2016

---

### Pfau v. Kim's Hapkido
Daily Journal D.A.R. 8247 (1999)

- Student injured in a police training class can not sue the instructor or other students for damages.
- Student assumes the risk of injury in attending class.
- Even if the class is a mandated training assignment.

---

### Rodrigo v. Koryo Martial Arts
Cal.App. 4th A096513 (7/31/02)

- Instructor's duty limited to acting in a fashion that doesn't increase the risks inherent in learning a sport.
- Liability only if intentional injury or reckless conduct totally outside ordinary action.
- Primary assumption of risk unless instructor acts to increase the risk of harm in the sport.
- Instructor's duty is to not increase the risks inherent in the learning process.

---

### Hamilton v. Martinelli & Associates
Cal. App. 4th E031683 (7/23/03)

- Doctrine of primary assumption of risk barred plaintiff's claims.
- No evidence that defendant exceeded the boundaries of the normal risks associated with this type of training.
- Defendant performed a training maneuver on plaintiff, not an attack.
- No duty is owed to a peace officer who is engaged in training to meet an emergency situation.

2/18/2016

### Saville v. Sierra College
#### C047923 Cal.App. 3d (10/26/05)

- Complaint was barred by doctrine of primary assumption of risk.
- The takedown maneuvers bear similar risks of injury inherent in many sports. The maneuvers are inherently dangerous.
- Whenever gravity is at play with the human body, the risk of injury is inherent.
- Even with the steps taken by the instructors, plaintiff suffered injury from that particular risk.
- Plaintiff did not advise of pre-existing neck injury.

### Testing Format

- Written exam: Value 25 points.
- Demonstration exam: Value 25 points.
- Teaching exam: Value 25 points.
- Spontaneous attack exam: Value 25 points.
- Total points possible: 100 points.
- 80 points required to certify.

35

2/18/2016

# Exhibit B

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4

   CHRISTOPHER WROTH and MARNI    )

5   WROTH,                         )
                                   )
6              Plaintiffs,         )
                                   )   CASE NO. 3:17-cv005339-JST
7       vs.                        )
                                   )
8   CITY OF ROHNERT PARK, DAVID    )
   SETTIG-WATTSON, SEAN HUOT,      )
9   MATT HUOT, MIKE WERLE, ERIC    )
   MATZEN and DOES 1-25,           )
10                                 )
               Defendants.         )
11  _____)

12

13            DEPOSITION OF BRIAN MASTERSON

14              Sebastopol, California

15            Tuesday, September 11, 2018

16

              REPORTED BY:  Sandra Beechinor

17                     CSR No. 3388

18

19

20

21

22

23

24

25  PAGES 1 - 81

                                        Page 1

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

CHRISTOPHER WROTH and MARNI        )

4    WROTH,                            )

                                       )

5                Plaintiffs,           )

                                       )  CASE NO. 3:17-cv005339-JST

6        vs.                           )

                                       )

7    CITY OF ROHNERT PARK, DAVID       )

    SETTIG-WATTSON, SEAN HUOT,         )

8    MATT HUOT, MIKE WERLE, ERIC       )

    MATZEN and DOES 1-25,              )

9                                      )

                Defendants.            )

10   _____)

11

12

13

14

15

16

17

18

19

20        Deposition of BRIAN MASTERSON, taken before SANDRA

21   BEECHINOR, a Certified Shorthand Reporter for the State of

22   California, with principal office in the County of Sonoma,

23   commencing at 1:20 p.m., Tuesday, September 11, 2018, at the

24   offices of IZAAK SCHWAIGER, 130 Petaluma Avenue, Suite 1-A,

25   Sebastopol, California.

                                              Page 2

```
1   APPEARANCES OF COUNSEL:

2   FOR PLAINTIFF:

3        LAW OFFICES OF IZAAK SCHWAIGER
         BY:  Izaak Schwaiger, Esq.

4        130 Petaluma Avenue, Suite 1-A
         Sebastopol, California  95472

5        TEL:  (707) 595-4414
         FAX:  (707) 381-1983

6        E-MAIL:  izaak@izaakschwaiger.com

7

8   FOR DEFENDANT CITY OF ROHNERT PARK:

9        GEARY, SHEA, O'DONNELL, GRATTAN & MITCHELL, P.C.
         BY:  Raymond J. Fullerton, Jr., Esq.

10       90 South E Street, Suite 300
         Santa Rosa, California  95404

11       TEL:  (707) 545-1660
         FAX:  (707) 545-1876

12       E-MAIL:  rfullerton@gearylaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25
                                          Page 3
```

```
1                          I N D E X
2
   WITNESS                                  EXAMINATION
3
   BRIAN MASTERSON
4
   Examination by:                             PAGE
5
   MR. SCHWAIGER                                  5
6
7
8                       E X H I B I T S
9  EXHIBIT              DESCRIPTION            PAGE
10   Exhibit 1      Notice of Deposition of
                    Brian Masterson             39
11
     Exhibit 2      Rohnert Park Department of
12                  Public Safety Policy 302 re
                    Use of Force Review Boards  39
13
     Exhibit 3      Rohnert Park Department of
14                  Public Safety Policy 310 re
                    Officer-Involved Shootings and
15                  Death                       66
16   Exhibit 4      Rohnert Park Department of
                    Public Safety Policy 309 re
17                  Conducted Energy Device     77
18   Exhibit 5      Rohnert Park Department of
                    Public Safety Policy 300 re
19                  Use of Force                77
20
21            WITNESS INSTRUCTED NOT TO ANSWER
                          (NONE)
22
23
              INFORMATION REQUESTED
24                      (NONE)
25
```

Page 4

```
1                          BRIAN MASTERSON,
2    called as a witness by and on behalf of the Plaintiffs, and
3    having been first duly sworn by the Certified Shorthand
4    Reporter, was examined and testified as follows.
5                             EXAMINATION
6    BY MR. SCHWAIGER:
7        Q.   Can you please state and spell your full name for
8    the record.
9        A.   Sure.  Brian Masterson.  B-r-i-a-n.
10   M-a-s-t-e-r-s-o-n.
11       Q.   Okay.  Mr. Masterson, my name's Izaak Schwaiger.
12   This is my card.
13       A.   Okay.
14       Q.   I represent Christopher and Marni Wroth, who are
15   the parents of Branch Wroth, who died in police custody
16   last -- well, one May beyond last.  So a little more than a
17   year ago.
18       A.   Right.
19       Q.   So we're here today to talk about some questions
20   that revolve around those events.  If I say, "the incident,"
21   that's what I'm referring to; if I say, "the events," that's
22   what I'm referring to.
23            Have you given your deposition previous to today?
24       A.   I have.
25       Q.   How many times do you think?
```

Page 5

1      A.   Yeah, I would be.  If I was asked, I would

2  definitely serve on that committee.

3      Q.   Let's see how we're doing.  We're doing okay.  We

4  got a little bit of a later start.

5           Let me talk a little bit about Branch Wroth's

6  death --

7      A.   Okay.

8      Q.   -- your knowledge and involvement in what

9  precipitated that.  Okay?  So I would like to know first

10  off, whether your department did any administrative review

11  of the events surrounding Branch's death.

12     A.   Not -- not an official administrative review, no.

13     Q.   Was there an unofficial review done?

14     A.   I would say -- I mean I've read the report after

15  the Sonoma County Sheriff's Office concluded the

16  investigation.  I had an opportunity to review the body-worn

17  cameras.  Based on that report, completed report by the

18  sheriff's office, based on the body-worn cameras and then at

19  the very end of the process the district attorney's review

20  of that report, I have an opinion based on my review of

21  those documents.

22     Q.   So when I asked you the original question you said,

23  "not officially."

24     A.   No.

25     Q.   So is your opinion -- unofficially is what you're

Page 34

1    referring to as your opinion based on your review of those

2    items?

3        A.    Correct.  So we, you know, in conversation with the

4    city attorney, with the city manager, we talked about, you

5    know, from the night of the incident all the way through

6    what was going to happen, you know, what were the steps

7    going to be.

8            And so in that conversation with the city

9    management and the city attorney, I told them that I reached

10   out to the sheriff's -- I talked to Sheriff Freitas,

11   explained to him what occurred, asked if his agency would

12   conduct the investigation.  He said, "Absolutely.  We'll

13   provide whatever resources are necessary."

14           And he says, "Are you" -- the sheriff asked me,

15   "Are you giving me permission to conduct an investigation of

16   the incident you just described?"  I said, "Yes. He says,

17   "Okay.  I'm going to get a hold of Lieutenant Duke, who runs

18   the investigations for Sonoma County Sheriff's Office.  I'm

19   going to have him give you a call."

20           So that started the sheriff's office assuming the

21   primary responsibility for completing the investigation into

22   the events.  That took a while.  And we knew that was going

23   to take some time.  And the sheriff told us, you know, "It's

24   not going to happen quick."

25           After that, the sheriff, Tim Duke, the lieutenant,

Page 35

1    "Says once the report is done and it's completed, I'm going

2    to turn it over to the district attorney, who then is going

3    to have to make a review to determine whether or not there

4    was any criminal misfindings, criminal conduct on the part

5    of the officers involved."

6          So I knew that it was going to take a while.  And

7    then in conversation with the city attorney and the city

8    manager, we talked about having an official administrative

9    review.  In our conversation we discussed the fact that we

10   felt it would be best to use an outside subject expert.

11         MR. FULLERTON:  And I have no problem telling you

12   what came of that, but we don't want to get into specifics

13   of what you discussed with the city attorney.

14         MR. SCHWAIGER:  Q.  And there are times when that

15   is okay.  For instance, if there's someone present who is

16   not a client of the attorney -- for instance, let's say that

17   you and Mr. Fullerton have a conversation and I'm present.

18   Unless I'm also your attorney, that kind of blows up the

19   privilege, because now someone else is involved.

20        A.    Right.

21        Q.    So you can feel free --  you know, if you're

22   sitting in a council meeting and the city's attorney there,

23   that doesn't make what goes on in the council meeting

24   privileged.

25         MR. FULLERTON:  If it's in closed session?

                                                    Page 36

1          MR. SCHWAIGER:  If it's in closed session,

2     absolutely --

3          MR. FULLERTON:   --

4          THE WITNESS:  If it's open --

5          MR. SCHWAIGER:  Q.  Right.  It's public record.  I

6     think we're still in fair game here.

7     A.   Okay.

8     Q.   What outside entity did you decide would do the

9     administrative review?

10    A.   So when I retired on August the 22nd, the city

11    attorney and city manager were still discussing who they

12    were going to select.  So as I sit here today on September

13    11th, I don't know who is going to conduct the

14    administrative review.  What I do know is that they were

15    planning to have someone outside the department conduct that

16    review.

17    Q.   All right.  But today, 17 months after the critical

18    incident, it still hasn't been reviewed.

19    A.   I don't know what's transpired between, you know,

20    August the 22nd and September the 11th.  I just know that

21    you have to allow the system to work its way through.

22         The first step was to allow the sheriff's office to

23    complete their investigation.  That took quite a lengthy

24    period of time.  And then once that was done, they notified

25    me.  They said, "Hey, we've, you know, concluded our

                                                  Page 37

1   investigation.  We turned over all of our reports to the

2   district attorney."

3         I contacted the district attorney, Jill Ravitch.

4   She told me, "It's going to take several months for my

5   deputy chief to review the report by the Sonoma County

6   Sheriff's Office, and then at that point I'll make a

7   finding."

8         So I knew -- from the beginning, in conversation

9   with the attorney and the city manager, we knew the

10  administrative review was going to be on the tail end of

11  this process.

12      Q.   Why would that be the case?  Why would you have to

13  wait for the criminal investigation to conclude before

14  reviewing it administratively?

15      A.   I would say based on my experience both as an

16  assessor and with Alameda County and Rohnert Park, that

17  that's pretty typically what happens.  You allow the

18  criminal investigation to go first, to determine what the

19  facts are.  And then obviously the district attorney has a

20  responsibility to review that again to see if there's any

21  criminal conduct on the part of the officers.  It just makes

22  sense that you would do the administrative review as the

23  last piece.

24      Q.   But that piece, to the best of your knowledge, has

25  not taken place?

                                                    Page 38

```
 1              MR. FULLERTON:  Lacks foundation; asked and
 2     answered.
 3              THE WITNESS:  What I can say is on August the 22nd
 4     it had not taken place.
 5              MR. SCHWAIGER:  Q.  Are you aware, as of August the
 6     22nd, of any plan, solid, in place, for that review to take
 7     place?
 8         A.   No.
 9                   (Plaintiffs' Exhibit 1 was marked for
10                   identification.)
11                   (Plaintiffs' Exhibit 2 was marked for
12                   identification.)
13              MR. SCHWAIGER:  Q.  All right.  So I've handed
14     you -- I'll just take that off there -- what's marked as
15     Plaintiff's Exhibit No. 2.  If you'd take a minute and tell
16     me if you recognize that as your department's Policy 302 for
17     use of force review boards.
18         A.   So it does appear to be our use of force policy.
19     It's got our department name on the top.  The only thing I
20     would say, on the bottom left-hand corner on Page 1, it says
21     the adoption date was August 3rd, 2016.  So I know these get
22     updated frequently.  I don't know if this policy has been
23     updated, but I know we updated our directives in 2018.
24         Q.   Okay.
25         A.   But this does appear to be our use of force review
```

Page 39

1    board policy.

2         Q.   And this would have been then the policy that was

3    in effect at the time of Mr. Wroth's death?

4         A.   I believe so.

5         Q.   And, again, this is the use of force review board

6    policy, correct?

7         A.   Correct.

8         Q.   All right.  You're familiar with the contents of

9    this policy generally?

10        A.   I've seen it.

11        Q.   Okay.  And you're aware that under Purpose and

12   Scope your department's policy says that "this review

13   process shall be in addition to any other review or

14   investigation ... conducted by an outside or multi-agency

15   entity ... ."

16        A.   Correct.

17        Q.   All right.  So that's not just limited to, say, the

18   sheriff's department.  It's any outside or multi-agency

19   entity that may have jurisdiction over the investigation?

20        A.   Hm-hm.  Yes.

21        Q.   And are you aware of any policy in your department

22   that permits the delegation of that use of force review

23   board to an outside entity?

24        A.   If I understand your question, am I aware is there

25   any policy that allows me to delegate the responsibility of

                                              Page 40

1    this review by an outside agency?

2         Q.   Yes.

3         A.   I'm not aware of any.

4         Q.   Okay.  Has a use of force review board, as of

5    August 11th of this year, been convened by your department

6    to examine the actions of the five officers involved in the

7    critical incident?

8         A.   No.

9         Q.   Do you know why not?

10        A.   Well, we just discussed previously with the

11   questions you asked, we still have not, to my knowledge --

12   again as of leaving and retiring on August the 22nd, the

13   city has not conducted the administrative review.

14        Q.   Would an admin review be independent of the use of

15   force review board, or is that the same thing?

16        A.    In my opinion, they would be two different,

17   separate entities.  I see them as different.

18        Q.   Okay.  And you understand that pursuant to your

19   policy, the use of force review board is to be composed

20   of -- in fact, if we look at 302.4.1.

21        A.   Right.

22        Q.   It lists different people that the board's to be

23   composed of.

24        A.   Correct.

25        Q.   Including a representative of each division.  That

Page 41

1    would be police and fire, correct?

2       A.   That would be correct.

3       Q.   Commanding officer of the member's chain of

4    command?

5       A.   Correct.

6       Q.   Training sergeant?

7       A.   Hm-hm.

8       Q.   A non-administrative supervisor?

9       A.   Right.

10      Q.   A peer officer?

11      A.   Correct.

12      Q.   A sworn peace officer from an outside agency?

13      A.   Correct.

14      Q.   And a department instructor for the type of weapon,

15    device or technique that was used?

16      A.   Correct.

17      Q.   All right.  So this, per policy, has a very

18    specific composition, this board, correct?

19      A.   Hm-hm.

20      Q.   And this board is to be convened when the use of

21    force by a member results in very serious injury or death to

22    another, correct?

23      A.   That's correct.

24      Q.   All right.  Is it your opinion that this policy

25    should or should not apply to the death of Mr. Wroth?

Page 42

1     A.   Well, I would say it should apply.  I would -- I

2   would point to the second page under 302.4.2, the fourth

3   paragraph that starts -- I'll read it slowly -- "The

4   Director of Public Safety will determine whether the board

5   should delay its review until after completion of any

6   criminal investigation, review by any prosecutorial" board,

7   "filing of criminal charges, the decision not to file

8   criminal charges, or any other action.  The board should be

9   provided all relevant available material from these

10   proceedings for its consideration."

11         So, again, as we talked about kind of the process

12   that the Branch Wroth investigation went through, we had the

13   criminal investigation done by the Sonoma County Sheriff's

14   Office; we have the review by the district attorney's

15   Office.  We're going to have an admin review as determined

16   by the city manager and the city attorney.  And then I would

17   say the last piece in the process would be the use of force

18   review board after those other components have been

19   completed.

20     Q.   Why would the use -- why would the use of force

21   review board come last?

22         MR. FULLERTON:  Asked and answered.

23         THE WITNESS:  Yeah.  I did answer it, but based on

24   my -- again, my experience and my training, typically the

25   thing that's going to drive this is going to be the criminal

Page 43

1   investigation.  And obviously the sheriff's office, they're

2   not making a determination in terms of criminal misconduct

3   on the part of the officer.  They're just reporting the

4   facts.  The district attorney has that responsibility under

5   the law.

6          And then to me it seems logical that you would have

7   the admin review followed by your use of force review board,

8   because in the policy it states that the board should have

9   all available material.  To put the admin -- or the use of

10  force review board further in the process, you keep the

11  board from having some available information.  In my

12  opinion, it should be the last part of the process.

13      Q.   And to the best of your knowledge, has a use of

14  force review board been scheduled?

15      A.   As of August 22nd I wasn't aware that there was a

16  board being scheduled, the use of force review board.

17      Q.   And if one was scheduled you wouldn't have been

18  aware of it?

19      A.   Correct.

20      Q.   When you said that you reviewed some documents

21  informally regarding the death and you reviewed the

22  body-worn cameras, which documents did you review?

23      A.   Let me start with the body-worn cameras.  So the

24  body-worn camera from the officers --

25      Q.   I don't need to know about the body-worn camera.

                                              Page 44

1  A. Okay.

2  Q. I'll just assume that you watched all the body-worn

3 cameras.

4  A. Okay.

5  Q. But what reports did you review?

6  A. The reports that I read was the final investigative

7 report from the Sonoma County Sheriff's Office when they

8 concluded their investigation, and they handed me this huge

9 binder that had all their investigative reports, interviews,

10 evidence collected, all those things that you would, you

11 know, expect in a criminal investigation.  They handed me

12 the entire report.

13  Q. Who gave that to you?

14  A. I'm pretty sure it was Lieutenant Duke.

15  Q. Okay.  Do you remember when you received it?

16  A. I'm going to give you an educated guess.  I want to

17 say it was just after the holidays.  My best guess would be

18 like in January.

19  Q. Okay.

20  A. So the incident happened in May.  So we're talking

21 about a little over seven months later they finally

22 concluded the report and gave me a copy of it.

23  Q. And what did you do with the binder and the report?

24  A. Kept it under lock and key in my office.  It took

25 me a period of time to get through it because it's -- I'm

Page 45

1    sure you have a copy of it.  It is rather voluminous.  It is

2    pretty thick.  So I kept control of that document.  I didn't

3    share it with any of the command staff.  I wanted to allow

4    the process to play out.

5            Even though I knew that the sheriff's office had

6    concluded their investigation, I still had to wait for the

7    district attorney to make their findings based on the Sonoma

8    County Sheriff's Office report.

9    Q.    Okay.  So you read the thousand plus pages over a

10   period of time.  When did you conclude your review of that?

11   A.    My best guess would be -- like I say, I believe I

12   got the report in January.  My -- I would say probably by

13   the end of January I would have read the report.

14   Q.    Okay.  All right.  Now, you understand that the

15   district attorney's investigation is different from an

16   administrative review?

17   A.    Correct.

18   Q.    All right.  So you're not relying on the district

19   attorney's determination in determining whether or not

20   policy was followed in your department?

21   A.    Absolutely correct.

22   Q.    All right.  Because the district attorney's report

23   is to determine if there's criminal liability, and, if there

24   was criminal liability, if a case could be proven beyond a

25   reasonable doubt against those officers, correct?

                                                    Page 46

```
 1        A.    Correct.
 2        Q.    All right.  Okay.  Once you completed your review
 3   of the sheriff's investigation, did you take any steps to
 4   address any perceived training deficiencies or performance
 5   inadequacies?
 6             MR. FULLERTON:  Objection; lacks foundation;
 7   assumes facts not in evidence.
 8             Go ahead.
 9             THE WITNESS:  Can I talk about the review?
10             MR. SCHWAIGER:  Q.  Sure.
11             MR. FULLERTON:  Just answer the question he asks,
12   but.
13             MR. SCHWAIGER:  Q.  My question is after you
14   finished your review did you look and say, "Well, I learned
15   something?  Let's do this"?
16        A.    No.
17        Q.    "Let's address this"?  No?
18        A.    No.  I didn't -- after review of the report I
19   didn't make any changes.
20        Q.    Okay.  After your review of the incident did you
21   determine that all of the officers acted within policy?
22             MR. FULLERTON:  Objection; assumes facts not in
23   evidence; lacks foundation.
24             MR. SCHWAIGER:  Q.  You can answer the question.
25             MR. FULLERTON:  You can answer.
```

Page 47

```
 1            THE WITNESS:  I felt that the officers acted
 2   professionally.  I was proud of how they conducted
 3   themselves in the incident, and I didn't see any violations
 4   of policy.  I thought they acted professionally and
 5   reasonable under the circumstances.
 6            MR. SCHWAIGER:  Q.  All right.  So you identified
 7   no violations of policy.
 8       A.   That's correct.
 9            MR. FULLERTON:  Same objections.
10            MR. SCHWAIGER:  Just for the record, what were the
11   objections?
12            MR. FULLERTON:  He didn't do a policy review.  He
13   read the report.  So you're assuming that he was evaluating,
14   doing administrative review of whether there was any
15   policy --
16            MR. SCHWAIGER:  I'm just asking him if he was able
17   to -- I'll just restate my question just to make sure for
18   the record that we're clear.
19       Q.   You reviewed the sheriff department's
20   investigation.
21       A.   Correct.
22       Q.   You also reviewed the district attorney's
23   recommendations and their findings.
24       A.   Correct, I did.
25       Q.   You reviewed all the body-worn cameras associated
```

Page 48

1    with this case.

2        A.    Correct.

3        Q.    And you determined there were no violations of

4    policy?

5              MR. FULLERTON:  Objection.

6              THE WITNESS:  I didn't see any violations based on

7    my review of the body-worn camera, the report from the

8    sheriff's office and the report from the district attorney.

9    I did not see any violations of our policies.

10             MR. SCHWAIGER:  Q.  Now, ultimately as director of

11   public safety, it is -- or I should say was, during your

12   tenure, your responsibility to make that call, correct?

13       A.    No.  I would say based on our conversations here

14   today and the questions you asked, we're following a

15   process, and each component in the process has a different

16   task, a different mission.

17             The admin review, that person, their mission is

18   going to be to take a look at the policies that the agency

19   has and did the officers in this incident, did they follow

20   those policies.  I would say that is the task of the admin

21   review.

22             Just like the task of the use of force review board

23   is going to have a narrow scope.  It's going to be, "Let's

24   look at the use of force used, not some other thing, but

25   let's focus on use of force and did the officers -- in their

Page 49

1    use of force, was it within department policy."

2         Q.   The person that has not yet been identified who

3    will hopefully one day conduct an administrative review of

4    this, what are they going to look at that you have not?

5              MR. FULLERTON:  Calls for speculation.

6              THE WITNESS:  You know, I don't know, because I

7    don't know who the person is.  I don't know what their

8    background is.  I don't think -- I really don't know.

9              MR. SCHWAIGER:  Q.  So let me ask it another way.

10   Are you aware of anything that they could look at

11   differently than what you reviewed?

12             MR. FULLERTON:  Same objection.

13             THE WITNESS:  They possibly could, based on this

14   person's background, their training.  I mean I've seen

15   experts out of state that are way different than in-state

16   California experts because the laws are different in some

17   states and they look at different things.

18             MR. SCHWAIGER:  Q.  This would be an internal

19   review regarding policy, correct?

20        A.   Right.  But depending on the subject expert, if

21   it's someone within California -- again, it could be someone

22   outside the state.  I don't know what they're going to look

23   at.  It could be different than what I might look at.

24        Q.   Is there someone out there who knows the

25   department's policies better than you do?

Page 50

1          MR. FULLERTON:  Calls for speculation.

2          THE WITNESS:  I would say the sergeants that

3    recently studied for the sergeants' promotional, I would say

4    they probably have a much -- a better grasp of it.

5          Q.    How about somebody outside the agency that has yet

6    to be identified or hired?  My point is -- what I'm asking

7    you to do is identify one extra thing --

8          A.    Right.

9          Q.    -- that that future person can review that makes

10   their administrative review of this event better than the

11   one you conducted.

12         MR. FULLERTON:  Objection; assumes facts not in

13   evidence.  His testimony is he didn't conduct an

14   administrative review.

15         MR. SCHWAIGER:  Q.  You understand what I'm saying.

16   You did an informal review.  That's what you've said.

17         A.    Right.  I reviewed the materials and the body-worn

18   camera.  Based on what I reviewed, what I saw, and based on

19   my experience and training, I felt that the officers, again,

20   acted professionally and reasonably under the circumstances.

21   I didn't see any obvious violation of policy.

22         Q.    So why do we need to send this on to somebody else

23   then?

24         A.    Transparency.  I mean we're in a different area in

25   law enforcement, not just in California, but in the country.

                                                    Page 51

1    And we're doing things way differently.  I get that.  And I

2    think having someone from outside who doesn't have any

3    subjectivity, someone who can be unbiased, to come in to do

4    a thorough review I think is what the public wants.

5         Q.   That why don't you include those people on a use of

6    force review board?

7              MR. FULLERTON:  Now you're talking about two

8    different things.

9              MR. SCHWAIGER:  I am.

10             MR. FULLERTON:  But -- okay.

11             MR. SCHWAIGER:  Q.  I value what you're saying.

12   Transparency is good.  "Let's have outside people come in

13   and look at it."

14        A.   Right.

15        Q.   That's why we do the critical incident protocol.

16   That's why the sheriff is investigating instead of yourself.

17        A.   Correct.

18        Q.   But ultimately the administrative review -- correct

19   me if I'm wrong -- even if it's one by you as chief of

20   police, as director of public safety, you could totally

21   disagree with those findings, correct?  And you could say,

22   "Huh.  Even though outside people are saying there was a

23   policy violation, the buck stops with me.  I'm the guy in

24   charge.  I determine there is no policy violation."  You

25   could do that, right?

Page 52

1          MR. FULLERTON:  Well, your question was about a

2     different thing.  Again, you talked about the use --

3          MR. SCHWAIGER:  There's an objection, but I want

4     him to answer.

5          MR. FULLERTON:  Okay.  You can answer the question,

6     but I object that it assumes facts not in evidence, lacks

7     foundation.  You're talking about two different things in

8     the same question, which is not proper, but go ahead.

9          MR. SCHWAIGER:  Q.  Do you understand the question?

10     A.   So I'm going to restate, and if I have it correct

11     I'll answer.  If I don't, correct me.  What I think you're

12     asking me is as the director of public safety if the city

13     were to hire a subject expert to do this admin review and if

14     I differed with their finding would I have the ability to,

15     you know, disagree with their recommendation or their

16     finding.  I think the answer would be yes.

17     Q.   Because you are the final decision maker regardless

18     of what any outside review would say.  At least you were at

19     the time.

20          MR. FULLERTON:  Go ahead and answer if you --

21          THE WITNESS:  I would say yes.

22          MR. SCHWAIGER:  Q.  Okay.  Can you imagine anything

23     that an outside review would tell you about this incident

24     that you don't already know?

25          MR. FULLERTON:  Calls for speculation.

                                                    Page 53

1        THE WITNESS:  Yeah, it's a hard question to answer,

2   because I don't know what I don't know.  In other words, in

3   my career, especially when I was doing tactics, there would

4   be times where I'm perfectly clear, I know exactly what I

5   want to do, and someone will say, "Hey, have we thought

6   about this?"  And I never looked at it from that

7   perspective.  And I go, "You know what?  That's a much

8   better plan."

9        So until, you know, the city hires a subject expert

10  and that person comes up with a finding, I don't -- I don't

11  know what they might state or what their findings might be.

12        MR. SCHWAIGER:  Q.  Has the city ever hired an

13  outside subject matter expert to conduct an administrative

14  review on a use of force event that you're aware of?

15        A.   There may have been one time previous in -- this

16  was just before I got hired.  With the Smith case.  Steve

17  Mitchell handled it on behalf of -- I came in at the tail

18  end of that.  I had to go to federal court with Steve.  That

19  case settled.  We didn't go to jury in federal court.  I

20  think there was someone outside that was working with the

21  law firm should the case go to jury trial, but it never did.

22        Q.   No.  I understand.  So that would be something like

23  a use of force expert who might be brought in to consult on

24  a case.

25        A.   Uh-huh.

Page 54

1      Q.   Or maybe not.   But what I'm referring to is has the

2   responsibility of the administrative review ever been pushed

3   out to someone outside of the agency while you've been

4   police chief?

5      A.   No.

6      Q.   What makes this case different?

7           MR. FULLERTON:   Calls for speculation.   Go ahead.

8           THE WITNESS:   In my almost ten years, this is the

9   only in-custody death we've ever had in my tenure.   So that

10  makes it different.   Different city manager, different city

11  attorney.   As much as I like to think that, you know, I can

12  kind of direct things, I don't always have the last say.

13          MR. SCHWAIGER:   Q.   Okay.   So was it your -- did

14  you have the last say here in farming out the administrative

15  review?

16     A.   I agreed, in the conversation with the city

17  attorney and the city manager, that it would be good to get

18  someone outside.   That was our conversations.

19          MR. FULLERTON:   Don't get into details of the

20  conversation.

21          THE WITNESS:   Okay.

22          MR. SCHWAIGER:   Q.   Now, you're aware that if there

23  are policy violations identified here that the Peace

24  Officers' Bill of Rights limits the amount of time that is

25  available for you to impose discipline for a violation of

                                                        Page 55

1   policy.

2       A.    Hm-hm.

3       Q.    You're aware that that limitation is 12 months from

4   the conclusion of the criminal investigation?

5       A.    Correct.

6       Q.    And we haven't even started the process yet?

7            MR. FULLERTON:  Calls for speculation.

8            THE WITNESS:  As of August 22nd it had not started.

9            MR. SCHWAIGER:  Q.  How long would an

10  administrative review of a case like this typically last?

11  It took you a month to get through the materials, right?

12      A.    I mean it's speculating because I don't know the

13  person; I don't know their workload.  I don't know -- I

14  would say at -- minimally it would take at least a month.

15      Q.    Okay.

16      A.    That would be my best guess.

17           MR. SCHWAIGER:  All right.  We are at one hour.

18  Let's take a break.  Since we're on short session today,

19  let's do a five-minute break, and we'll come back in.  Okay?

20           THE WITNESS:  Sounds good.

21           (Break was taken from 2:27 to 2:40 p.m.)

22           MR. SCHWAIGER:  Q.  All right.  When you looked at

23  the body-worn cameras, how many times did you go through

24  those each, do you think?  And I know some of them are a

25  little more informative than others.

                                           Page 56

```
 1              REPORTER CERTIFICATE
 2         I hereby certify that BRIAN MASTERSON was by me
 3    duly sworn to testify to the truth, the whole truth and
 4    nothing but the truth in the within-entitled cause; that
 5    said deposition was taken at the time and place herein
 6    named; that the deposition is a true record of the witness's
 7    testimony as reported to the best of my ability by me, a
 8    duly certified shorthand reporter and a disinterested
 9    person, and was thereafter transcribed under my direction
10    into typewriting by computer; that a request was made to
11    read and correct said deposition.
12         I further certify that I am not interested in the
13    outcome of said action, nor connected with, nor related to
14    any of the parties in said action, nor to their respective
15    counsel.
16         IN WITNESS WHEREOF, I have hereunto set my hand
17    this 25th day of September, 2018.
18
19
20
21
22
23
24    SANDRA BEECHINOR, C.S.R. No. 3388
25

                                              Page 81
```

# Exhibit C

# Rohnert Park Department Of Public Safety
## *INTERNAL AFFAIRS INVESTIGATION*



# IA# F-2018-03

**Involved Subject:** Public Safety Officer David Wattson
Public Safety Officer Sean Huot
Public Safety Officer Michael Werle
Public Safety Officer Matthew Huot
Sergeant Eric Matzen

---

**THIS IS A CONFIDENTIAL DOCUMENT AND AS SUCH, IS NOT FOR REVIEW WITHOUT THE PERMISSION OF THE CHIEF OF POLICE, OR THEIR DESIGNEE**

ORIGINAL Submitted by:

## Command Consulting & Investigations, Inc.

RP000001

**Rohnert Park Department**
**Of Public Safety**
**INTERNAL AFFAIRS INVESTIGATION**
**IA# F-2018-03**

# TABLE OF CONTENTS

**Tab #**                                                                    **Page**

**1. Internal Affairs Report**

    Introduction/Summary/Signature Page                        1

    David Wattson Complaint/Authorities                        3

    Sean Huot Complaint/Authorities                            6

    Michael Werle Complaint/Authorities                        9

    Matthew Huot Complaint/Authorities                         12

    Eric Matzen Complaint/Authorities                          15

    Background                                                 17

    Investigation                                              18

    David Wattson Findings                                     37

    Sean Huot Findings                                         46

    Michael Werle Findings                                     52

    Matthew Huot Findings                                      58

    Eric Matzen Findings                                       63

    Conclusions                                                68

**2. Attachments**

    Attachment A        A complete copy of the Sonoma County Sheriff's Office Criminal Investigation, # 170512-027, including all related documents and recordings, contained in a separate binder

    Attachment B        Table of contents from Sonoma County Sheriff's Office Criminal Investigation, # 170512-027.

RP000002

**Rohnert Park Department**
**Of Public Safety**
INTERNAL AFFAIRS INVESTIGATION
IA# F-2018-03

| | |
|---|---|
| Attachment C | Investigative summary from Sonoma County Sheriff's Office Criminal Investigation, # 170512-027 |
| Attachment D | Transcript of Sheriff's detective interview of PSO Wattson |
| Attachment E | Transcript of Sheriff's detective interview of PSO S. Huot |
| Attachment F | Transcript of Sheriff's detective interview of PSO Werle |
| Attachment G | Transcript of Sheriff's detective interview of PSO M. Huot |
| Attachment H | Transcript of Sheriff's detective interview of Sgt. Matzen |

## 3. Transcripts

| | |
|---|---|
| Section I | Transcript of CCI interview with David Wattson |

## 4. Advisement Forms

David Wattson Pre-Interrogation Notice
David Wattson Administrative Admonishment
Sean Huot Pre-Interrogation Notice
Michael Werle Pre-Interrogation Notice
Matthew Huot Pre-Interrogation Notice
Eric Matzen Pre-Interrogation Notice

## 5. Electronic Copy of Investigation

RP000003

# Rohnert Park Department
# Of Public Safety
### *INTERNAL AFFAIRS INVESTIGATION*



# IA# F-2018-03

Involved Subject:  Public Safety Officer David Wattson
Public Safety Officer Sean Huot
Public Safety Officer Michael Werle
Public Safety Officer Matthew Huot
Sergeant Eric Matzen

---

## THIS IS A CONFIDENTIAL DOCUMENT AND AS SUCH, IS NOT FOR REVIEW WITHOUT THE PERMISSION OF THE CHIEF OF POLICE, OR THEIR DESIGNEE

ORIGINAL Submitted by:

## Command Consulting & Investigations, Inc.

*Paul Henry*
**Paul Henry**

*Bill Cogbill*
**Bill Cogbill**

RP000004

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

# Rohnert Park Department
# Of Public Safety
### Internal Investigation Report

| INCIDENT TYPE: Administrative Review Use of Force Standard of Conduct | | DATE REPORTED: 05/12/17 | DATE OF INCIDENT: 05/12/17 | FILE NUMBER: IA F-2018-03 |
|---|---|---|---|---|
| EMPLOYEE: OFFICER DAVID WATTSON OFFICER SEAN HUOT OFFICER MICHAEL WERLE OFFICER MATTHEW HUOT SERGEANT ERIC MATZEN | | DIVISION OR ASSIGNMENT: Patrol | | WORK LOCATION: Rohnert Park Department of Public Safety |

| COMPLAINANT: ROHNERT PARK DEPARTMENT OF PUBLIC SAFETY | | ADDRESS: 500 City Center Drive | |
|---|---|---|---|
| CITY: Rohnert Park | | STATE: CA | ZIP CODE: 94928 |
| HOME TELEPHONE: | | WORK OR CONTACT TELEPHONE: (707) 584-2600 | |

| SUMMARY OF COMPLAINT: |
|---|
| On August 30, 2018, Interim Director of Public Safety Jeff Weaver of the Rohnert Park Department of Public Safety (RPDPS) contacted Command Consulting and Investigations, Inc. (CCI). Weaver explained that five of his officers had been involved in a fatal, officer-involved incident and that the Sonoma County Sheriff's Office conducted the criminal investigation. He stated that the City of Rohnert Park was interested in hiring CCI to conduct an outside independent internal administrative investigation/review of their officers' conduct and use of force. |

| DIVISION ASSIGNED: Command Consulting & Investigations, Inc. | DATE ASSIGNED: 09/12/18 | DATE COMPLETED: 01/08/19 |
|---|---|---|
| INVESTIGATOR: Paul Henry / Bill Cogbill | SUPERVISOR (S) REVIEW: RPDPS Administration | |

1

RP000005

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

## Officer David Wattson

| VIOLATION (S): | REVIEWER'S FINDING: | REVIEWER'S FINDING: | REVIEWER'S FINDING: |
|---|---|---|---|
| **RPDPS Policy Manual Section 300.3** | | | |
| **RPDPS Policy Manual Section 300.3.1** | | | |
| **RPDPS Policy Manual Section 300.3.3** | | | |
| **RPDPS Policy Manual Section 300.6** | | | |
| | SIGNED and DATED: | SIGNED and DATED: | SIGNED and DATED: |

| DISPOSITION: | |
|---|---|
| SIGNATURE: | DATE: |

2

RP000006

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

# Officer David Wattson Complaint / Authorities

The focus of this investigation is Officer David Wattson's conduct on May 12, 2017.  At issue is whether Officer Wattson's conduct violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest – *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

3

RP000007

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

*(a) The degree to which the application of the technique may be controlled given the level of resistance.*
*(b) Whether the person can comply with the direction or orders of the officer.*
*(c) Whether the person has been given sufficient opportunity to comply.*

*The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.*

*RPDPS Policy Manual Section 300.6 Medical Consideration - Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

4

RP000008

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

## Officer Sean Huot

| VIOLATION (S): | REVIEWER'S FINDING: | REVIEWER'S FINDING: | REVIEWER'S FINDING: |
|---|---|---|---|
| **RPDPS Policy Manual Section 300.3** | | | |
| **RPDPS Policy Manual Section 300.3.1** | | | |
| **RPDPS Policy Manual Section 300.3.3** | | | |
| **RPDPS Policy Manual Section 300.6** | | | |
| | SIGNED and DATED: | SIGNED and DATED: | SIGNED and DATED: |

| DISPOSITION: | |
|---|---|
| SIGNATURE: | DATE: |

5

RP000009

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

# Officer Sean Huot Complaint / Authorities

The focus of this investigation is Officer Sean Huot's conduct on May 12, 2017.  At issue is whether Officer Huot's conduct violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

6

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

> *(a) The degree to which the application of the technique may be controlled given the level of resistance.*
> *(b) Whether the person can comply with the direction or orders of the officer.*
> *(c) Whether the person has been given sufficient opportunity to comply.*

*The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.*

RPDPS Policy Manual Section 300.6 Medical Consideration - *Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

7

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

## Officer Michael Werle

| VIOLATION (S): | REVIEWER'S FINDING: | REVIEWER'S FINDING: | REVIEWER'S FINDING: |
|---|---|---|---|
| **RPDPS Policy Manual Section 300.3** | | | |
| **RPDPS Policy Manual Section 300.3.1** | | | |
| **RPDPS Policy Manual Section 300.3.3** | | | |
| **RPDPS Policy Manual Section 300.6** | | | |
| | SIGNED and DATED: | SIGNED and DATED: | SIGNED and DATED: |

| DISPOSITION: | |
|---|---|
| SIGNATURE: | DATE: |

8

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

# Officer Michael Werle Complaint / Authorities

The focus of this investigation is Officer David Wattson's conduct on May 12, 2017. At issue is whether Officer Wattson's conduct violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

9

RP000013

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

*(a) The degree to which the application of the technique may be controlled given the level of resistance.*
*(b) Whether the person can comply with the direction or orders of the officer.*
*(c) Whether the person has been given sufficient opportunity to comply.*

*The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.*

RPDPS Policy Manual Section 300.6 Medical Consideration *- Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

RP000014

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

## Officer Matthew Huot

| VIOLATION (S): | REVIEWER'S FINDING: | REVIEWER'S FINDING: | REVIEWER'S FINDING: |
|---|---|---|---|
| **RPDPS Policy Manual Section 300.3** | | | |
| **RPDPS Policy Manual Section 300.3.1** | | | |
| **RPDPS Policy Manual Section 300.3.3** | | | |
| **RPDPS Policy Manual Section 300.6** | | | |
| | SIGNED and DATED: | SIGNED and DATED: | SIGNED and DATED: |

| DISPOSITION: | |
|---|---|
| SIGNATURE: | DATE: |

11

RP000015

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

# Officer Matthew Huot Complaint / Authorities

The focus of this investigation is Officer David Wattson's conduct on May 12, 2017.  At issue is whether Officer Wattson's conduct violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

12

RP000016

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

(a) The degree to which the application of the technique may be controlled given the level of resistance.
(b) Whether the person can comply with the direction or orders of the officer.
(c) Whether the person has been given sufficient opportunity to comply.

*The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.*

RPDPS Policy Manual Section 300.6 Medical Consideration - *Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

13

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

## Sergeant Eric Matzen

| VIOLATION (S): | REVIEWER'S FINDING: | REVIEWER'S FINDING: | REVIEWER'S FINDING: |
|---|---|---|---|
| **RPDPS Policy Manual Section 300.3** | | | |
| **RPDPS Policy Manual Section 300.3.1** | | | |
| **RPDPS Policy Manual Section 300.3.3** | | | |
| **RPDPS Policy Manual Section 300.6** | | | |
| | SIGNED and DATED: | SIGNED and DATED: | SIGNED and DATED: |

| DISPOSITION: | |
|---|---|
| SIGNATURE: | DATE: |

14

RP000018

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

# Sergeant Eric Matzen Complaint / Authorities

The focus of this investigation is Officer David Wattson's conduct on May 12, 2017.  At issue is whether Officer Wattson's conduct violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

15

RP000019

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

*(a) The degree to which the application of the technique may be controlled given the level of resistance.*
*(b) Whether the person can comply with the direction or orders of the officer.*
*(c) Whether the person has been given sufficient opportunity to comply.*

*The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.*

*RPDPS Policy Manual Section 300.6 Medical Consideration - Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

RP000020

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

# Background Summary

On August 30, 2018, Interim Director of Public Safety Jeff Weaver of the Rohnert Park Department of Public Safety (RPDPS) contacted Command Consulting and Investigations (CCI) regarding a fatal officer-involved incident that involved 5 officers from the RPDPS.  Per the county protocol, the Sonoma County Sheriff's Office conducted the criminal investigation.  Weaver asked if CCI was interested in conducting an outside, independent, internal administrative investigation/review, of their officers' conduct and use of force.  After discussing the details of the case CCI accepted the case.

On October 03, 2018, CCI received a complete copy of the criminal investigation and related materials.

17

RP000021

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

## Investigation

On August 30, 2018, CCI was requested and authorized by Rohnert Park Interim Director of Public Safety Jeff Weaver to conduct this investigation.

During the first few weeks of the investigation, RPDPS management provided CCI with the following information:

| | |
|---|---|
| Attachment (A) | A complete copy of the Sonoma County Sheriff's Office Criminal Investigation, # 170512-027, including all related documents and recordings, contained in a separate binder. |
| Attachment (B) | Table of contents from Sonoma County Sheriff's Office Criminal Investigation, # 170512-027. |
| Attachment (C) | Investigative summary from Sonoma County Sheriff's Office Criminal Investigation, # 170512-027. |
| Attachment (D) | Transcript of Sheriff's detective interview of PSO Wattson |
| Attachment (E) | Transcript of Sheriff's detective interview of PSO S. Huot |
| Attachment (F) | Transcript of Sheriff's detective interview of PSO Werle |
| Attachment (G) | Transcript of Sheriff's detective interview of PSO M. Huot |
| Attachment (H) | Transcript of Sheriff's detective interview of Sgt. Matzen |

In reviewing the above-listed materials and the information provided by RPDPS Management, CCI created the following general timeline:

05/12/17     RPDPS officers receive a call of a check the welfare of a subject acting strangely at the Budget Inn Motel, room # ▮▮▮ . Upon learning that Branch Wroth had a warrant for his arrest, the first two officers on scene attempt to take him into custody. Wroth resists arrest, necessitating the deployment of personal body weapons and a Taser to overcome his resistance. Two additional officers and a sergeant respond to the scene to assist. Wroth is taken into custody and put in handcuffs with the effort of all five officers on scene. Shortly after being handcuffed, Wroth stops breathing which is immediately noticed by an officer on scene and emergency life-saving efforts are initiated by the officers, fire personnel, and ambulance personnel. Wroth dies at the scene.

18

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

The Sonoma County Sheriff's Office conducts a criminal investigation as outlined in the countywide critical incident protocol.

05/17/17    The Sonoma County Coroner's Office performs an autopsy on Branch Christopher Wroth. The cause of death is determined to be Cardiopulmonary Arrest after a struggle with law enforcement ██████

12/12/17    The Sonoma County Sheriff's Office turns over their competed criminal investigation to the Sonoma County District Attorney's Office.

04/30/18    The District Attorney's Office notifys RPDPS that no criminal charges will be filed against the officers.

08/30/18    CCI is hired to conduct an administrative investigation/review of the CPD officers' use of force.

10/03/18    CCI receives a complete copy of the criminal investigation and starts an administrative review/investigation.

11/29/18    CCI interviews RPDPS Public Safety Officer Wattson.

01/08/19    CCI completes its investigation and submits the report to RPDPS management.

---

### Interview of David Wattson

Wattson was interviewed for the criminal investigation into this incident by Sonoma County Sheriff's Detectives Jesse Hanshew and Jeff Toney on May 13, 2017. Wattson provided a voluntary statement to the Sheriff's detectives and he was represented by Attorney Doug Foley, with the law firm of Rains, Lucia, Stern, St. Phalle, and Silver.

Summary of Wattson's interview with Sonoma County Sheriff's Detectives:

During this interview, Wattson stated in essence that he has worked at the RPDPS for approximately three and one-half years. He is assigned to patrol. Additionally, regarding specialized training, Wattson stated that he is a Defensive Tactics instructor for the RPDPS.

Wattson stated that prior to being interviewed by the Sheriff's detectives, he reviewed the video of the incident from his Body Worn Camera.

19

RP000023

### INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

He stated that on May 12, 2017, he was wearing a dark blue, RPDPS Public Safety Officer uniform. His uniform has patches on each shoulder that identify him as a Public Safety Officer for the City of Rohnert Park. Additionally, he had a silver metal badge on the left breast pocket and a nametag on the right breast pocket of his uniform shirt. He stated that, in addition to his department-issued firearm, he was carrying a Taser and a Yawara impact weapon.

Wattson stated that he saw a call pending on his Mobile Digital Computer (MDC) of a check the welfare of a subject at the Budget Inn Motel who was acting paranoid and erratically. He attached himself to the call and responded to the motel.

Upon his arrival, Wattson contacted two security guards outside room number ███ One of the security guards explained to Wattson that the subject, later identified as Branch Christopher Wroth (12/16/75), had damaged the motel room and had torn up his clothing. The security guard handed Wattson the registration information for the room.

Wattson contacted Wroth and noted that he was ripping his shirt and his pants were unbuttoned and down around his knees. Wattson asked Wroth to sit on the bed and he described Wroth as agitated. He said Wroth had a hard time understanding his questions and was unable to speak coherently. Wattson asked what his name was and Wroth gave his first name only.

Wattson verified Wroth's identity through RPDPS dispatch by relaying the information off of the registration card for the room. He subsequently learned that Wroth had a misdemeanor warrant for his arrest.

Wroth told Wattson that ████████████████████████████████████ ████████████ He said that was the reason he was tearing his clothing. Wroth said he had been staying at a friend's house in Sebastopol, but he was unable to explain how he got to Rohnert Park.

Wattson believed, based on Wroth's behavior and Wattson's prior experience, that ████████████████████████████████.

Wattson told Wroth that he had a warrant for his arrest and he explained to Wroth that he should pull up and button his pants so that he could accompany Wattson to his patrol car where it would be determined if Wroth could be released with a citation to appear in court.

Wattson stated that Wroth pulled his pants off and started to turn them inside out while saying that ████████████████████████. Wattson said that Wroth was ████████████████

Wattson continued to talk with Wroth and continued to try and convince him to put his pants on. He again explained to Wroth that once dressed, he would place handcuffs on

20

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

him, walk him to his patrol car, and then determine if Wroth could be released on a citation to appear in court.

Public Safety Officer Sean Huot arrived and Wattson waived him into the motel room.

Wattson said that Wroth took his pants off completely and "started to kinda stare off like away from us". Wattson determined that Wroth was not going to cooperate by putting his clothes on so he motioned to S. Huot that "we're going to go hands-on".

Wattson moved to Wroth's left side, grabbed ahold of his left upper arm and assisted Wroth to his feet. S. Huot grabbed Wroth's upper right arm. Wattson said that Wroth then immediately moved forward toward the window of the motel room. He said that Wroth started yelling and he pushed the window screen out and attempted to climb through the open window.

Wattson said that he "attempted several compliance strikes with a closed fist". He explained that he punched Wroth in the back multiple times in an attempt to keep him from climbing through the window. Wattson said that he also struck Wroth in his back two times with a downward strike with his elbow, also in an attempt to keep Wroth from climbing through the window.

Wattson said that at this point, nearly all of Wroth's upper body was through the open window. Wattson then pulled out his Taser. He said that he deployed his Taser into Wroth's back by firing the darts at Wroth.

Wattson said the Taser deployment was effective in that Wroth fell backward, into the motel room and away from the window. He said Wroth fell to the floor and that he was on his back and side.

Wattson said that both he and S. Huot ordered Wroth to roll over on to his stomach, but Wroth continued to resist and he continued to yell. He said that Wroth kicked at he and S. Huot and he "flailed" his arms about, preventing them from grabbing ahold of him.

Wattson yelled at Wroth to roll over on to his stomach and warned him he would deploy his Taser again if he did not comply. Wroth continued to yell and continued to resist being controlled. Wattson then deployed his Taser for another five-second cycle.

Wattson said he believed the second Taser deployment had an effect on Wroth, but Wroth was able to "fight through it". He said that as soon as the Taser had finished it's cycle, Wroth continued to yell and thrash his arms and legs, preventing the officers from putting him in handcuffs.

Wattson said that he again ordered Wroth to roll over on to his stomach and put his hands behind his back and Wroth continued to refuse to comply. Wroth continued to yell and resist their efforts to put him into handcuffs.

21

RP000025

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Wattson said that he deployed his Taser for a third time, this time creating a third point of contact by pushing the Taser against Wroth's lower leg. He said that he thought that the darts in Wroth's back may have been dislodged because of the sound the Taser made.

Wattson said he deployed his Taser a fourth time and this time determined that the Taser was ineffective with changing Wroth's behavior. He said that he disconnected the Taser cartridge and put the Taser in his holster.

Wattson said that he grabbed ahold of one of Wroth's arms and attempted to roll him over on to his stomach. Wroth continued to resist by laying on the ground on his back while moving his arms and kicking his legs. He said that Wroth kicked at one of the security guards who had entered the room to assist them.

PSO Werle arrived at this time and Wattson saw that Werle had his flashlight in his hand. Wattson yelled at Werle to strike Wroth with his flashlight because Wroth continued to resist and they were unable to get Wroth on to his stomach and they were unable to put Wroth into handcuffs.

According to Wattson, Werle struck Wroth with his flashlight an unknown number of times on his upper thigh. Wattson said that "we were able to get his right arm behind his back and place the handcuffs on him".

Once Wroth was put into handcuffs he continued to try to kick his legs. Wattson said that Sgt. Matzen put Wroth into a figure four control hold to control his legs and prevent Wroth from kicking any of the officers. He said that at no time did he feel he and S. Huot were in control of Wroth until after the other officers arrived and until after Wroth was finally put into handcuffs.

Wattson said that Matzen ordered an officer to retrieve a maximum restraint device from one of the patrol cars as Wroth continued to yell. Once the maximum restraint device was retrieved from the patrol car they discussed how they were going to move Wroth away from the wall under the window of the motel room so that the device could be applied.

During this time Wattson heard someone say "check him, check his face". Wattson said that he rolled Wroth's head over so that he could see his face and discovered that Wroth was not breathing.

Rohnert Park Fire personnel, who were already on scene and standing outside the motel room then immediately began life-saving efforts on Wroth. Wattson said that Wroth was rolled over on to his back and █████████████████████████████████
████████

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

back with his fist and elbow as "compliance strikes". He said that the strikes were applied to Wroth for the purpose of using pain compliance to gain Wroth's cooperation with being taken into custody.

Wattson explained that after striking Wroth several times with a closed fist his wrist began to hurt so he transitioned to striking Wroth with his elbow. He stated that his target was Wroth's ribs on his upper and middle back.

Wattson was asked if he struck Wroth with his knee and he stated that he did recall striking Wroth several times with his knee. He did not remember how many times he struck Wroth with his knee and he said his target area was Wroth's upper thigh. He said he applied these knee strikes for the same purpose of gaining Wroth's compliance to stop resisting the arrest process. His knee strikes were deployed by him during the same timeframe that he had deployed the other compliance strikes to Wroth's back. He said that he was trying to "soften" Wroth's leg so that he and S. Huot could more easily take Wroth to the ground. As with the other compliance strikes applied by Wattson to Wroth, he said that his knee strikes were unsuccessful in gaining Wroth's compliance with the arrest process.

When asked, Wattson explained that there are several places on the body that should be avoided when deploying a compliance strike with a fist, elbow, or knee. He stated these areas include a subject's neck, groin, and vital organs. Wattson said that he did not target any of these areas when he applied these strikes to Wroth.

Wattson was asked if he ever struck Wroth on his head and he said no, he never struck Wroth in his head.

Wattson said that he stopped his compliance strikes to Wroth when it became clear that they were ineffective in gaining Wroth's compliance with being taken into custody.

Wattson said that because the compliance strikes he deployed against Wroth were ineffective he transitioned to his Taser. He said that the first deployment of his Taser against Wroth was partially effective in that he and S. Huot were able to pull Wroth away from the window and on to the floor of the motel room.

Wattson said that he believed he deployed his Taser against Wroth four times. He said that he deployed his Taser each subsequent time because Wroth continued to fight and resist their efforts to put handcuffs on him.

Wattson said that he stopped deploying his Taser when he realized that each subsequent application seemed to be less effective than the previous application. He said that because the Taser deployments were ineffective in gaining Wroth's cooperation he put his Taser back into his holster and attempted to physically overpower Wroth and put him into handcuffs.

24

RP000028

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Wattson said that when he observed Werle arrive in the motel room he saw that Werle had his flashlight in his hand. Wattson yelled at Werle to strike Wroth with his flashlight. Wattson explained that at this point in the confrontation, Wroth was on the ground, flailing his arms and legs, actively resisting the efforts of Wattson and S. Huot to put handcuffs on him. Wroth had grabbed ahold of Wattson's hand just prior to Wattson directing Werle to strike Wroth with his flashlight.

Wattson described the resistance of Wroth as "immense". He said that both he and S. Huot "are not small people", but they were unable to overcome the resistance of Wroth. He said that Wroth was very strong and able to fend off their efforts to take him into custody.

Wattson said that during the entire time of his confrontation with Wroth he yelled commands to Wroth for him to stop resisting and for him to lay on his stomach with his hands behind his back. He said that he yelled at Wroth and warned him between each Taser deployment that Wroth should comply with his command or he (Wattson) would deploy his Taser again. He stated that at no time during the confrontation did Wroth comply with any of his commands.

When asked what other force options he considered to use against Wroth, Wattson said that he carried a Yawara stick, which is an impact weapon. He said that he did not think the Yawara stick would be effective because his compliance strikes were ineffective in gaining Wroth's cooperation. Wattson said that he did not ever consider deploying his firearm because he did not feel the level of Wroth's resistance warranted the use of deadly force.


## Interview of Sean Huot

S. Huot was interviewed for the criminal investigation into this incident by Sonoma County Sheriff's Detectives Jesse Hanshew and Jeff Toney on May 13, 2017. S. Huot provided a voluntary statement to the Sheriff's detectives and he was represented by Attorney Doug Foley, with the law firm of Rains, Lucia, Stern, St. Phalle, and Silver.


Summary of S. Huot's interview with Sonoma County Sheriff's Detectives:

During this interview, S. Huot stated in essence that he has worked at the RPDPS for approximately nine months. He is assigned to patrol.

S. Huot stated that he did not review the video from his Body Worn Camera prior to his interview with the Sheriff's detectives.

He stated that on May 12, 2017, he was wearing a dark blue, RPDPS Public Safety Officer uniform. He stated the uniform has patches on each shoulder that identify him

25

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

as a Public Safety Officer for the City of Rohnert Park. He stated that he was wearing a ballistic vest carrier on the outside of his uniform shirt. Additionally, he had a silver metal badge on the left breast pocket and a nametag on the right breast pocket of his ballistic vest carrier. He stated that, in addition to his department-issued firearm, he was carrying a Taser.

S. Huot stated that he first became aware of Wattson's contact with Wroth when he heard Wattson run a warrants check on Wroth over the police radio. S. Huot responded from the RPDPS station to assist Wattson when he heard the dispatcher advise Wattson that Wroth had a misdemeanor warrant for his arrest. S. Huot said that he read on his MDC that the call was for a check the welfare of a subject acting strangely at the Budget Inn Motel.

Upon his arrival at the call, S. Huot said he saw the two security guards for the motel standing outside room number ▮▮▮. He looked inside the room and saw Wroth sitting on the bed and he noticed that Wroth was not wearing pants. Wattson motioned to him to wait outside of the motel room. S. Huot said that he heard Wattson talking with Wroth and that Wattson was trying to convince Wroth to put his pants on.

After a short time, Wattson motioned S. Huot into the room. S. Huot said that when he walked into the room, Wroth had a "thousand-yard stare" and seemed easily confused. He said that Wroth's speech was slow and deliberate and he was unable to put his pants on. It appeared to S. Huot that Wroth was either having a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

S. Huot identified himself by name to Wroth and Wroth gave S. Huot his first name. Wattson explained to Wroth that he needed him to put his pants on so that he could be handcuffed. After which, Wattson would determine if Wroth's misdemeanor warrant was citable. S. Huot said that Wroth had one pant leg on, but it looked like his pants were inside out. He said that Wroth put his left leg into the right side of his pants. He said that Wroth struggled and was unable to put his other leg into his pants.

S. Huot said that Wattson told Wroth to stand up as Wattson grabbed on to Wroth's left arm. S. Huot moved forward and grabbed ahold of Wroth's right arm. S. Huot said that Wroth pulled both of his arms toward the middle of his body, while at the same time lunging forward, toward the window the motel room. S. Huot said that all three of them fell into the window. Both S. Huot and Wattson told Wroth not to resist.

S. Huot said that both he and Wattson tried to pull Wroth's arms behind his back, but they were unable to do so. S. Huot asked dispatch for additional officers.

Wattson stated, "Let's dump him", which S. Huot understood to mean that they should force Wroth to the ground. S. Huot said they were unable to force Wroth to the ground as Wroth continued to resist. He said Wroth was swinging his arms about and resisting their efforts to pull his arms behind his back.

26

RP000030

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

According to S. Huot, Wattson "threw a couple distraction blows" toward Wroth's head area. He did not know if the distraction blows connected with Wroth or not. He said that both he and Wattson "threw a knee" to Wroth's abdomen, but he did not know if they connected or not with their intended target. S. Huot said that he used his right knee and that he attempted to strike Wroth with his knee one time.

S. Huot said that his one knee strike was the only time he attempted to strike Wroth during the struggle to take him into custody.

S. Huot said that none of their tactics to this point were successful in gaining Wroth's compliance. He said their efforts had had little to no effect on Wroth. He said that both he and Wattson continued to give Wroth multiple commands to stop resisting their efforts to take him into custody.

S. Huot said that Wattson disengaged with Wroth and yelled "Taser". S. Huot said he too let go of Wroth as Wattson deployed his Taser. The Taser darts hit Wroth in his back. S. Huot said that Wroth began to scream and after three to five seconds, Wroth fell to the floor inside the motel room.

Wroth continued to yell and fight as he lay on his back on the motel room floor. Both S. Huot and Wattson yelled for Wroth to roll over on to his stomach and put his hands behind his back.

S. Huot said that both he and Wattson grabbed on to Wroth as they tried to force his hands behind his back. Wroth continued to resist by "thrashing" his arms about, kicking, yelling, and trying to get up to his feet. S. Huot said that he and Wattson continued to give Wroth commands to stop resisting. Wattson deployed his Taser for a second cycle, and according to S. Huot, it had little to no effect on Wroth.

S. Huot said he was able to get one of Wroth's wrists into a handcuff. He held on to the center chain and he tried to pull Wroth's arm behind his back. Wattson deployed his Taser again as Wroth continued to fight with them. S. Huot believed that Wattson utilized a drive stun against Wroth be touching one of Wroth's lower legs as he activated the Taser. S. Huot said that he felt the effects of the Taser and that he let go of Wroth and fell backward.

S. Huot said that he grabbed ahold of the handcuff and continued to yell at Wroth to stop resisting and put his hands behind his back. S. Huot said he was unable to pull Wroth's arm behind his back even though he was using both of his hands and arms against just one of Wroth's arms. He said that Wattson continued to struggle with gaining control of Wroth's other arm. He said, "We were unable to get him under control."

S. Huot said that PSO M. Huot, PSO Werle, and Sgt. Matzen all arrived at the same time. He said that with the assistance of the other officers they were able to pull both of Wroth's arms behind his back and place him into handcuffs.

27

RP000031

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

S.Huot said that it was only with the assistance of the other officers that they were able to finally take control of Wroth and overcome his resistance.

S. Huot said that even though Wroth was in handcuffs he continued to struggle against them and they decided to apply maximum restraints. As they waited for an officer to retrieve the maximum restraint device one of the officers noticed that Wroth did not appear to be breathing. He said one of the officers checked him and noted that Wroth was not breathing.

S. Huot said they immediately rolled Wroth over and determined that ███████████████████

███████████████████████████████████████

S. Huot said that PSO Hayes took the lead in providing life-saving measures to Wroth. S. Huot described Hayes as a very experienced EMT. He said ███████████████████

█████████████████████████████████████████████████.

S. Huot was not interviewed by CCI for this Administrative/Internal Affairs Investigation.


## Interview of Michael Werle

Werle was interviewed for the criminal investigation into this incident by Sonoma County Sheriff's Detectives Jesse Hanshew and Jeff Toney on May 13, 2017. Werle provided a voluntary statement to the Sheriff's detectives and he was represented by Attorney Doug Foley, with the law firm of Rains, Lucia, Stern, St. Phalle, and Silver.


Summary of Werle's interview with Sonoma County Sheriff's Detectives:

During this interview, Werle stated in essence that he has worked at the RPDPS for approximately thirteen years. He is assigned to patrol and he is a Field Training Officer. Werle said that he is also an experienced Emergency Medical Technician.

Werle stated that he did not review the video from his Body Worn Camera prior to his interview with the Sheriff's detectives.

He stated that on May 12, 2017, he was wearing a dark blue, RPDPS Public Safety Officer uniform. He said he was wearing a dark blue RPDPS baseball cap. His uniform shirt has patches on each shoulder that identify him as a Public Safety Officer for the City of Rohnert Park. He stated that he was wearing a ballistic vest carrier on the outside of his uniform shirt. Additionally, he had a silver metal badge on the left breast

28

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

pocket and a nametag on the right breast pocket of his ballistic vest carrier. He stated that, in addition to his department-issued firearm, he was carrying a Taser.

Werle stated that he was in the police station at the RPDPS when this incident began. He said that it was the beginning of his shift and he had set up his patrol car but had not yet gone out on the street. He was doing paperwork in the station when he heard over the police radio the sound of an officer in distress. He stated, "I wouldn't call it a scream, but I couldn't understand what, whoever broadcasted it had said." He said that he and the other officers in the report writing room of the station became concerned and listened as the dispatcher tried to reach the officer to clarify his broadcast. He said he heard several "mic clicks" and believed that the original officer was involved in a physical struggle and needed help.

Werle said he ran to his patrol car and as he pulled out of the back gate of the parking lot he asked dispatch to confirm the location of the officer who needed assistance. Dispatch advised him that the location was the Budget Inn and gave him the room number. He drove Code 3 (lights and siren) and another officer followed him to the location from the police station. He did not know who that other officer was.

Werle said he parked on the north side of the parking lot and grabbed his flashlight as he got out of his car. He said that he knew from experience that the room number given to him by dispatch was on the second floor of the motel.

Werle said he saw two people he did not recognize, later determined to be the security guards for the motel, standing outside of a room on the second-floor balcony. One of the security guards was holding on to Wroth's legs as they were partially outside the motel room door.

Werle asked the security guard to move so that he could enter the room. He saw Wattson on the floor near Wroth and said that Wroth was not wearing pants. Werle observed Taser wires on the floor next to Wroth and said that Wroth was partially on his left side and partially on his stomach. Werle said that Wroth's left arm was out in front of him and Wattson had a hold of it and was attempting to control Wroth's left hand. Wroth's legs were "flailing about" and Werle put his right foot on one of Wroth's legs in an attempt to control his movement. Werle heard an officer shout, "Stop resisting", but he did not know which officer gave the command.

Wattson yelled at Werle to "hit him". Werle said that he could clearly see that Wattson was attempting to take Wroth into custody and that Wroth was actively resisting Wattson. Werle said that Wroth was moaning or grunting but he did not hear Wroth say any words.

Werle's flashlight was in his left hand. He said he "delivered several strikes to the subject's, the meaty part of his thigh" in an effort to gain his compliance. Werle did not know how many times he struck Wroth with his flashlight.

29

RP000033

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

## Interview of Matthew Huot

M. Huot was interviewed for the criminal investigation into this incident by Sonoma County Sheriff's Detectives Jesse Hanshew and Jeff Toney on May 13, 2017. M. Huot provided a voluntary statement to the Sheriff's detectives and he was represented by Attorney Vance Piggott, with the law firm of Rains, Lucia, Stern, St. Phalle, and Silver.

Summary of M. Huot interview with Sonoma County Sheriff's Detectives:

During this interview, M. Huot stated in essence that he has worked at the RPDPS for approximately five months. Previously, he worked at the Clear Lake Police Department for approximately one and one-half years. He is assigned to patrol.

M. Huot stated that he was not wearing a Body Worn Camera at the time of this incident.

He stated that on May 12, 2017, he was wearing a dark blue, RPDPS Public Safety Officer uniform. He stated the uniform has patches on each shoulder that identify him as a Public Safety Officer for the City of Rohnert Park. He stated that he was wearing a ballistic vest carrier on the outside of his uniform shirt. Additionally, he had a silver metal badge on the left breast pocket and a nametag on the right breast pocket of his ballistic vest carrier. He stated that, in addition to his department-issued firearm, he was carrying a wooden straight baton.

M. Huot stated that he was in Sgt. Matzen's office, in the RPDPS, talking with Matzen when he heard a radio broadcast of something that sounded like a fight. He said the communication was unclear, but he thought he heard something similar to "Code 3". M Huot said he paused and listened to his radio. He heard several "mic clicks" and believed that an officer was involved in a fight of some kind. He did not know which officer or where the fight was taking place.

M. Huot ran toward his patrol car and saw Werle run out of the report writing room and to his car. M. Huot followed Werle out of the police parking lot and heard Werle tell dispatch that he was in route "Code 3". M. Huot advised dispatch that he was also in route to the call "Code 3". Werle asked dispatch for the location of the call and M. Huot believed dispatch provided the address for the Budget Inn. M. Huot said there was no more radio traffic from the officers on scene of the incident as he was in route to the motel.

M. Huot said they drove to the north side of the parking lot of the motel and he saw two patrol cars parked nearby. He parked his patrol vehicle and followed Werle up the stairs, toward the motel room. M. Huot said he saw two security guards standing outside one of the rooms. He said Wroth's legs were partially outside the door of the room.

31

RP000035

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

M. Huot said he saw Wroth on his stomach and said he was naked from the waist down. Werle entered the motel room ahead of him and stopped near the door. M. Huot said he saw Werle strike Wroth on one of his legs with his flashlight. M. Huot pushed Werle farther into the room so that he could get past Werle and into the room to assist with controlling Wroth.

M. Huot said that Wattson and S. Huot looked fatigued as they struggled with trying to control Wroth's movement. He said they were unable to get Wroth into handcuffs. M. Huot got down on the ground, on his knees, straddling Wroth's head. He said he put a hand on Wroth's back and felt that ████████████████.

M. Huot said S. Huot was directly to his right and was trying to control Wroth's left arm. Wattson was on M. Huot's left side. Werle was on S. Huot's right. M. Huot said he saw the two Taser darts in Wroth's back. M. Huot said Wroth was yelling and he thought that ████████████████████████.

M. Huot said he grabbed the chain of the handcuff that S. Huot had just put on Wroth's left wrist. He said that it took all of his strength to pull Wroth's left arm behind his back. M. Huot said he then grabbed Wroth's right arm, which Wattson was attempting to control, and M. Huot pulled Wroth's right arm behind his back and put the handcuff on Wroth's right wrist, completing the cuffing technique. M. Huot said that he yelled, at least once, for Wroth to stop resisting.

M. Huot described Wroth as "big" and "very strong".

M. Huot said that Wroth continued to resist after being handcuffed. He said that Wroth continued to yell. He put his left knee on Wroth's upper back to keep him from trying to stand up or roll over as M. Huot put gloves on his hands.

M. Huot said that as they discussed moving Wroth away from the wall so that they could put him into a maximum restraint, Werle asked, "Is he breathing". M. Huot was not sure, but he thought that it was Werle that checked Wroth and determined that he was not breathing.

M. Huot said that RPDPS fire personnel were already on scene and immediately began emergency life-saving measures. M. Huot said Cpt. Nicks rolled Wroth over on to his back and ████████████. PSO Thompson told M. Huot to move the bed in the room up against the far wall to create more room for them to work on Wroth. Also present on scene were PSOs Hayes and Huffaker. M. Huot said that S. Huot ████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

M. Huot believed they worked to resuscitate Wroth ████████████████
before one of the medics on the ambulance pronounced Wroth deceased.

32

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

M. Huot said that his use of force against Wroth consisted entirely of him helping to put Wroth into handcuffs. He said that he did not strike Wroth with any part of his body and he did not deploy any weapon against Wroth.

M. Huot was not interviewed by CCI for this Administrative/Internal Affairs Investigation.

## Interview of Eric Matzen

Matzen was interviewed for the criminal investigation into this incident by Sonoma County Sheriff's Detectives Jesse Hanshew and Jeff Toney on May 13, 2017. Matzen provided a voluntary statement to the Sheriff's detectives and he was represented by Attorney Vance Piggott, with the law firm of Rains, Lucia, Stern, St. Phalle, and Silver.

Summary of Matzen interview with Sonoma County Sheriff's Detectives:

During this interview, Matzen stated in essence that he has worked at the RPDPS for approximately thirteen and one-half years. He is an Administrative Sergeant for the Department and is responsible for scheduling, training and fill-in patrol sergeant duties as needed. He is also a firearms instructor for the RPDPS.

Matzen stated that he reviewed the video from his Body Worn Camera prior to his interview with the Sheriff's detectives.

He stated that on May 12, 2017, he was wearing a dark blue, RPDPS Public Safety Officer uniform. He said he was wearing a navy blue RPDPS baseball hat. His uniform shirt has patches on each shoulder and sergeant chevrons that identify him as a sergeant for the RPDPS. He stated that he was wearing a ballistic vest carrier on the outside of his uniform shirt. Additionally, he had a silver metal badge on the left breast pocket and a nametag on the right breast pocket of his ballistic vest carrier. He stated that, in addition to his department-issued firearm, he was carrying a Taser and a collapsible baton.

Matzen said that he was in his office at the RPDPS when he heard S. Huot on the radio. He said that it sounded as if S. Huot was "out of breath" and that he asked for additional units. The dispatcher asked S. Huot to clarify his request but S. Huot did not respond to the dispatcher. Matzen said that he got on the radio and told the dispatcher to "send everybody". The dispatcher then repeated the location for the call, the Budget Inn, room number ▮▮▮

Matzen said that he is familiar with the Budget Inn and that he is aware that the area around the motel is a high crime area that involves illegal narcotics. He said he thought PSOs Wattson and S. Huot were in a fight of some sort. Matzen said that he drove

33

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Code 3 to the call and that he followed PSOs Werle and M. Huot from the station to the motel.

Matzen said that he saw the two security guards standing outside the motel room. He said the door to the room was open. The window was open and the screen had been removed.

Matzen said that he saw Wroth on his stomach in the motel room with his feet toward and near the open door. Wattson and S. Huot were fighting with Wroth and were trying to put handcuffs on him. Wroth was yelling and grunting as he resisted the efforts of the officers to put handcuffs on him. Wroth was naked from the waist down and had Taser darts in his back.

Matzen said there were no Taser deployments during the time he was on scene and he assumed a Taser had been deployed against Wroth before his arrival at the scene.

Matzen said that someone, he did not know who, shouted, "let go of him". He also heard an officer shout, "give us your hand". He said Werle hit Wroth several times in the back of one of his legs with his flashlight. Matzen believed that Wroth's left hand was already in a handcuff and behind Wroth's back. He could not see where Wroth's right hand was. Matzen said that he was fearful that Wroth may have a weapon that he could not see and that may have been the reason Wroth had resisted the officer's efforts to control his right hand.

Matzen said that he heard the officers on scene shout to Wroth several times to "stop resisting". Matzen said that he grabbed on to Wroth's feet and tried to put a figure four control hold on his legs. Matzen said that initially, Wroth was able to resist Matzen's efforts by pushing his feet and legs against him. He said that after several attempts he was able to control Wroth's feet and legs with the control hold.

The other officers were successful in getting both of Wroth's hands into the handcuffs. Matzen said that Werle then asked the dispatcher to send a paramedic to the scene.

Matzen told PSO Hartnett, who had just arrived at the scene, to go to one of the patrol cars and retrieve a maximum restraint device so that it could be applied to Wroth. Matzen began to discuss with the other officers on scene how they were going to put the maximum restraint device on Wroth and that they needed to slide Wroth away from the wall, toward the center of the room, when Hartnett returned with the maximum restraint device.

During this conversation, Werle noticed that Wroth may not be breathing. Werle yelled, "check him". The personnel from two RPDPS fire engines responded to the scene and had just arrived at the room. Matzen said the fire personnel consisted of Cpt. Nicks, and PSOs Huffaker, Hayes, and Thompson.

RP000038

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Matzen stated, "They were in the room. ████████████████████y."
Matzen said that he released the figure four control hold and Wroth was rolled over to
his back. Matzen said that Nicks, Huffaker, Hayes, and Thompson then ████████.

Matzen said he directed one of the officers, he could not remember who, to go to the
fire engine and ████████████████████. Matzen said an ambulance
crew arrived a short time later and took over primary care for Wroth.

Matzen then asked Wattson what the details of the call were and Wattson explained
that he responded to a check the welfare call for a subject acting erratically. Wattson
then gave Matzen an in essence report about his contact and subsequent efforts to take
Wroth into custody.

Matzen was not interviewed by CCI for this Administrative/Internal Affairs Investigation.

## Independent Witness Interviews

████████ was interviewed for the criminal investigation into this incident by Sonoma
County Sheriff's Detective Jeff Toney on May 12, 2017. ████ provided a voluntary
statement.

████████ was interviewed for the criminal investigation into this incident by Sonoma
County Sheriff's Detective Jesse Hanshew on May 12, 2017. ████ provided a
voluntary statement.

████ and ████ are the two security guards that were present at the scene during
this incident. ████ and ████ were called to the scene by the management of the
Budget Inn Motel in regards to Wroth failing to vacate his room at the scheduled
checkout time.

Both ████ and ████ contacted Wroth and noted that Wroth was yelling and acting
strangely. They said Wroth seemed easily confused and had difficulty answering simple
questions. Wroth was naked and he refused to get dressed, stating that ████
████████████████████ ████ subsequently called the RPDPS and
requested the assistance of an officer to conduct a check the welfare on Wroth.

████ and ████ were present at the scene during the entire time of the confrontation
between the RPDPS officers and Wroth. Both ████ and ████ provided statements
to the Sheriff's detectives that were consistent with the statements provided by the
Rohnert Park Department of Public Safety Officers.

████ and ████ were not interviewed by CCI for this Administrative/Internal Affairs
Investigation.

35

RP000039

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

## Body Worn Camera Videos

A review of the videos from the four Body-Worn Cameras at this scene confirms that the statements provided by the officers during the criminal investigation into this incident are a consistent and accurate reflection of what occurred at the scene of this officer-involved critical incident on May 12, 2017, in the City of Rohnert Park.

**RP000040**

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

# Officer David Wattson Findings

The purpose of this investigation was to investigate whether Officer David Wattson's conduct on May 12, 2017, violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

37

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

*(a) The degree to which the application of the technique may be controlled given the level of resistance.*
*(b) Whether the person can comply with the direction or orders of the officer.*
*(c) Whether the person has been given sufficient opportunity to comply.*

*The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.*

During the investigation, it was determined that Public Safety Officer David Wattson did not violate the above listed Rohnert Park Department of Public Safety policies.

On May 12, 2017, at approximately 1511 hours, PSO Wattson noticed a pending call for service on his MDC. The details of the call were a check the welfare of a subject acting strangely at the Budget Inn Motel. Wattson attached himself to the call and drove to the motel.

Upon his arrival, Wattson contacted two security guards for the motel standing outside room number ███  One of the security guards told Wattson that Branch Wroth had rented the room. He told Wattson that Wroth had damaged the room and had torn up his clothing.

Wattson contacted Wroth inside the motel room and noticed that Wroth was ripping his shirt and his pants were unbuttoned and down around his knees. Wattson said that Wroth appeared agitated. He was easily confused and his statements did not make sense. Wattson asked Wroth to sit down on the bed and Wroth complied. Wattson then asked Wroth several questions about his identity, whether or not Wroth knew where he was, and how he got to the motel. Wattson said that Wroth had difficulty understanding his questions and he was unable to answer his questions coherently.

Wattson stated that based on his training and experience, together with Wroth's behavior, he believed that Wroth was ███████████████████████ ██████.

Wattson requested a warrant check on Wroth by providing the RPDPS dispatcher Wroth's identifying information which Wattson got from the registration card for the room. Wattson then learned that Wroth had a misdemeanor warrant for his arrest.

Wattson explained to Wroth that he had a warrant for his arrest and Wattson asked Wroth to put his pants on so that Wattson could put him into handcuffs and take him to Wattson's patrol car, where Wattson would determine if Wroth could be released on a citation to appear in court.

Wroth told Wattson that ████████████████████████████████ ██████████

RP000042

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Wattson said that he talked with Wroth in a calm voice as he attempted to convince Wroth to put his pants back on. Wattson said that he believed that he had gained Wroth's cooperation at one point, but Wroth continued to state that he had been poisoned and he did not want to put his pants on.

S. Huot was at the RPDPS station when he heard on the radio that Wattson was at the Budget Inn with a subject that had a misdemeanor warrant for his arrest. S. Huot then responded to the motel to assist Wattson.

Wattson motioned for S. Huot to remain outside of the motel room because he believed he had gained Wroth's cooperation and he did not want to upset the rapport he had developed with Wroth with the presence of S. Huot.

Wattson estimated that he talked with Wroth for at least ten minutes as he tried to gain his cooperation with getting him to put his pants on. However, Wroth then took his pants completely off and then pulled them inside out.

Eventually, Wattson concluded that Wroth was unwilling, or unable to get himself dressed and Wattson then motioned S. Huot into the motel room. Wattson made several more attempts to ask Wroth to put his pants on but Wroth did not comply.

Wattson then moved to Wroth's left side and grabbed ahold of Wroth's upper left arm and assisted him to his feet while S. Huot grabbed on to Wroth's upper right arm.

According to both Wattson and S. Huot, Wroth then immediately tensed up and pulled both of his arms to the center of his body. Wroth then moved forward, toward the open motel room window.

S. Huot asked Dispatch for additional officers to respond to the scene to assist.

Wattson asked Wroth not to resist but Wroth did not comply. When Wattson realized that he and S. Huot were unable to control Wroth's movements, he yelled to S. Huot, "Dump him", meaning take him to the ground. Wattson explained that he and S. Huot tried to push Wroth to the ground by physically overpowering him but they were unsuccessful.

Wroth continued to resist the efforts of Wattson and S. Huot and he then lunged forward into the open motel room window. Wroth pushed the screen out and attempted to climb through the window. Wattson said that Wroth was screaming.

Wattson struck Wroth several times with both a closed fist and an elbow in Wroth's back. Wattson described the strikes as "compliance strikes" and he explained that he deployed these strikes in an attempt to gain Wroth's compliance and keep him from climbing through the window. Wattson also struck Wroth on his upper leg at least two times with his knee. He stated that these strikes were also an attempt by him to use pain compliance to gain Wroth's cooperation.

39

RP000043

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Wattson explained that he specifically targeted Wroth's upper leg and lower back when he deployed his compliance strikes. He said that he avoided targeting any area that could cause serious harm to Wroth, such as his groin, neck, head, or any vital organs.

Both Wattson and S. Huot described Wroth as very strong. Wattson realized that his compliance strikes were ineffective in gaining Wroth's cooperation and he and S. Huot were unable to physically overpower Wroth so he decided to deploy his Taser. Wattson shouted at S. Huot that he was going to deploy his Taser and Wattson then fired the darts of the Taser into Wroth's back.

Wattson said that his initial deployment of the Taser was for a full five-second cycle. He said that the Taser deployment was partially effective in that Wroth stopped trying to climb through the window. Wroth fell to the floor of the motel room but he did not cooperate with being taken into custody.

Both Wattson and S. Huot shouted multiple commands at Wroth for him to "stop resisting", "put your hands behind your back", "get on the ground", "get on your stomach". Wroth failed to comply with any of these commands and he actively resisted the efforts of the two officers to take him into custody. He flailed his arms about, kicked his feet, and refused to roll over to his stomach once on the floor.

When Wroth fell to the floor of the room he landed partially on his back and his side. Both Wattson and S. Huot yelled at Wroth to roll over on to his stomach and put his hands behind his back. Wattson yelled that if Wroth did not comply with his command he would deploy his Taser again.

Wattson then deployed his Taser for a second cycle. Wattson said that he believed the second Taser deployment had an effect on Wroth, but he was able to fight through the effects of the Taser and continue to resist their efforts to get him on to his stomach and handcuff him.

Wattson said that Wroth continued to yell and he continued to resist. Wattson deployed his Taser for a third cycle, this time with a drive stun contact deployment to the lower part of one of Wroth's legs. Wroth continued to fight and continued to resist their efforts to put handcuffs on him.

Wattson said that he deployed his Taser for a fourth cycle and this time determined that the Taser deployments were ineffective in changing Wroth's behavior. Wattson said he then disconnected the cartridge and put his Taser back into his holster.

Wattson said that he grabbed ahold of one of Wroth's arms and attempted to force him on to his stomach. Wroth continued to yell, kick at them, and flail his arms about preventing the officers from putting him into handcuffs.

40

RP000044

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

Wattson said that PSO Werle arrived and Wattson saw that Werle had his flashlight in his hand. Wroth grabbed on to one of Wattson's hands. Wattson then yelled at Werle to strike Wroth with his flashlight.

Wattson described the level of Wroth's resistance as "immense". He stated that both he and S. Huot "are not small people" but they were not able to overcome Wroth's resistance. He described Wroth as very strong and able to fend off their attempts to control his movement and their attempts to put handcuffs on him.

According to Wattson, Werle struck Wroth an unknown number of times with his flashlight on Wroth's upper thigh. He said that they were then finally able to pull both of Wroth's hands behind his back and place him into handcuffs.

According to Wattson, Wroth continued to resist by kicking at the officers. Wattson said that Sgt. Matzen, who had responded to assist, then put a figure four control hold on Wroth's legs to keep him from kicking at them.

Wattson said that at no time did he feel that he and S. Huot were in control of Wroth and that it was only with the combined efforts of all five of the officers were they finally able to overcome Wroth's resistance and take him into custody by securing him into handcuffs.

Matzen directed an officer to retrieve a maximum restraint device from a patrol car and they discussed how they could move Wroth away from a wall and into the middle of the room so that the control device could be applied.

During this time Wattson heard an officer say, "Check him. Check his face." Wattson then turned Wroth's head to face him and announced that Wroth was not breathing. Matzen released the figure four control hold and another officer immediately rolled Wroth over to his back. RPDPS Fire had already responded to the scene and was standing outside the motel room. Several firefighters entered the room and immediately began emergency life-saving measures. ████████████████████

Wattson said that he believed that he was in the way of the other Public Safety Officers who were trying to save Wroth's life so he stepped out of the room and stood by on the balcony near the motel room.

The evidence developed during both the criminal and administrative investigations support a conclusion that Branch Christopher Wroth actively resisted the efforts of five Rohnert Park Department of Public Safety Officers to take him into custody. Wroth had caused damage to the room and had a current and valid warrant for his arrest. Additionally, although not articulated by Wattson or the security guards before Wroth was taken into custody, Wroth had failed to vacate his motel room at the required check out time, thus creating another offense for which Wroth could be arrested.

41

RP000045

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Wroth's active resistance to being placed into handcuffs necessitated the deployment of control holds, pain compliance strikes, and ultimately several Taser deployments by Wattson.

At the time Wattson deployed "compliance strikes" on Wroth, Wroth was attempting to escape from Wattson and S. Huot by climbing through a window. Wattson's use of "compliance strikes" against Wroth by striking Wroth with his fist, elbow, and knee, are within RPDPS policy and within commonly accepted law enforcement practices.

Wattson and the other Public Safety Officers on scene repeatedly gave Wroth commands, ordering him to "stop resisting", "lay on the ground", "get on his stomach", and "put your hands behind your back". These commands amount to clear and unambiguous direction to Wroth, which he failed to comply with.

When Wattson realized his pain compliance strikes to Wroth were ineffective with gaining Wroth's cooperation, Wattson transitioned to the deployment of his Taser. Wattson continued to shout commands at Wroth and several times warned him that if Wroth did not comply with his commands, Wattson would deploy his Taser.

Wattson stated both during his interview for the criminal investigation and in his interview for this administrative investigation that he believed he deployed his Taser against Wroth four times.

Deputy Emily Dickey, from the Sonoma County Sheriff's Office, conducted a forensic download of Wattson's Taser on 5/25/17. Dickey determined that Wattson actually deployed his Taser against Wroth six times.

1. Occurred at 15:30:26 with a 5 second duration
2. Occurred at 15:30:32 with a 5 second duration
3. Occurred at 15:30:49 with a 1 second duration
4. Occurred at 15:30:52 with a 4 second duration
5. Occurred at 15:31:11 with a 5 second duration
6. Occurred at 15:31:25 with a 5 second duration

This incident was dynamic and violent. It involved the active resistance by Wroth and the subsequent efforts of five RPDPS Public Safety Officers to overcome Wroth's resistance to take him into custody. The setting for this incident was a relatively small motel room.

Several law enforcement groups (PERF, IACP, COPS, and DOJ) have established that multiple applications of a Taser should be avoided. However, Wattson had already attempted to overcome Wroth's resistance by physically overpowering Wroth with brute force and with the use of Personal Body Weapons/pain compliance. These tactics were unsuccessful. Given the level of Wroth's resistance, the rapidly changing dynamic of this event, and the number of officers it took to overcome his resistance, Wattson had

42

RP000046

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

no alternative other than multiple applications of his Taser to overcome the resistance by Wroth.

Wattson stated that he never considered deploying his firearm because he did not believe the level of Wroth's resistance rose to the level of the necessary use of deadly force.

Wattson gave direction to Wroth on what he had to do to avoid subsequent Taser deployments and Wroth refused to comply. Once Wattson determined that his Taser deployments were ineffective in gaining Wroth's cooperation he discontinued the use of his Taser and he replaced it in his holster.

Significantly, Wroth continued to fight with the officers and continued to resist their efforts to put handcuffs on him. It was only after three additional officers arrived at the scene and together, the five officers were able to physically overpower Wroth and take him into custody.

Wattson's use of force during this incident is supported by reasonable and justifiable cause, based on the actions of Wroth.

As the investigation disclosed that excessive force was not used and the evidence confirmed that the amount of force used by Wattson was reasonable, within policy and the law, the finding for each of the above-listed policies is Exonerated.


**Finding:     Exonerated**

_____


RPDPS Policy Manual Section 300.6 Medical Consideration - *Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any*

43

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

*use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

During the investigation, it was determined that Public Safety Officer David Wattson did not violate the above listed Rohnert Park Department of Public Safety Policy.

At 1534 hours, after Wroth was successfully secured in handcuffs, PSO Werle advised RPDPS Dispatch to request paramedics from Sonoma Life Support respond to the scene Code 3. He stated that he believed that Wroth ██████████████████ ████████ and he thought the paramedics may be necessary to provide medical aid to Wroth.

Cpt. Nicks and PSO Huffaker were on RPDPS fire engine #9982. PSO Thompson and PSO Hayes were on RPDPS fire engine #9984. Both fire engines responded to the Budget Inn Motel without being dispatched when they heard an officer ask for code three cover at the motel. Nicks stated they arrived on scene as PSO Hartnett was retrieving a maximum restraint device from a patrol car.

Werle is an Emergency Medical Technician and noticed that Wroth's ████████████ ████████████████. He said that he knows from his prior training and experience that that condition is indicative of a subject not breathing. He yelled out, "Check him. Check him. Check his face."

Wattson knelt down next to Wroth and turned his head to face him and noticed that it did not appear that Wroth was breathing. Wattson announced that Wroth was not breathing. Matzen immediately released his figure four control hold of Wroth's legs.

Cpt. Nicks immediately entered the room and rolled Wroth over, on to his back. Thompson directed M. Huot to push the bed against the far wall to create more room to provide emergency medical aid to Wroth. ████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

44

RP000048

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

████████████████████████████████████████████████

Paramedic Kenneth Chaffe and Emergency Medical Technician Lia Gaetano, from Sonoma Life Support, were dispatched to the scene at 1534 hours.  They responded from the parking lot of Mary's Pizza in Rohnert Park and arrived on scene at 1538 hours.

Chaffe and Gaetano took over primary care of Wroth while the RPDPS officers continued to assist.  Chaffe ████████████████████████████████
████████████ and he was pronounced deceased at 1600 hours.

As the investigation disclosed that neglecting to provide or obtain medical assistance did not occur; and the evidence confirmed that emergency medical care was obtained and provided, the finding is Unfounded.

**Finding:**      **Unfounded**

45

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

## Officer Sean Huot Findings

The purpose of this investigation was to investigate whether Officer Sean Huot's conduct on May 12, 2017, violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

46

RP000050

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

*(a) The degree to which the application of the technique may be controlled
given the level of resistance.
(b) Whether the person can comply with the direction or orders of the officer.
(c) Whether the person has been given sufficient opportunity to comply.*

*The application of any pain compliance technique shall be discontinued once the officer
determines that compliance has been achieved.*

During the investigation, it was determined that Public Safety Officer Sean Huot did not
violate the above listed Rohnert Park Department of Public Safety policies.

On May 12, 2017, at approximately 1511 hours, PSO Wattson noticed a pending call for
service on his MDC.  The details of the call were a check the welfare of a subject acting
strangely at the Budget Inn Motel. Wattson attached himself to the call and drove to the
motel.

S. Huot was in the RPDPS building when he heard Wattson run a warrant check on
Wroth over the radio.  He heard the dispatcher advise Wattson that Wroth had a
misdemeanor warrant for his arrest and S. Huot responded to the scene of the motel to
assist Wattson.

Upon his arrival at the room, S. Huot observed the two security guards standing outside
the room.  Wattson motioned to S. Huot that he should remain outside the room while
Wattson talked with Wroth.

S. Huot noticed that Wroth was not wearing pants and Wattson was attempting to
convince Wroth to put his pants on.  After a short time, Wattson motioned to S. Huot to
enter the room.  S. Huot said that Wroth had a "thousand-yard stare" and he seemed
easily confused by Wattson's questions.

S. Huot said that it appeared to him that Wroth was ███████████████████
███████ ██ ███████████████████████████.

Wattson continued to talk with Wroth.  Wattson explained to Wroth that he needed to
put his pants on so that Wattson could then handcuff him.  Wattson said he would walk
Wroth out to his patrol car, where he would determine if Wroth could be released on a
citation to appear in court for his warrant. S. Huot said that Wroth had one pant leg on,
but his pants were inside out and he had his left leg in the right side of his pants.

When it appeared that Wroth would not put his pants on, Wattson told Wroth to stand up
and he grabbed ahold of Wroth's left arm. S. Huot then grabbed Wroth's right arm as
Wroth stood up from the bed. S. Huot said that Wroth immediately tensed his body and
he pulled his arms to the center of his body. Wroth then lunged toward the motel room
window. S. Huot said that all three of them fell into the window.

47

RP000051

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

S. Huot said that he tried to pull Wroth's right arm behind his back but was unable to do so. He said that both he and Wattson told Wroth not to resist. S. Huot asked RPDPS dispatch to send additional officers to assist.

Wattson said, "Let's dump him", which S. Huot understood to mean that they were going to attempt to force Wroth to the ground. He said that Wroth was swinging his arms about, resisting his effort to pull his right arm behind his back and they were unable to force Wroth down to the ground.

According to S. Huot, Wattson struck Wroth several times with his fist. He did not know how many strikes were attempted. He said that both he and Wattson attempted to strike Wroth with their knee in Wroth's abdomen area. S. Huot said that he used his right knee to deliver one strike to Wroth's abdomen and he did not know if the strike connected with his intended target. He said that his knee strike was the only time he attempted to strike Wroth during the incident.

S. Huot said that both he and Wattson continued to shout commands at Wroth to "stop resisting". He said that none of their tactics to this point were successful in overcoming Wroth's resistance.

Wattson yelled, "Taser", and S. Huot let go of Wroth. Wattson then deployed his Taser into Wroth's back. He said that Wroth began to scream and after the five-second cycle Wroth fell away from the window and on to the floor of the motel room.

Wroth fell on to his back and side and he continued to resist by "thrashing" his arms about, kicking, yelling, and trying to get up to his feet. S. Huot said that both he and Wattson continued to give Wroth commands and Wattson deployed his Taser for a second cycle.

S. Huot believed that the Taser deployments had little to no effect on Wroth. He said that he was able to put one of Wroth's wrists into a handcuff as Wattson deployed his Taser again, this time with a drive stun to the lower portion of one of Wroth's legs.

S. Huot said he was unable to pull Wroth's arm behind his back, even though he had ahold of the handcuff with both of his hands. He said that Wattson also struggled to gain control of Wroth's other arm.

According to S. Huot, M. Huot, Werle and Sgt. Matzen all arrived at the same time. With the assistance of the other officers, they were able to pull Wroth's arms behind his back and secure his wrists in handcuffs.

The evidence developed during both the criminal and administrative investigations support a conclusion that Branch Christopher Wroth actively resisted the efforts of five Rohnert Park Department of Public Safety Officers to take him into custody. Wroth had caused damage to the room and had a current and valid warrant for his arrest. Additionally, although not articulated by Wattson or the security guards before Wroth

RP000052

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

was taken into custody, Wroth had failed to vacate his motel room at the required check out time, thus creating another offense for which Wroth could be arrested.

Wroth's active resistance to being placed into handcuffs necessitated the deployment of control holds, pain compliance strikes, and ultimately several Taser deployments by Wattson.

S. Huot utilized force during this incident by attempting to force Wroth's right arm behind his back, by attempting to push Wroth to the floor of the motel room and finally by a single strike with his right knee to Wroth's abdomen.  S. Huot continuously shouted commands to Wroth to "stop resisting" as he attempted to take Wroth into custody and put handcuffs on him.

As the investigation disclosed that excessive force was not used and the evidence confirmed that the amount of force used by S. Huot was reasonable, within policy and the law, the finding for each of the above-listed policies is Exonerated.


**Finding:**     **Exonerated**

---

RPDPS Policy Manual Section 300.6 Medical Consideration - *Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and*

49

RP000053

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

*imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

During the investigation, it was determined that Public Safety Officer Sean Huot did not violate the above listed Rohnert Park Department of Public Safety Policy.

At 1534 hours, after Wroth was successfully secured in handcuffs, PSO Werle advised RPDPS Dispatch to request paramedics from Sonoma Life Support respond to the scene Code 3. He stated that he believed that Wroth ███████████ and he thought the paramedics may be necessary to provide medical aid to Wroth.

Cpt. Nicks and PSO Huffaker were on RPDPS fire engine #9982. PSO Thompson and PSO Hayes were on RPDPS fire engine #9984. Both fire engines responded to the Budget Inn Motel without being dispatched when they heard an officer ask for code three cover at the motel. Nicks stated they arrived on scene as PSO Hartnett was retrieving a maximum restraint device from a patrol car.

Werle is an Emergency Medical Technician and noticed that Wroth's ███████ ███████████ He said that he knows from his prior training and experience that that condition is indicative of a subject not breathing. He yelled out, "Check him. Check him. Check his face."

Wattson knelt down next to Wroth and turned his head to face him and noticed that it did not appear that Wroth was breathing. Wattson announced that Wroth was not breathing. Matzen immediately released his figure four control hold of Wroth's legs.

Cpt. Nicks immediately entered the room and rolled Wroth over, on to his back. Thompson directed M. Huot to push the bed against the far wall to create more room to provide emergency medical aid to Wroth. ████████████

Paramedic Kenneth Chaffe and Emergency Medical Technician Lia Gaetano, from Sonoma Life Support, were dispatched to the scene at 1534 hours. They responded

50

RP000054

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

from the parking lot of Mary's Pizza in Rohnert Park and arrived on scene at 1538 hours.

Chaffe and Gaetano took over primary care of Wroth while the RPDPS officers continued to assist. ███████████████████████████████████████

███████████ and he was pronounced deceased at 1600 hours.

As the investigation disclosed that neglecting to provide or obtain medical assistance did not occur; and the evidence confirmed that emergency medical care was obtained and provided, the finding is Unfounded.


**Finding:     Unfounded**

51

RP000055

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

## Officer Michael Werle Findings

The purpose of this investigation was to investigate whether Officer Michael Werle's conduct on May 12, 2017, violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

52

RP000056

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

*(a) The degree to which the application of the technique may be controlled given the level of resistance.*
*(b) Whether the person can comply with the direction or orders of the officer.*
*(c) Whether the person has been given sufficient opportunity to comply.*

*The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.*

During the investigation, it was determined that Public Safety Officer Michael Werle did not violate the above listed Rohnert Park Department of Public Safety policies.

On May 12, 2017, at approximately 1511 hours, PSO Wattson noticed a pending call for service on his MDC.  The details of the call were a check the welfare of a subject acting strangely at the Budget Inn motel.  Wattson attached himself to the call and drove to the motel.

Werle was in the RPDPS building when he heard the sound of an officer in distress over the police radio.  He stated that it was the beginning of his shift and he had set up his car, but he had not yet deployed on the street.  He said that he was concerned and listened intently as the dispatched attempted to raise the officer and ask for clarification on what was requested.  He heard several "mic clicks" and believed that the officer was involved in a fight and needed emergency assistance.

Werle ran to his patrol car and then asked the dispatcher for the location of the officer who requested assistance.  The dispatcher advised him that the location was the Budget Inn Motel and he drove Code 3 to the motel.

Werle grabbed his flashlight as he exited his car at the motel and ran to the room number given him by the dispatcher.  He saw two people he did not recognize standing outside the motel room and learned later that they were security for the motel.  One of the security guards was holding on to Wroth's legs as his legs were partially outside of the room.

Werle asked the security guard to let go of Wroth and to move away so that Werle could enter the room.  He observed that Wroth was on his left side on the floor and was not wearing pants.  Wattson was on the floor next to Wroth.  Wroth's left arm was out in front of him and Wattson had ahold of it and was attempting to control his arm.  Wroth's legs were flailing about.  Werle put one of his feet on top of Wroth's legs in an attempt to control his movement and keep Wroth from kicking him.

Werle heard an unknown officer shout, "Stop resisting".  Wattson yelled at Werle to "hit him".  Werle said that he could see that Wattson was attempting to take Wroth into custody and that Wroth was actively resisting arrest.  He heard Wroth moaning or grunting, but he did not hear Wroth say any words.

RP000057

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

Werle's flashlight was in his left hand. He then struck Wroth several times with his flashlight on the back of one of Wroth's legs. He did not know how many times he struck Wroth with his flashlight.

Werle said that either S. Huot or M. Huot, he did not know which one, had Wroth's right arm near the center of his back. After he delivered the strikes with his flashlight to Wroth's leg, Wattson was able to pull Wroth's left arm behind his back though he continued to struggle with applying the handcuff.

Werle said that during this time, a portion of Wattson's body moved underneath Wroth's leg and Werle was then unable to deliver any more strikes to Wroth's leg because he did not want to strike Wattson by mistake.

Werle said he then struck Wroth's upper back area, near his shoulder blade with his flashlight. He said he hit Wroth several times in his back with his flashlight and that one of the Huot officers was then able to finally put Wroth's left wrist into the handcuff, completing the cuffing process.

Werle said that Wroth continued to move his legs about and that Sgt. Matzen secured Wroth's legs with a figure four control hold.

Werle said that once Wroth was secured in handcuffs, he advised Dispatch to send a Sonoma Life Support ambulance Code 3 to their location. He said he believed that Wroth may be ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and he thought it would be a good idea to have a paramedic on scene should Wroth need medical attention.

The evidence developed during both the criminal and administrative investigations support a conclusion that Branch Christopher Wroth actively resisted the efforts of five Rohnert Park Department of Public Safety Officers to take him into custody. Wroth had caused damage to the room and had a current and valid warrant for his arrest. Additionally, although not articulated by Wattson or the security guards before Wroth was taken into custody, Wroth had failed to vacate his motel room at the required check out time, thus creating another offense for which Wroth could be arrested.

Wroth's active resistance to being placed into handcuffs necessitated the deployment of control holds, pain compliance strikes, and ultimately several Taser deployments by Wattson.

Werle utilized force during this incident by Striking Wroth multiple times with his flashlight on the upper rear part of one of Wroth's legs and on his upper back area, near his shoulder blade. According to Werle, his strikes to Wroth's leg and back were effective in that when he struck Wroth's leg, Wattson was able to pull Wroth's left arm behind his back. Additionally, when Werle struck Wroth's back with his flashlight, one of the Huot officers was able to complete the cuffing process by putting Wroth's left wrist into the handcuff.

54

RP000058

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Werle did not strike Wroth, or use any other force against him, after Wroth was secured in handcuffs.

As the investigation disclosed that excessive force was not used and the evidence confirmed that the amount of force used by Werle was reasonable, within policy and the law, the finding for each of the above-listed policies is Exonerated.

**Finding:     Exonerated**

---

*RPDPS Policy Manual Section 300.6 Medical Consideration - Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

During the investigation, it was determined that Public Safety Officer Michael Werle did not violate the above listed Rohnert Park Department of Public Safety Policy.

RP000059

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

At 1534 hours, after Wroth was successfully secured in handcuffs, PSO Werle advised RPDPS Dispatch to request paramedics from Sonoma Life Support respond to the scene Code 3. He stated that he believed that Wroth ████████████████████ ██████ and he thought the paramedics may be necessary to provide medical aid to Wroth.

Cpt. Nicks and PSO Huffaker were on RPDPS fire engine #9982. PSO Thompson and PSO Hayes were on RPDPS fire engine #9984. Both fire engines responded to the Budget Inn Motel without being dispatched when they heard an officer ask for code three cover at the motel. Nicks stated they arrived on scene as PSO Hartnett was retrieving a maximum restraint device from a patrol car.

Werle is an Emergency Medical Technician and noticed that Wroth's ████████████ ████████████. He said that he knows from his prior training and experience that that condition is indicative of a subject not breathing. He yelled out, "Check him. Check him. Check his face."

Wattson knelt down next to Wroth and turned his head to face him and noticed that it did not appear that Wroth was breathing. Wattson announced that Wroth was not breathing. Matzen immediately released his figure four control hold of Wroth's legs.

Cpt. Nicks immediately entered the room and rolled Wroth over, on to his back. Thompson directed M. Huot to push the bed against the far wall to create more room to provide emergency medical aid to Wroth. ████████████████████████████

Paramedic Kenneth Chaffe and Emergency Medical Technician Lia Gaetano, from Sonoma Life Support, were dispatched to the scene at 1534 hours. They responded from the parking lot of Mary's Pizza in Rohnert Park and arrived on scene at 1538 hours.

Chaffe and Gaetano took over primary care of Wroth while the RPDPS officers continued to assist. Chaffe ████████████████████████████████ █████████ and he was pronounced deceased at 1600 hours.

As the investigation disclosed that neglecting to provide or obtain medical assistance did not occur; and the evidence confirmed that emergency medical care was obtained

RP000060

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

## Officer Matthew Huot Findings

The purpose of this investigation was to investigate whether Officer Matthew Huot's conduct on May 12, 2017, violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

58

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

*(a) The degree to which the application of the technique may be controlled given the level of resistance.*
*(b) Whether the person can comply with the direction or orders of the officer.*
*(c) Whether the person has been given sufficient opportunity to comply.*

*The application of any pain compliance technique shall be discontinued once the officer determines that compliance has been achieved.*

During the investigation, it was determined that Public Safety Officer Matthew Huot did not violate the above listed Rohnert Park Department of Public Safety policies.

On May 12, 2017, at approximately 1511 hours, PSO Wattson noticed a pending call for service on his MDC. The details of the call were a check the welfare of a subject acting strangely at the Budget Inn Motel. Wattson attached himself to the call and drove to the motel.

M. Huot said that he was in Sgt. Matzen's office at the RPDPS building when he heard an officer on the radio who sounded as if he was in a fight. He said the communication was unclear, but he thought he heard the words "Code 3".

M. Huot ran to his patrol car and followed Werle out of the back parking lot of the Safety Building. Werle asked Dispatch to confirm the location of the call and was told to respond to the Budget Inn Motel. M. Huot advised dispatch that he was responding Code 3.

When he arrived at the room of the motel he observed the two security guards standing outside the room and he saw that Wroth's lower legs were partially outside the room.

M. Huot said that Wroth was on his stomach and was naked from the waist down. Werle entered the room and stopped near the door. M. Huot saw Werle strike Wroth several times in the leg with his flashlight. M. Huot pushed Werle farther into the room so that he could get past him through the door and into the room.

M. Huot said that Wattson and S. Huot were struggling with Wroth and were attempting to put handcuffs on him. Wroth was resisting their efforts by flailing his hands and legs. M. Huot said that it appeared to him that both Wattson and S. Huot were fatigued and were unable to overcome Wroth's resistance.

M. Huot knelt down on the ground, straddling Wroth's head. He said that he had one knee on each side of Wroth's head and that Wattson was on his left, while S. Huot was on his right. Werle was on S. Huot's right side. He observed two Taser darts in Wroth's back. Wroth was yelling and M. Huot believed that Wroth ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

M. Huot said that S. Huot was holding a handcuff that secured Wroth's left wrist. M.

RP000063

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

Huot grabbed the center chain of the handcuff and pulled Wroth's left arm to the center portion of his back. He said that it took all of his strength to pull Wroth's arm behind his back. M. Huot then grabbed Wroth's right arm, which Wattson was attempting to control, and pulled it behind the center portion of Wroth's back. He then put Wroth's right wrist into the handcuff, securing both of Wroth's wrists in the handcuffs. He said that he yelled, at least one time, for Wroth to "stop resisting".

M. Huot described Wroth as "big" and "very strong".

M. Huot said that Wroth continued to yell and move about after he was handcuffed. He put his left knee on the upper portion of Wroth's back so that he could keep Wroth from attempting to stand up as he put gloves on. He said that only a small portion of his weight was on Wroth as most of his weight was supported by his other leg.

M. Huot said they were discussing putting Wroth into a maximum restraint device when Werle asked if he was breathing. Wroth was checked immediately and when it was determined that he was not breathing, Fire personnel immediately began emergency life-saving measures.

The evidence developed during both the criminal and administrative investigations support a conclusion that Branch Christopher Wroth actively resisted the efforts of five Rohnert Park Department of Public Safety Officers to take him into custody. Wroth had caused damage to the room and had a current and valid warrant for his arrest. Additionally, although not articulated by Wattson or the security guards before Wroth was taken into custody, Wroth had failed to vacate his motel room at the required check out time, thus creating another offense for which Wroth could be arrested.

Wroth's active resistance to being placed into handcuffs necessitated the deployment of control holds, pain compliance strikes, and ultimately several Taser deployments by Wattson.

M. Huot utilized force during this incident by grabbing ahold of each of Wroth's arms and physically overpowering him, with the assistance of S. Huot and Wattson, thus pulling Wroth's arms behind his back and placing him in handcuffs.

M. Huot did not strike Wroth, or use any other force against him, other than putting him into handcuffs against Wroth's resistance.

As the investigation disclosed that excessive force was not used and the evidence confirmed that the amount of force used by M. Huot was reasonable, within policy and the law, the finding for each of the above-listed policies is Exonerated.


**Finding:**     **Exonerated**

RP000064

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

<u>RPDPS Policy Manual Section 300.6 Medical Consideration</u> - *Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

During the investigation, it was determined that Public Safety Officer Matthew Huot did not violate the above listed Rohnert Park Department of Public Safety Policy.

At 1534 hours, after Wroth was successfully secured in handcuffs, PSO Werle advised RPDPS Dispatch to request paramedics from Sonoma Life Support respond to the scene Code 3. He stated that he believed that Wroth ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ and he thought the paramedics may be necessary to provide medical aid to Wroth.

Cpt. Nicks and PSO Huffaker were on RPDPS fire engine #9982. PSO Thompson and PSO Hayes were on RPDPS fire engine #9984. Both fire engines responded to the Budget Inn Motel without being dispatched when they heard an officer ask for code three cover at the motel. Nicks stated they arrived on scene as PSO Hartnett was retrieving a maximum restraint device from a patrol car.

61

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Werle is an Emergency Medical Technician and noticed that Wroth's █████████ ██████████ He said that he knows from his prior training and experience that that condition is indicative of a subject not breathing. He yelled out, "Check him. Check him. Check his face."

Wattson knelt down next to Wroth and turned his head to face him and noticed that it did not appear that Wroth was breathing. Wattson announced that Wroth was not breathing. Matzen immediately released his figure four control hold of Wroth's legs.

Cpt. Nicks immediately entered the room and rolled Wroth over, on to his back. Thompson directed M. Huot to push the bed against the far wall to create more room to provide emergency medical aid to Wroth. ██████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

Paramedic Kenneth Chaffe and Emergency Medical Technician Lia Gaetano, from Sonoma Life Support, were dispatched to the scene at 1534 hours. They responded from the parking lot of Mary's Pizza in Rohnert Park and arrived on scene at 1538 hours.

Chaffe and Gaetano took over primary care of Wroth while the RPDPS officers continued to assist. Chaffe ████████████████████████████████████

████████ and he was pronounced deceased at 1600 hours.

As the investigation disclosed that neglecting to provide or obtain medical assistance did not occur; and the evidence confirmed that emergency medical care was obtained and provided, the finding is Unfounded.

**Finding:   Unfounded**

RP000066

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

## Sergeant Eric Matzen Findings

The purpose of this investigation was to investigate whether Sergeant Eric Matzen 's conduct on May 12, 2017, violated Rohnert Park Department of Public Safety Policy Manual Section 300, more specifically:

RPDPS Policy Manual Section 300.3 Use of Force - *Officers shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose.*

*The reasonableness of force will be judged from the perspective of a reasonable officer on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that officers are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving.*

*Given that no policy can realistically predict every possible situation an officer might encounter, officers are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident.*

*It is also recognized that circumstances may arise in which officers reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Department. Officers may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.*

*While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires an officer to retreat or be exposed to possible physical injury before applying reasonable force.*

RPDPS Policy Manual Section 300.3.1 Use of Force to Effect an Arrest - *Any peace officer may use reasonable force to effect an arrest, to prevent escape or to overcome resistance. A peace officer who makes or attempts to make an arrest need not retreat or desist from his/her efforts by reason of resistance or threatened resistance on the part of the person being arrested; nor shall an officer be deemed the aggressor or lose his/her right to self-defense by the use of reasonable force to effect the arrest, prevent escape or to overcome resistance (Penal Code § 835).*

RPDPS Policy Manual Section 300.3.3 Pain Compliance Techniques - *Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Officers may only apply those pain compliance techniques for which they have successfully completed department-approved training. Officers utilizing any pain compliance technique should consider:*

63

RP000067

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

(a) The degree to which the application of the technique may be controlled
given the level of resistance.
(b) Whether the person can comply with the direction or orders of the officer.
(c) Whether the person has been given sufficient opportunity to comply.

*The application of any pain compliance technique shall be discontinued once the officer
determines that compliance has been achieved.*

During the investigation, it was determined that Sergeant Eric Matzen did not violate the
above listed Rohnert Park Department of Public Safety policies.

On May 12, 2017, at approximately 1511 hours, PSO Wattson noticed a pending call for
service on his MDC.  The details of the call were a check the welfare of a subject acting
strangely at the Budget Inn Motel.  Wattson attached himself to the call and drove to the
motel.

Matzen stated that he was in his office at the RPDPS building when he heard S. Huot
on the police radio and that it sounded as if he was "out of breath" when he asked for
the assistance of additional officers.  The dispatcher attempted to raise S. Huot to clarify
his request when Matzen advised the dispatcher to "send everybody".  The dispatcher
then gave the location of the Budget Inn Motel, room ███.

Matzen said he responded to the motel while driving Code 3.  He was behind Werle and
M. Huot.  When he arrived at the room he saw the two security guards standing outside
the room.

Matzen saw that Wroth was on his stomach and his feet were toward the door of the
room.  Wroth was naked from the waist down.  Wattson and S. Huot were fighting with
Wroth and were trying to put handcuffs on him.  Wroth was yelling or grunting and he
resisted the efforts of the officers to put handcuffs on him.

Matzen heard an officer shout, "Let go of him" and "give us your hand".  He observed
Werle strike Wroth several times with his flashlight on the back of one of his legs.
Matzen thought Wroth's left hand was already in a handcuff and was behind his back.
He could not see where Wroth's right hand was and he was fearful that Wroth could
have a weapon of some kind in his right hand.

Matzen said he heard the officers on scene shout several times, "stop resisting".
Matzen grabbed ahold of Wroth's feet and attempted to secure him a figure four control
hold.  Wroth resisted Matzen by pushing against him with his legs and he was able to
push Matzen away from him.

Matzen continued to attempt to control Wroth with the figure four control hold and was
eventually able to overcome Wroth's resistance and apply the control hold, thus
securing Wroth's legs and preventing him from kicking any of the officers.

64

RP000068

## INTERNAL AFFAIRS INVESTIGATION
### IA # F-2018-03

At this point, the other officers were successful in overcoming Wroth's resistance and they secured both of Wroth's wrists in handcuffs.

Werle asked the dispatcher to send Code 3 medical to the scene.

Matzen told PSO Hartnett, who had just arrived, to go to a patrol car and retrieve a maximum restraint device. As they discussed moving Wroth away from the wall so that they could apply the maximum restraint device, Werle noticed that Wroth may not be breathing. Werle yelled, "Check him". Two RPDPS fire engines had responded to the scene and had just arrived at this point.

Matzen released the figure four control hold on Wroth as the fire personnel initiated emergency life-saving measures.

The evidence developed during both the criminal and administrative investigations support a conclusion that Branch Christopher Wroth actively resisted the efforts of five Rohnert Park Department of Public Safety Officers to take him into custody. Wroth had caused damage to the room and had a current and valid warrant for his arrest. Additionally, although not articulated by Wattson or the security guards before Wroth was taken into custody, Wroth had failed to vacate his motel room at the required check out time, thus creating another offense for which Wroth could be arrested.

Wroth's active resistance to being placed into handcuffs necessitated the deployment of control holds, pain compliance strikes, and ultimately several Taser deployments by Wattson.

Matzen utilized force during this incident by grabbing ahold of Wroth's legs and securing him in a figure four control hold, preventing him from kicking any of the officers.

Matzen did not strike Wroth, or use any other force against him, other than applying the control hold to Wroth's legs.

As the investigation disclosed that excessive force was not used and the evidence confirmed that the amount of force used by Matzen was reasonable, within policy and the law, the finding for each of the above-listed policies is Exonerated.


**Finding:**     **Exonerated**

65

RP000069

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

RPDPS Policy Manual Section 300.6 Medical Consideration - *Prior to booking or release, medical assistance shall be obtained for any person who exhibits signs of physical distress, who has sustained visible injury, expresses a complaint of injury or continuing pain, or who was rendered unconscious. Any individual exhibiting signs of physical distress after an encounter should be continuously monitored until he/she can be medically assessed.*

*Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by fire personnel, paramedics, hospital staff or medical staff at the jail. If any such individual refuses medical attention, such a refusal shall be fully documented in related reports and, whenever practicable, should be witnessed by another officer and/or medical personnel. If a recording is made of the contact or an interview with the individual, any refusal should be included in the recording, if possible.*

*The on-scene supervisor, or if not available, the primary handling officer shall ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force. This notification shall include a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject (e.g., prolonged struggle, extreme agitation, impaired respiration).*

*Persons who exhibit extreme agitation, violent irrational behavior accompanied by profuse sweating, extraordinary strength beyond their physical characteristics and imperviousness to pain (sometimes called "excited delirium"), or who require a protracted physical encounter with multiple officers to be brought under control, may be at an increased risk of sudden death. Calls involving these persons should be considered medical emergencies. Officers who reasonably suspect a medical emergency should request medical assistance as soon as practicable and have medical personnel stage away if appropriate.*

During the investigation, it was determined that Sergeant Eric Matzen did not violate the above listed Rohnert Park Department of Public Safety Policy.

At 1534 hours, after Wroth was successfully secured in handcuffs, PSO Werle advised RPDPS Dispatch to request paramedics from Sonoma Life Support respond to the scene Code 3. He stated that he believed that Wroth ███████████████ ███████ and he thought the paramedics may be necessary to provide medical aid to Wroth.

Cpt. Nicks and PSO Huffaker were on RPDPS fire engine #9982. PSO Thompson and PSO Hayes were on RPDPS fire engine #9984. Both fire engines responded to the Budget Inn Motel without being dispatched when they heard an officer ask for code three cover at the motel. Nicks stated they arrived on scene as PSO Hartnett was retrieving a maximum restraint device from a patrol car.

66

**INTERNAL AFFAIRS INVESTIGATION**
**IA # F-2018-03**

Werle is an Emergency Medical Technician and noticed that Wroth's ████████
████████. He said that he knows from his prior training and experience that
that condition is indicative of a subject not breathing. He yelled out, "Check him. Check
him. Check his face."

Wattson knelt down next to Wroth and turned his head to face him and noticed that it
did not appear that Wroth was breathing. Wattson announced that Wroth was not
breathing. Matzen immediately released his figure four control hold of Wroth's legs.

Cpt. Nicks immediately entered the room and rolled Wroth over, on to his back.
Thompson directed M. Huot to push the bed against the far wall to create more room to
provide emergency medical aid to Wroth. ████████

████████

████████

Paramedic Kenneth Chaffe and Emergency Medical Technician Lia Gaetano, from
Sonoma Life Support, were dispatched to the scene at 1534 hours. They responded
from the parking lot of Mary's Pizza in Rohnert Park and arrived on scene at 1538
hours.

Chaffe and Gaetano took over primary care of Wroth while the RPDPS officers
continued to assist. ████████

████████ and he was pronounced deceased at 1600 hours.

As the investigation disclosed that neglecting to provide or obtain medical assistance
did not occur; and the evidence confirmed that emergency medical care was obtained
and provided, the finding is Unfounded.

**Finding:      Unfounded**

RP000071

INTERNAL AFFAIRS INVESTIGATION
IA # F-2018-03

## Conclusions

After an extensive review of all the information included in the criminal investigation and comparing it to the information developed in the administrative investigation, CCI came to the conclusion that the findings for all of the use of force and medical consideration listed policies for each RPDPS employee are Exonerated or Unfounded.

All the RPDPS employees involved in this incident used good judgment and restraint in dealing with a dangerous and evolving situation.  When it became necessary to change from a use of force situation to a medical emergency, they seamlessly started life-saving efforts to do what they could to save the life of the suspect.

**RP000072**

# Exhibit D

Transcript of Video File 20170512151954 (Wattson Body Camera)

DW     David Sittig-Wattson
BW     Branch Wroth
SH     Sean Huot
UI     Unidentified
…      Unintelligible

--------------------------------------------------------------------------------------------------------

**[15:19:25]**

*15:19:25-15:19:55 of the video file contains no audio*

DW:     What's happening, partner?

BW:     I'm having a meltdown.

DW:     What's going on? Go ahead and just take a seat for me. Just take a seat. What's –

BW:     [*Coughing.*]

DW:     What's happenin'?

BW:     I was poisoned.

DW:     You were poisoned with what?

BW:     With um, uh, uh, glycol. Uh, mono – monosudal [sic] glycol or whatever?

DW:     Mmhmm.

BW:     It's in uh, it's in uh, it was in detergent.

DW:     Okay.

BW:     And whatever, I don't know what's in if, I don't know what's in th- that oil.

DW:     Okay. What's your name, partner?

BW:     Branch Christopher Wroth.

DW:     Okay, what's your date of birth, Branch?

BW:     Twelve - twelve - sixt-

DW:     Rohnert Park four Edward twenty-one. Ten twenty-six by number.

BW:     Um. Yes.

DW:     It's gonna be California boy, five three two, three seven zero seven.

BW:     No, I'm not a boy.

DW:     No, It's just, uh, phonetics for "B".

DW:     So, what's going on here, wh- why - why are you, uh, why are you ripping up your shirt?

BW:     Because I was poisoned. I told you.

**[15:21:31]**

DW:   Wh- what kind of caplets are those? Those yellow ones. Do you know?

BW:   No.

DW:   No? Okay.

BW:   I don't know what those are.

DW:   Okay. How long you been staying here, Branch?

BW:   Um, just from yesterday.

DW:   Just yesterday?

BW:   Yeah.

DW:   Where you from originally?

BW:   I'm, I'm from, uh – originally?

DW:   Where do you live?

BW:   I don't really, I've been living with my, with my best friend, Adam Dyke.

DW:   Okay. Alright. Do you know where you're at now?

BW:   Yeah. I'm - I'm protected by a group of - individuals - that - I didn't - I just wish that somebody had came and talked to me, you know?

DW:   Okay. Do you know what city you're in right now, Branch?

BW:   Yeah, PR. Yep.

DW:   Where's that?

BW:   Rohnert Park.

DW:   Rohnert Park? Okay. Perfect. How'd you get here?

BW:   Walked.

DW:   You walked? From where?

BW:   From, uh, from Adam Dyke's house.

DW:   Where's uh, Adam live?

BW:   Um, well I don't live there.

DW:   I know, but where does Adam live?

BW:   Adam lives in, uh, Adam lives in Sebastopol.

DW:   Okay. And you walked here from Sebastopol?

BW:   No.

DW:   No?

**[15:23:15]**

BW:   No.

DW:   Well where'd you walk from? You said you came from Adam's house.

BW:   Um, uh, it's –

DW:   Go ahead.

BW:   Please don't kill me, you guys.

DW:   Go ahead and sit down, dude.

BW:   I just –

DW:   Sit down.

BW:   I know I was poisoned. I know a hundred percent I was poisoned.

DW:   Copy.

BW:   I just – all I wanted to – all I wanted is some group of individuals -

DW:   I copy your return.

BW:   - to actually come and talk to me and, you know I just wanted to have a place, and, and -

DW:   Okay.

BW:   - you know -

DW:   Alright, Branch, so here's the deal. You have a warrant.

BW:   No, I don't.

DW:   You do.

BW:   Huh uh.

DW:   So we're going to have to go get that sorted out. So I have to see if it's gonna be citable, but you're going to have to come with me, alright?

BW:   Okay.

DW:   So I have to go see if I can give you a ticket for it or not, okay? So it'll be super easy. I just have to double-check what it's for, okay? So are you able to go with the program? Yeah?

BW:   I can go with the program -

DW:   Perfect.

BW:   - I can, I can definitely go with the program if I know what the program is. It's like -

DW:   The program is I'm gonna have you stand up and pull your pants up and put 'em on, and then I'm gonna put you in handcuffs and we're gonna go see if its citable. That's what the

**[15:25:05]**

       program's gonna be. Make sense? Alright. Go ahead and stand up and put your pants on for me then, please.

BW:    Should I - put my shirt on?

DW:    You can put your shirt on if you want. Alright, go ahead -

BW:    I don't wanna wear these pants…

DW:    What do you wanna wear?

BW:    I need to wear something else, you guys, do you…

DW:    Do you have - do you have anything else here?

BW:    I can't have these saturated fucking … pants, dude…

DW:    Do you anything else to wear here? Do you have any other pants to wear here?

BW:    Yeah. Yeah.

DW:    Where?

BW:    I can put on something, yes.

DW:    Where? I'll get it for you.

BW:    I'll just throw on a freakin'…

DW:    I can't let you wear a sheet. You gotta wear some pants. Do you have any pants in your bag here? Or any shorts?

BW:    I don't think I have any pants in my bag, no.

DW:    No?

BW:    I don't have any pants. I don't -

DW:    I don't wanna, I don't wanna walk you down there with nothin' on, so those are gonna have to do it for now. So.

BW:    Okay. But I - okay. But, d-do you - can I - these are drenched with chemicals.

DW:    Okay. Well that's all we have right now, uh, Branch, so we're gonna have to use those ones for now. We'll get 'em off quickly, alright? So go ahead and stand up and button those up. Perfect. Go pull those up and button 'em.

BW:    This is what's getting' me all sick.

DW:    What is?

BW:    This is - the chemicals.

**[15:27:14]**

DW:   Okay. D you wanna wear 'em inside out then? You wanna try that out? Alright. We'll do that.

BW:   I don't - I don't know.

DW:   Well, I want you to put some pants on.

BW:   I know. I - don't have any pants.

DW:   Yeah. Just those ones that you have. So, you gotta cover yourself up.

BW:   I don't – I don't want these damn, fucking pants, dude. They've been -

DW:   Okay. We'll make something else work then. Go ahead, stand up for me and put your hands behind your back. I gotta put handcuffs on you like we talked about, alright?

BW:   I'll do it. I'll do it. I just - what insurance do I have?

DW:   I don't know. I don't deal in insurance.

BW:   [*Coughing.*]

DW:   Probably wanna put 'em on before you button 'em.

BW:   No, cause they're loose.

DW:   They're loose?

BW:   Yeah.

DW:   Okay.

BW:   [*Coughing.*]

DW:   Go slide 'em up for me, partner.

UI:   …

DW:   Alright, Branch. Get that other leg on so we can get ya going, so I can see if this is citable or not. This is my partner. He's here to help out.

SH:   How you doin', sir?

BW:   Hey, buddy.

SH:   What's your name?

BW:   My name's Branch.

SH:   Hey, Branch. I'm Officer Huot. Nice to meet you.

BW:   You're Officer what?

SH:   Huot. It's a weird name.

BW:   Okay.

**[15:29:51]**

SH: You can blame the French.

DW: Can you go put that other pant leg on so that we can get goin', Branch? Alright, so we're just gonna stand you up and put you in some handcuffs, alright? Branch?

SH: Branch? Hey. Branch.

BW: Please, don't.

DW: Branch.

BW: You guys.

DW: Dump him. **[15:30:29]**

SH: Branch.

DW: Dump him!

BW: Help! Help! Help! Help! Help! Dad! Ahhh! God damnit!

UI: Taser! Taser! Taser! Taser!

BW: [*Screaming. Taser deploys.*] **[15:30:49]**

UI: Get on the ground! Get on the ground! Get on the ground!

BW: [*Screaming.*] Help!

UI: Get your hands behind your back!

BW: Help me! Help me, Dad! Dad!

UI: Get on your stomach! Get on your stomach!

BW: Dad! Father! Father!

UI: Get on your stomach! You're gonna get tased again!

BW: [*Screaming.*] Help me, Father!

UI: Get on your stomach!

BW: Help me! Arh!

[*Taser arching.*]

BW: Help!

UI: Get on your stomach!

BW: [*Screaming.*] Help! Help me, mother!

DW: Get on your stomach!

SH: Get on your stomach!

DW: Get on your stomach now!

**[15:31:29]**

BW:   [*Moaning.*]

DW:   Get on your stomach!

[*Taser arching.*]

BW:   [*Screaming, crying.*] Ah! Father!

UI:   …

[*Taser arching.*]

BW:   [*Crying.*] Help me!

UI:   No.

BW:   [*Crying.*] Help me! Help me!

DW:   …

BW:   Help! [*Screaming.*] 9-1-1! Help! …

DW:   …

BW:   [*Screaming.*] Help! Help, me! Dad! Dad! Dad! Father!

DW:   … disconnect?

SH:   …

BW:   Adam Dyke!

DW:   I think this one is broken.

BW:   Help me… Help me, Adam! [*Moaning.*]

UI:   This is -

BW:   [*Moaning. Crying.*] Help me! Help me! Help me! Help me! Help me! Help me! Help me!
       Help! Help! Help! Dad! Mom! Somebody! Help! Help! Dad!

UI:   … camera.

BW:   Adam Dyke! 9-1-1! 9-1… No! Somebody!

UI:   Ready?

UI:   I'm gonna roll him.

BW:   Help! Help me!

UI:   Fuck.

UI:   Keep those in.

UI:   …

BW:   Help me! No!

**[15:33:17]**

UI:     Branch!

BW:     Help! Dad!

UI:     Hit him! Hit him! Hit him! Hit him!

[*Impact noises.*]

BW:     Dad!

[*Impact noises.*]

UI:     Let go of him!

[*Impact noises.*]

BW:     [*Screaming.*] Dad!

UI:     Get your arm behind your back!

BW:     [*Screaming.*]

UI:     Get your arm behind your back!

BW:     [*Screaming.*] Mom! Dad! Dad!

UI:     Get your arm behind your back! Do it now!

SH:     Stop resisting!

[*Impact noises.*]

BW:     [*Screaming. Moaning.*]

SH:     … your back! Do it now!

[*Handcuffs ratchet.*]

BW:     Help!

UI:     Keep your … right there.

UI:     I got a figure four coming here, guys.

UI:     Frank Eleven. [*Handcuffs ratchet.*] **[15:33:51]** Uh, give us code three medics. Code three
        medics. Edward Thirty, code three.

BW:     Help! I can't –

UI:     Can you go get a hobble?

BW:     Help! [*Muffled moaning. Sirens.*] Help me! [*Moaning.*] Ahh! Help! Help! Ugh! I can't breathe!
        **[15:34:29]**

UI:     You guys okay?

UI:     …

**[15:34:32]**

UI:     You can breathe. [*Sirens.*]

BW:     [*Crying. Moaning.*] Help! Help! Help!

UI:     Hey, can you pick up that camera there, and just – just hold on to it? Thanks.

BW:     Help! [*Crying. Moaning.*] Oh!

UI:     …the call.

DW:     Check the welfare. He's a warrant.

UI:     Okay.

UI:     That's the guy?

DW:     Yeah.

BW:     [*Moaning.*]

UI:     Just - you guys wanna do the max restraint? Right now?

SH:     Uh.

BW:     [*Moaning.*]

DW:     I don't think he's gonna - I don't think he's walkin'.

UI:     No.

UI:     That's probably a good plan.

UI:     …

UI:     Yeah. We're good.

UI:     You okay, David?

DW:     Yeah.

[*Radio chatter.*]

UI:     … try and move him away from the wall towards the bed.

UI:     …

UI:     Yeah, let's do it on –

UI:     You alright?

UI:     Yeah.

SH:     You wanna pick him up?

UI:     Er, just slide him.

SH:     Just slide him.

UI:     Let Mike put his gloves on.

**[15:35:30]**

DW:   We do have sharps. Right here.

UI:   Okay.

UI:   I got gloves. What do you need?

UI:   We just wanna slide him towards the bed so we can put him in the hobble.

UI:   Check him. Check him. Check him.

UI:   Okay.

UI:   Check his face. Check his face.

UI.   No. He's not breathing. **[15:35:41]**

UI:   He's not breathing.

UI:   Nope. Nope. Roll him over. Roll him over.

UI:   Fuck.

UI:   Keep going. Keep going.

UI:   Grab an AED.

UI:   …

UI:   Go get the medical bag.

UI:   Eighty-four, bring up your AED. Ninety-nine Eighty-four, bring up the AED.

UI:   Is someone getting the AED?

UI:   Yeah.

UI:   Ninety-nine Eighty-four, bring up the AED.

SH:   My camera's off.

DW:   Mine's off.

---------------//--------------- END TRANSCRIPTION

*Video file ends at 15:36:12*