UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER WROTH, et al., | Case No. 17-cv-05339-JST |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART SUMMARY JUDGMENT** |
| CITY OF ROHNERT PARK, et al., | |
| Defendants. | Re: ECF No. 65 |

Before the Court is Defendants' motion for summary judgment. ECF No. 65. The Court will grant the motion in part and deny it in part.

## I. BACKGROUND

### A. Factual Background

On May 12, 2017, City of Rohnert Park police offers attempted to arrest Branch Wroth. Wroth died during the interaction. His parents, Christopher and Marni Wroth ("Plaintiffs"),[1] filed this suit, alleging Fourteenth Amendment violations against five of the officers ("Officer Defendants") – Officer David Wattson, Officer Sean Huot, Officer Matt Huot, Officer Michael Werle, and Sergeant Eric Matzen – and the City of Rohnert Park ("Rohnert Park").

The officers' interaction with Wroth is documented in large part by footage from officers' body-worn cameras. *See* ECF No. 67-6.[2] During certain portions of the struggle, the cameras captured only audio.

---

[1] For the sake of clarity, the Court refers to Christopher and Marni Wroth as "Plaintiffs" and Branch Wroth as "Wroth."

[2] Consistent with Defendants' brief, the Court cites to the video from each body-worn camera ("BWC") as "BWC [Officer's Last Name] [Time of Day]."

The Court therefore recounts the record in the light most favorable to Plaintiffs, "so long as their version of the facts is not blatantly contradicted by the video [or audio] evidence." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378-79 (2007)).  The Court bears in mind, moreover, that "[t]he mere existence of video footage of the incident does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Id.*  Finally, Wroth cannot testify, and the parties have produced no accounts from witnesses other than the officers involved.  Accordingly, the Court must closely scrutinize "all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, . . . to determine whether the officer[s'] story is internally consistent and consistent with other known facts." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (en banc) (first alteration in original) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

The facts leading up to the struggle are largely undisputed.  On May 12, 2017, a security guard at the Budget Inn in Rohnert Park reported that a guest was acting strangely and had refused to leave after checkout time.  Officer Wattson responded first.  When Wattson arrived, the security guard provided him with the registration card for the room, which contained Wroth's name.  ECF No. 66-2 at 49:17-50:9.

Officer Wattson entered the room at approximately 3:20 p.m. through an open door.  BWC Wattson 15:20:00.  Wroth was naked and attempting to pull on a pair of pants.  *Id.*  Officer Wattson requested that Wroth take a seat on the bed, and Wroth complied.  *Id.* at 15:20:05-10.  Wroth stated that he had been poisoned with "glycol" or a similar chemical in detergent.  *Id.* at 15:20:18-40.  Wroth was able to confirm his name, but he could not give his full birth date.  *Id.* at 15:20:40-15:21:01.  Officer Wattson then ran a dispatch check on Wroth's information, which returned an outstanding misdemeanor warrant.  *Id.* at 15:21:13-17; ECF No. 66-2 at 50:20-23, 51:8-19.  Officer Wattson continued speaking with Wroth for approximately three more minutes.  Wattson BWC 15:21:01-15:24:20.

In his testimony, Officer Wattson described Wroth as "sweaty hands moving, fidgety, incoherent speech and rapid speech," although not aggressive, combative, or belligerent.  ECF No.

2

66-2 at 55:4-8. This is consistent with footage of the incident. Based on these observations, Officer Wattson determined that Wroth was under the influence of methamphetamine and "intoxicated . . . to the point [where] if I released him he would become a danger to himself or others in the area." *Id.* at 53:24-54:1, 55:16-20. Officer Wattson decided to arrest Wroth and take him into custody. *Id.* at 53:20-23.

In an attempt to downplay the situation, Officer Wattson informed Wroth that he would need to handcuff Wroth and bring him to the police station so that they could determine whether the outstanding warrant was "citable." Wattson BWC 15:24:20-15:25:10; *see also* ECF No. 66-2 at 53:9-23. For the next five minutes, officers encouraged Wroth to get dressed, but he was unable or unwilling to do so. Wattson BWC 15:25:10-15:30:22. During this time, Officer Sean Huot[3] arrived to assist. Huot BWC 15:29:30.

Shortly after 3:30 p.m., the two officers attempted to stand Wroth up from the bed and handcuff him. Huot BWC 15:30:18. At this point, the videos turn unclear as the situation became more chaotic. Both officers' cameras fell to the ground. The officers testified that Wroth "rushed towards the window and pushed out the screen and attempted to crawl out the window." ECF No. 66-2 at 66:5-13; *see also* ECF No. 66-4 at 68:21-24. Plaintiffs do not dispute this testimony. *See* ECF No. 74 at 8 (Plaintiffs' opposition stating that Wroth "tr[ied] to escape from [the officers] out the window onto the breezeway outside the room").

The parties agree that, as the officers attempted to restrain Wroth and handcuff him, he was physically resisting, although they dispute the degree of resistance and the threat it posed to the officers. The parties further agree that officers applied a series of "distraction blows" and then a Taser multiple times before wrestling Wroth to the ground. Wattson BWC 15:30:33-37; ECF No. 66-2 at 70:18-72:18; ECF No. 66-4 at 69:15-70:9; ECF No. 74 at 8. Sean Huot was able to handcuff one of Wroth's arms. ECF No. 66-4 at 70:7-9. During this time, Wroth can be heard repeatedly screaming, "Help me" and groaning unintelligibly as the officers instruct him to get on his stomach. Wattson BWC 15:30:38-15:33:20.

---

[3] The Court distinguishes between Officers Sean Huot and Matt Huot by using both their first and last names.

Two-and-a-half minutes after the encounter turned violent, Officer Werle, Sergeant Matzen, and Officer Matt Huot entered the room, having just arrived on the scene. Matzen BWC 15:33:13-17. At Officer Wattson's instruction, Officer Werle struck Wroth repeatedly in the upper leg with his flashlight. *Id.* at 15:33:17-22. After an initial struggle, Sergeant Matzen was able to place Wroth's legs into a figure four hold, and officers were able to handcuff Wroth's hands behind his back. Matzen BWC 15:33:45.

Thus, at 3:33:45 p.m.,[4] Wroth was on his stomach, naked from the waist down, with his hands handcuffed behind his back. *Id.*; Werle BWC 15:33:54. Five officers were in the room. Officer Werle immediately called for "Code 3, medics." Matzen BWC 15:33:46. A sixth officer, Officer Hartnett, was sent to get hobble restraints for Wroth's legs. Hartnett BWC 15:34:09.

At this point, Officers Wattson and Matt Huot were restraining Wroth's torso. From at least 3:34:15 p.m. onward, Officer Wattson had one knee on the ground, and one knee and a hand on Wroth's left shoulder blade. Matzen BWC 15:34:15; ECF No. 66-2 at 117:4-16.[5] Officer Wattson testified that he was putting most of his weight on the ground rather than Wroth, as Wattson had been trained not to put excess weight on a face-down suspect. ECF No. 66-2 at 117:14-118:10.

During this same time, Officer Matt Huot had his hand on Wroth's shoulders. ECF No. 66-5 at 84:19-85:11; Matzen BWC 15:33:45-34:21. He testified that he "wasn't giving any pressure to hold [Wroth] down." ECF No. 66-5 at 85:13-14. At 3:34:24 p.m., Matt Huot replaced his left hand with his left knee. Matzen BWC 15:34:22-23. Immediately after, Wroth uttered in a muffled voice, "I can't breathe." *Id.* at 15:34:24-25. An officer responded, "You can breathe." Matzen BWC 15:34:25-26; Werle BWC 15:34:35. Wroth continued to repeat, "Help." Matzen BWC 15:34:27-37. At 3:34:38 p.m., Matt Huot removed his left knee from Wroth's back and

---

[4] Although the different body cameras are all timestamped, there are slight variations of a few seconds at which the same audio is recorded. Because Sergeant Matzen's camera provides the best vantage of Wroth's critical final minutes, the Court uses that time stamp to measure the length of time.

[5] On video, it is unclear precisely when Wattson places his knee on top of Wroth, but he repositions it squarely onto Wroth at 3:34:15 p.m. Matzen BWC 15:34:15.

replaced it with his hand. *Id.* at 15:34:38.

Officers then discussed moving Wroth away from the wall. *Id.* at 15:34:58-35:15. At 3:35:15 p.m., Officer Wattson moved his left knee off of the center of Wroth's shoulder blade. *Id.* at 15:35:14-15. At 3:35:29 p.m., Officer Werle told officers to check Wroth. *Id.* at 15:35:29. Werle later testified that he did so because he observed that the back of Wroth's neck had turned purple. ECF No. 66-3 at 111:9-18. Officer Matt Huot then turned Wroth's head to the side and, six seconds later, reported that Wroth was not breathing. Matzen BWC 15:35:35.

Officers rolled Wroth over and EMTs – who had arrived in response to the call for medics – began CPR within 10 seconds. *Id.* at 15:35:45. Wroth was pronounced dead 27 minutes later.

In sum, roughly five minutes passed from when officers first used physical force on Wroth until they realized he was not breathing. For the final 1 minute and 50 seconds of the encounter, Wroth was handcuffed in the prone position with officers on top of him. Officer Wattson had one knee on Wroth's back for at least 1 minute of that time. Officer Matt Huot had a knee on Wroth's back for 14 seconds of that same period.

Wroth's precise cause of death is disputed. Under Plaintiffs' theory of the case, Wroth died from positional asphyxiation. ECF No. 74 at 6; ECF No. 74-4 ¶ 3(h).[6]

### B. Procedural History

On September 14, 2017, Plaintiffs filed this action under 42 U.S.C. § 1983, raising claims that (1) the Officer Defendants unlawfully deprived them of their familial relationship with Wroth, in violation of the First and Fourteenth Amendments; and (2) Rohnert Park was also liable because Director of Public Safety Brian Masterson had ratified the Officer Defendants' conduct. ECF No. 1. Plaintiffs amended their complaint on June 19, 2018. ECF No. 39. On December 7, 2018, the Court granted Plaintiffs leave to file the operative second amended complaint ("SAC") to add a failure to train theory of liability against Rohnert Park. ECF No. 58.

---

[6] Plaintiffs' expert indicates that there are technical differences between restraint asphyxia and positional asphyxia. ECF No. 74-4 at 13. The parties and their supporting evidence, however, do not appear to distinguish between the two concepts in any manner material to this motion. The Court accordingly uses restraint asphyxia and positional asphyxia interchangeably throughout this Order.

1    Defendants filed this motion for summary judgment on March 1, 2019.

**II.     LEGAL STANDARD**

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When deciding a motion for summary judgment, the court must draw "all justifiable inferences" in the nonmoving party's favor and may not weigh evidence or make credibility determinations. *Id.* at 255.

Where the party moving for summary judgment would bear the burden of proof at trial, that party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists. *Id.* at 1102-03. If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**III.    EVIDENTIARY OBJECTIONS**

The Court first addresses Defendants' evidentiary objections. Defendants object to Plaintiffs' expert Dr. A. Jay Chapman's opinion that Wroth's cause of death was "restraint asphyxia," ECF No. 74-4 ¶ 3(h), under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 582 (1993). In particular, Defendants contend that Dr. Chapman's opinion is unreliable because he did not review any Officer Defendant's post-hoc account of the incident (i.e., deposition testimony or other statement) and only reviewed some, but

not all, of the BWC videos. ECF No. 75 at 19.

Dr. Chapman based his opinion on various post-incident medical reports, two BWC videos, and scene and autopsy photographs. ECF No. 74-4. The Court concludes that this provided an adequate basis for Dr. Chapman to form an opinion regarding possible causes of Wroth's death. *See Daubert*, 509 U.S. at 582 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). To the extent those unreviewed materials undermine Dr. Chapman's conclusions, that challenge goes "to the weight of the testimony and its credibility, not its admissibility." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013); *see also id.* at 969 ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."). Similarly, that Dr. Chapman did not establish a precise "quantity of pressure upon Wroth," ECF No. 75 at 19,[7] does not preclude admission of his testimony. *See Watson-Nance v. City of Phoenix*, No. CV-08-01129-PHX-ROS, 2011 WL 13152466, at *12 (D. Ariz. June 16, 2011) (rejecting a similar challenge to expert's positional asphyxia testimony because, "[w]ith respect to the reliability of Dr. Spitz's ability to quantify the amount of compression, the issue goes to the weight of the evidence, not its admissibility").

The Court therefore overrules Defendants' objection to Dr. Chapman's opinion. The Court further overrules as moot Defendants' remaining objections to the declarations of Richard Ehle and Izaak Schwaiger, ECF No. 75 at 17-18, 20, because the Court finds the disputed testimony and exhibit unnecessary to resolve this motion.

## IV.    ANALYSIS

### A.    Officer Defendants: Fourteenth Amendment

#### 1.    Qualified Immunity Framework

Where, as here, defendants assert qualified immunity at summary judgment, courts conduct a two-prong inquiry. *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). Viewing the record

---

[7] The Court notes that it is difficult to evaluate Defendants' argument on this point because they did not include many of the deposition pages to which they cite. *Compare* ECF No. 75 at 19, *with* ECF No. 66-8.

through the lens of summary judgment, a court must determine "(1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). But a court may exercise its discretion to address either prong first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### a.    Fourteenth Amendment

Plaintiffs assert "that they have been deprived of a familial relationship with [Wroth] in violation of their Fourteenth Amendment right to substantive due process." *Gonzalez*, 747 F.3d at 797 *see also Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) ("This circuit has recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children.").[8] Accordingly, they must demonstrate "that the officers' use of force 'shock[ed] the conscience.'" *Gonzalez*, 747 F.3d at 797 (alteration in original) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). Under Ninth Circuit precedent, the governing standard for this inquiry turns on the facts of the incident.

When officers lack "the opportunity for actual deliberation," plaintiffs must make "a more demanding showing that [they] acted with a purpose to harm for reasons unrelated to legitimate law enforcement objectives." *Porter*, 546 F.3d at 1137-38 (emphasis omitted). "Legitimate law enforcement objectives include, among others, arrest, self-protection, and protection of the public." *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018). Conversely, "[a] police officer lacks such legitimate law enforcement objectives when the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or get even, or when an officer uses force against a clearly harmless or subdued suspect." *Id.* (internal quotation marks and citations omitted).

---

[8] Plaintiffs assert both the First and the Fourteenth Amendments as the basis for this right. SAC ¶ 23; ECF No. 74 at 12. As the Ninth Circuit has recently noted, courts have not "been entirely clear regarding the source of the right [to familial association]; they have variously relied on the Fourteenth, First, and Fourth Amendments." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018). Because Plaintiffs do not assert the First Amendment as an independent claim or identify any difference in the standard that should apply, the Court refers to this claim as their Fourteenth Amendment claim.

But "[w]here actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013). This deliberate indifference standard is met where officers display "the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013)).

### b.    Clearly Established Law

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). In other words, even if a plaintiff demonstrates a constitutional or statutory violation, a court must also determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232.

The Supreme Court has emphasized quite forcefully that, while it "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Because fair notice is the touchstone of this inquiry, officials' "reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).

### 2.    Analysis

### a.    Causation

As a threshold matter, the parties dispute whether Defendants' actions bear a sufficient causal relationship to Wroth's death. ECF No. 65 at 23-24; ECF No. 74 at 18-19.

Because "[a] § 1983 claim creates a species of tort liability," a court "must first determine what act or omission constituted the breach of [the constitutional] duty, and then ask whether that act or omission was the but-for and proximate cause of the plaintiff's injuries." *Mendez v. County of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018). An act proximately causes an injury where "the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

The Court cannot resolve this issue at summary judgment because there are disputed factual issues regarding the cause of Wroth's death. As discussed above, Dr. Chapman opined that Wroth perished from restraint asphyxia. ECF No. 74-4 ¶ 3(h). Defendants' expert disagreed, concluding that "the restraining process did not cause or contribute" to Wroth's death. ECF No. 71 ¶ 7. He instead opined that "methamphetamine use along with extreme exertion in combination with his enlarged heart is the probable cause of Mr. Wroth's sudden cardiac arrest." *Id.* ¶ 10. This is a matter for the jury.

Defendants alternatively argue that, as a matter of law, they did not proximately cause Wroth's death because Wroth resisted arrest. ECF No. 65 at 24. The authority cited by Defendants does not support this startling proposition. In *White v. Roper*, a pretrial detainee claimed that an officer was deliberately indifferent to his safety by attempting to force the detainee into a cell with another person who allegedly threatened physical violence. 901 F.2d 1501, 1504 (9th Cir. 1990). When the detainee refused to enter and tried to leave, officers forcibly subdued him, injuring him in the process. *Id.* at 1503. Despite stating that the detainee's refusal was an "intervening cause" between the initial decision to force him into a cell and his later injuries, the Ninth Circuit held that there remained factual issues as to whether that resistance "supersedes [defendant's] liability" based on that initial decision. *Id.* at 1506. Moreover, the *White* court did not even raise a causation question as to the detainee's other claim based on the force itself. *Id.* at 1507.

Contrary to Defendants, then, *White* does not suggest that a person's resistance relives officers of § 1983 liability for subsequent force that violates constitutional rights. The Court therefore rejects Defendants' causation argument.

10

### b. Actual Deliberation

Next, the Court must determine the standard that governs Plaintiffs' Fourteenth Amendment claim. Defendants contend that actual deliberation was impossible because the confrontation with Wroth "rapidly escalated into a violent struggle" and officers never gained sufficient control of the situation to permit deliberation. ECF No. 65 at 18-19. Plaintiffs argue that there are disputed issues of fact whether deliberation was practical once Wroth "was face down on the floor and restrained by five officers." ECF No. 74 at 15.[9]

The root of the Ninth Circuit's framework is the Supreme Court's decision in *County of Sacramento v. Lewis*, which considered the test for whether "a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death . . . in a high-speed automobile chase aimed at apprehending a suspected offender." 523 U.S. at 836. During the high-speed chase, the suspects' motorcycle slid out, and a pursuing officer's patrol car slammed into one suspect despite the officer's attempt to brake. *Id.* at 837. Drawing on its Eighth Amendment jurisprudence, the Supreme Court explained that, "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical, and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Id.* (citation and footnote omitted). By contrast, "deliberate indifference does not suffice for constitutional liability . . . even in prison circumstances when a prisoner's claim arises not from normal custody but from response to a violent disturbance." *Id.* at 852. The *Lewis* Court reasoned that high-speed chases present circumstances akin to prison riots, where officials "are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 853 (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). During a high-speed

---

[9] The Officer Defendants do not dispute that they are each potentially liable under the integral participant doctrine. ECF No. 74 at 16-18; *see also Keates*, 883 F.3d at 1241 (explaining that "defendants can be liable for 'integral participation' even if the actions of each defendant do not 'rise to the level of a constitutional violation.'" (quoting *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004)).

United States District Court
Northern District of California

chase, for instance, an officer "must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders." *Id.* Accordingly, the *Lewis* Court held, "just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case." *Id.* at 854; *see also Whitley*, 475 U.S. at 320-21 (holding that an Eighth Amendment excessive force violation "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" (internal quotation marks and citation omitted)).

Applying *Lewis*, the Ninth Circuit has characterized opportunities to deliberate as existing along a spectrum. *Porter*, 546 F.3d at 1138-39. At one end of the spectrum, the purpose to harm standard governs high-speed automobile chases. *Lewis*, 523 U.S. at 836. The Ninth Circuit has clarified that this more demanding standard governs "*all* high-speed chases," *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008), and applies regardless whether officers injure a fleeing suspect or an innocent bystander, *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999). Similar considerations control where a suspect seeks to use a vehicle as a weapon. *See Gonzalez*, 747 F.3d at 792-93, 797 (officer trapped in suspect's rapidly accelerating vehicle and unable to regain control of the car); *Wilkinson*, 610 F.3d at 554 (holding that the "application of the purpose-to-harm standard is clearly appropriate" where, "[w]ithin a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot"); *Porter*, 546 F.3d at 1135 (officer argued that he believed suspect was about to run over fellow officer). The Ninth Circuit has identified other instances of comparable urgency, such as "a gun fight in a crowded parking lot, a patently fast paced and urgent threat to public safety," *Porter*, 546 F.3d at 1139 (citing *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998)), or where officers must make "a snap judgment based on the unexpected appearance of a knife in [a suspect's] hand," *Hayes*, 736 F.3d at 1230.

By contrast, the other end of the spectrum includes custodial cases where "extended opportunities to do better are teamed with protracted failure even to care." *Porter*, 546 F.3d at

12

1139 (quoting *Lewis*, 523 U.S. at 853). Thus, the Ninth Circuit has recognized that deliberate indifference may suffice to shock the conscience "where officers have ample time to correct their obviously mistaken detention of the wrong individual, but nonetheless fail to do so." *Porter*, 546 F.3d at 1139 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 684 (9th Cir. 2001)). Similarly, the deliberate indifference standard applies to Fourteenth Amendment claims based on the fabrication of evidence or withholding exculpatory evidence. *See Tatum*, 768 F.3d at 821; *Gantt*, 717 F.3d at 708.

Here, officers faced a situation falling between those two extremes. Although Defendants rely on *Porter* and *Hayes*, those cases provide little guidance for these circumstances. Both involve a split-second decision to shoot a suspect based on an (arguably) imminent deadly threat. In *Hayes*, officers had their weapons holstered when a suspect drew a knife and stepped toward them from six to eight feet away; the officers drew their weapons and fired within four seconds. 736 F.3d at 1227-28; 1230. Likewise, in *Porter*, the shooting officer testified that he perceived that the suspect was on the verge of running over another officer who was on foot. 546 F.3d at 1135 ("And then instantly [the] engine revved what sounded to me like full throttle and the tires were spinning and his lights were lighting up Trooper Whittom's uniform from his last known position knowing he's behind the door, I remember seeing blue in the lights." (alteration in original)).

In this case, Wroth did not have a weapon of any kind, and no officers testified that they perceived one. The threat Wroth posed to the officers' safety throughout the encounter pales in comparison to that posed by a suspect with a vehicle or knife. Although Officer Sean Huot testified that Wroth was "swinging punches" at him during the initial struggle, ECF No. 66-4 at 86:3-88:4, a jury could reasonably conclude that this threat was minimal. In particular, the only video evidence of the encounter while Wroth was on the ground shows an officer striking Wroth while others hold his arms behind his back. Werle BWC 15:33:23-30. In any event, a reasonable jury could find that this threat had entirely evaporated once officers succeeded in handcuffing Wroth. Matzen BWC 15:33:45. Moreover, while Officer Wattson testified that he initially feared that Wroth would fall off the second-floor balcony if Wroth escaped out the window, ECF No. 66-

2 at 66:14-23, this threat had likewise been eliminated. In sum, this case does not present a comparable mix of conflicting safety obligations and simultaneous threats to life as in *Lewis*, *Porter*, or *Hayes*.

At the same time, the Court recognizes that the officers did not have the same "chance for repeated reflection, largely uncomplicated by the pulls of competing obligations" available in more extended custodial situations. *Lewis*, 523 U.S. at 853. Here, the physical struggle lasted roughly five minutes, and officers had Wroth handcuffed for less than two minutes before they discovered he was not breathing.

In the absence of binding authority, the Court finds instructive the analysis of other district courts that have considered the practicality of deliberation while officers attempt to restrain a prone suspect. In *Greer v. City of Hayward*, the decedent Greer was "on the ground in a prone position for approximately seven minutes while several officers . . . applied pressure to various parts of Greer's body in an attempt to make him comply" with their orders. 229 F. Supp. 3d 1091, 1103 (N.D. Cal. 2017). Based on video of the incident, the *Greer* plaintiffs alleged that at least one of the officers applied continuous pressure for approximately 2 minutes and 40 seconds. *Id.* at 1097. The court concluded that, viewing the facts in plaintiffs' favor, "the officers had time to deliberate while they lay on Greer's back as he struggled to breathe." *Id.* at 1108.

In *Garlick v. County of Kern*, officers "applied weight to [the decedent's] back for approximately eight to ten minutes" of a twenty-minute encounter, including for two to three minutes after the decedent "was in hobbles and hogtied." 167 F. Supp. 3d 1117, 1170 (E.D. Cal. 2016). "Based on these undisputed facts," the court concluded that "once [the decedent] was in handcuffs the circumstances had de-escalated and officers could deliberate whether to continue applying weight to his back." *Id.* at 1170-71.

The Court agrees with those other courts that, once officers have subdued a suspect to the point that there is no longer a threat, it becomes practical to deliberate about the type and degree of force to use in continuing to restrain the suspect. *See also I.A. v. City of Emeryville*, No. 15-CV-04973-DMR, 2017 WL 952894, at *10 (N.D. Cal. Mar. 13, 2017) ("[A] reasonable juror could conclude that because Henderson presented no immediate threat to Williams's safety, . . . 'actual

deliberation was practical.'" (quoting *Lewis*, 523 U.S. at 851)). Here, as explained above, a jury could reasonably find that Wroth posed no threat to the officers, at a minimum, once he was handcuffed.[10] Viewing the record in Plaintiffs' favor, the Court concludes that Officer Defendants had sufficient opportunity to deliberate.

Because a jury could reasonably find that either standard applies, the Court addresses both tests.

### c.    Purpose to Harm

The Ninth Circuit has held that "[t]he purpose to harm standard is a subjective standard of culpability." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013). Thus, even where the officer uses force that is intended to inflict bodily harm – such as shooting a suspect – the question is whether the officer actually had in mind "legitimate law enforcement objectives" or instead, improper "ulterior motives for using force." *Gonzalez*, 747 F.3d at 797-98. Under this standard, objectively unreasonable force is insufficient to establish a Fourteenth Amendment claim. *See id.* (reversing summary judgment to officers on Fourth Amendment excessive force claim and affirming summary judgment on Fourteenth Amendment substantive due process claim). Moreover, "speculation as to . . . improper motive does not rise to the level of evidence sufficient to survive summary judgment." *Id.* at 798 (alteration in original) (quoting *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003)).

At the outset, the Court observes some tension between this approach and the Supreme Court's subsequent description of the purpose to harm standard in *Lewis*. In *Kingsley v. Hendrickson*, the Supreme Court held that a pretrial detainee's excessive force claim under Fourteenth Amendment due process is governed by an objective reasonableness standard. 135 S. Ct. 2466, 2470 (2015). The *Kingsley* Court declined to adopt a standard that would have taken into account an officer's subjective awareness "whether the force deliberately used is, constitutionally speaking, 'excessive.'" *Id.* at 2472. In so doing, the Supreme Court discussed

---

[10] Defendants contend that Wroth "continued to . . . resist application of the figure-four hold" during this time, ECF No. 75 at 8, but a jury could reasonably infer otherwise from the video, *see, e .g.*, Matzen BWC 15:35:00-25.

*Lewis*'s statement that "[j]ust as a purpose to cause harm is needed for Eighth Amendment liability in a [prison] riot case, so it ought to be needed for due process liability in a pursuit case." *Id.* at 2475 (alterations in original) (quoting *Lewis*, 523 U.S. at 854). The Supreme Court rejected respondents' argument that "this statement shows that the [*Lewis*] Court embraced a standard for due process claims that requires a showing of subjective intent." *Kingsley*, 135 S. Ct. at 2475. Rather, the *Kingsley* Court explained, "[o]ther portions of the *Lewis* opinion make clear . . . that this statement referred to the defendant's intent to commit the acts in question, not to whether the force intentionally used was 'excessive.'" *Id.* (citing *Lewis*, 523 U.S. at 854 & n.13).

As noted above, the officer in *Lewis* attempted to brake but nonetheless struck a suspect that had suddenly fallen in front of the officer's car. 523 U.S. at 837. Thus, when the *Lewis* Court held "that high-speed chases with no intent to *harm suspects physically* or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment," *id.* at 854 (emphasis added), it did not necessarily hold that malicious intent was required. On those facts, the *Lewis* Court could conclude that the officer had no purpose to harm because he lacked any "intent to harm [the] suspect[] physically" at all. *Id.*

While *Kingsley* itself involved pretrial detainees, the Second Circuit has concluded that *Kingsley*'s objective reasonableness standard is not limited to that context, but rather "all excessive force claims brought under the Fourteenth Amendment." *Edrei v. Maguire*, 892 F.3d 525, 536 (2d Cir. 2018) (Katzmann, J.). The Second Circuit noted, for instance, that "when the *Kingsley* defendants argued that *Lewis* supported a subjective intent standard, the Court had an opportunity to distinguish its earlier decision as a case limited to non-detainees. But the Court did no such thing. Instead, it explained why that argument misread *Lewis*'s holding." *Id.* at 535 n.1. Further, the Second Circuit highlighted the anomaly that would result from limiting *Kingsley* in this fashion: "After all, with a non-detainee the government has not even shown probable cause of criminal activity, much less a public safety (or flight) risk warranting detention. For this reason, it would be extraordinary to conclude that 'pretrial detainees . . . cannot be punished at all, much less "maliciously and sadistically," while requiring non-detainees to prove malice and sadism.'" *Id.* at 535-36 (quoting *Kingsley*, 135 S. Ct. at 2475).

Though the Ninth Circuit does not appear to have considered the impact of *Kingsley* on its purpose to harm precedent, its subsequent cases have continued to suggest a subjective intent approach. *See, e.g.*, *Foster*, 908 F.3d at 1211. And while the Second Circuit's *Edrei* decision offers some compelling arguments, it does not demonstrate that *Kingsley* and its clarification of *Lewis* "have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Accordingly, the Court applies "a subjective standard of culpability." *A.D.*, 712 F.3d at 453.

Here, Plaintiffs cite no specific evidence suggesting improper motives. A jury could not reasonably discern any improper motives from the initial ten-minute interaction with Wroth. There was no physical altercation or argument during this period, or any other indication that the officers harbored malice towards Wroth. Similarly, there is no specific evidence that officers subsequently used force "only to 'teach [Wroth] a lesson' or to 'get even'" for his resistance. *Porter*, 546 F.3d at 1140 (citation omitted).

Plaintiffs instead focus on the lack of a threat posed by Wroth, reasoning that the officers' force was so disproportionate to the danger that it had no legitimate law enforcement purpose. ECF No. 74 at 15-16. The Ninth Circuit has recognized that a purpose to harm may sometimes be inferred where "an officer uses force against a clearly harmless or subdued suspect." *Foster*, 908 F.3d at 1211. A jury may reasonably draw this inference, for instance, from evidence that an officer moved another officer out of the way in order to shoot an "adequately subdued" suspect in the back. *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1170 (9th Cir. 2013). A reasonable jury can reach the same conclusion if an officer "knew he had rendered [a suspect] incapable of causing harm or fleeing" and, after pausing for several seconds, took a running start and stomped on the suspect's head multiple times. *Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017).

That inference is not reasonable here. Plaintiffs contend that officers escalated a peaceful situation for no reason. ECF No. 74 at 16; *see also Porter*, 546 F.3d at 1131 (explaining that a factfinder may consider whether officers' "own conduct created and agitated th[e] escalating

17

situation").[11]  But this assertion is belied by testimony that Wroth attempted to escape out the window, which Plaintiffs do not dispute.  ECF No. 66-2 at 66:5-13; ECF No. 66-4 at 68:21-24; ECF No. 74 at 8.  Effectuating arrest of a fleeing suspect is a legitimate law enforcement objective.  *Foster*, 908 F.3d at 1211.  Nor was officers' force the type of brutal conduct that was patently divorced from those objectives, such as shooting or head-stomping.  *Cf. Zion*, 874 F.3d at 1077; *Johnson*, 724 F.3d at 1170.

*Martinez v. City of Pittsburg*, is instructive.  No. 17-CV-04246-RS, 2019 WL 1102375 (N.D. Cal. Mar. 8, 2019).  In *Martinez*, two officers attempted to subdue a fleeing suspect on the ground, with one officer delivering blows and the other attempting "either a carotid hold or a choke hold."  *Id.* at *2.  Under plaintiffs' version of events, the decedent resisted being handcuffed but did not strike the officers.  *Id.* at *2 & n.3.  When additional officers arrived, they tased and struck the decedent, eventually succeeding in forcing him into a prone position and securing handcuffs behind his back – ending the two-and-half minute struggle.  *Id.*  Although the officer released the hold on the decedent's neck, another officer continued to apply pressure to the decedent's back for 30 seconds to 2 minutes, at which point officers noticed that he was not breathing.  *Id.* at *3.  The *Martinez* court denied summary judgment (and qualified immunity) on the Fourth Amendment excessive force claim, explaining that "[a] reasonable jury could conclude that, although he resisted arrest, [the decedent] did not deliberately strike the arresting officers, yet the officers delivered strikes that broke sixteen ribs and deployed a prohibited choke hold that crushed the cartilage in his neck resulting in his death."  *Id.* at *5.  The court nonetheless granted summary judgment to the officers under the Fourteenth Amendment purpose to harm standard, explaining that their "use of force – even if excessive – was at all times consistent with the aim of subduing and detaining a suspect who was resisting arrest."  *Id.* at *6.

---

[11] To the extent that Plaintiffs seek to rely on the Ninth Circuit's "provocation" doctrine, ECF No. 74 at 16, the Supreme Court overruled that line of precedent in the very passage that Plaintiffs cite. *See County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017).  Regardless, that rule would have been inapposite, as it applied to "an excessive force claim under the Fourth Amendment 'where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an *independent* Fourth Amendment violation.'"  *Id.* (emphasis added) (quoting *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)).

United States District Court
Northern District of California

If anything, the force in *Martinez* was more brutal than what officers deployed here. The Court agrees that the use of force under these circumstances, without more, does not permit a jury to reasonably conclude that officers "were motivated by a nefarious purpose." *Id.*

Accordingly, if officers lacked the opportunity to deliberate, Plaintiffs' Fourteenth Amendment claim would fail as a matter of law.

### d. Deliberate Indifference

### i. Constitutional Violation

The parties dispute whether the relevant deliberate indifference standard is subjective or objective. ECF No. 74 at 14; ECF No. 75 at 10.

As noted above, the Ninth Circuit has previously held that deliberate indifference in this context requires "the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Tatum*, 768 F.3d at 821 (quoting *Gantt*, 717 F.3d at 708). Further, it has explained, "[t]his mens rea standard is a subjective one and describes a culpable state of mind." *Id.*

Plaintiffs contend that the Ninth Circuit's post-*Kingsley* precedent requires a "purely objective" test. ECF No. 74 at 14. Drawing on *Kingsley*, the Ninth Circuit has extended an objective unreasonableness standard to pretrial detainees' Fourteenth Amendment claims for "failure to protect" and "inadequate medical care," holding that the defendant's failure to "take reasonable available measures to abate th[e] risk . . . must be objectively unreasonable." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (failure to protect); *see also Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (inadequate medical care). But Plaintiffs fail to cite any Ninth Circuit cases overruling or abrogating its precedent in the situation before the Court here.

Ultimately, the Court need not decide which standard applies, because even under a subjective standard, Plaintiffs have raised triable issues of fact whether officers consciously or recklessly disregarded the risk of positional asphyxiation while restraining Wroth. *See Tatum*, 768 F.3d at 821. That risk has long been recognized in this Circuit. *Drummond ex rel. Drummond v.*

19

*City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (collecting cases and explaining that "[u]nder similar circumstances, in what has come to be known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers"); *see also Abston v. City of Merced*, 506 F. App'x 650, 653 (9th Cir. 2013); *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th Cir. 2012); *Arce v. Blackwell*, 294 F. App'x 259, 261 (9th Cir. 2008).[12]

Here, Officers Wattson and Matt Huot continued to apply weight to Wroth's back during the 1 minute and 50 second period after he was handcuffed. Matzen BWC 15:33:45-35:29. After approximately 40 seconds, Wroth stated that he couldn't breathe. *Id.* at 15:34:24-25. Although one officer acknowledged this statement, no officer attempted to check Wroth's breathing. Officers were also aware that Wroth was possibly under the influence of methamphetamines and had just experienced a chaotic struggle in which he was tased and struck multiple times. Under these circumstances, a jury could reasonably find that officers were deliberately indifferent.

Defendants contend that other cases finding deliberate indifference to positional asphyxia are distinguishable, emphasizing that here, fewer officers applied less body weight to Wroth for a shorter time frame. ECF No. 75 at 10-12; *see also Greer*, 229 F. Supp. 3d at 1108; *Garlick*, 167 F. Supp. 3d at 1171. While that characterization generally appears accurate, the Court cannot say that the force and duration here was so minimal as to foreclose a finding of deliberate indifference as a matter of law.

### ii.    Clearly Established Law

Because a jury could reasonably find that Defendants were deliberate indifferent to Wroth's plight – and therefore, Plaintiffs' constitutional rights – the Court considers "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. "For a right to be clearly established, case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable

---

[12] Pursuant to Ninth Circuit Rule 36-3, *Abston*, *Tucker*, and *Arce* are not precedential. The Court cites these cases only to provide some small indication of the frequency with which similar deaths have occurred.

government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

As the Ninth Circuit has recently reiterated, "deliberate indifference claims [that] 'depend in part on a subjective test [do] not fit easily with the qualified immunity inquiry,' which is an objective inquiry." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 600 (9th Cir. 2019) (quoting *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002)).[13] In that case, "the qualified immunity inquiry should concentrate on the objective aspects of the constitutional standard." *Id.* In other words, the Court must determine whether "given the available case law at the time of [the incident], a reasonable officer, knowing what [one of the Officer Defendants] knew, would have understood that failing to" use different restraint techniques on Wroth created a risk of unconstitutional severity. *Id.*

Plaintiffs bear "the burden of showing that the rights allegedly violated were clearly established." *Shafer*, 868 F.3d at 1118. Here, Plaintiffs rely on *Drummond*, 343 F.3d at 1056-60, but *Drummond* is insufficient to carry that burden. As an initial matter, the Court assumes without deciding that *Drummond*'s Fourth Amendment excessive force holding could clearly establish rights under the Fourteenth Amendment Due Process Clause, despite the differing standards for constitutional violations. *But see Gonzalez*, 747 F.3d at 797-98 (on the same facts, reaching differing conclusions on those two claims). Because Wroth's death is what deprived Plaintiffs of their Fourteenth Amendment rights, *Drummond* is instructive only insofar as it puts a reasonable officer on notice that certain force creates a risk of death via asphyxia. Then the Court must determine, in turn, whether any reasonable officer exerting the force applied here would have known, based on *Drummond*, that the risk of Wroth asphyxiating was severe enough that it was reckless to disregard it. *See Shafer*, 868 F.3d at 1118. Viewed in this light, *Drummond* is readily distinguishable.[14]

_____

[13] Even were the Court to conclude that the deliberate indifference inquiry should be purely objective in light of *Kingsley*, it would still apply the existing, partially subjective standard to the clearly established inquiry. *See Horton*, 915 F.3d at 602.

[14] The Supreme Court has repeatedly suggested that a single controlling circuit case may not suffice to clearly establish law for qualified immunity. *See, e.g., City of Escondido v. Emmons*,

United States District Court
Northern District of California

In that case, Drummond offered no resistance when officers handcuffed him in the prone position. 343 F.3d at 1054. Two officers each placed their full body weight on Drummond's back using both of their knees, with one officer's knee on his neck. *Id.* Despite Drummond's repeated protestations that he could not breathe and that he was choking, officers remained on top of him for most or all of the next 20 minutes. *Id.* at 1054-55. A third-party witness also testified that the officers were "obviously causing [Drummond] to have trouble breathing." *Id.* at 1055 (alteration in original).

The differences in this case are largely self-evident. Of particular note, officers had Wroth handcuffed for fewer than 2 minutes, rather than 20. Although a jury could reasonably infer, based on the video, that Officers Wattson and Matt Huot placed more than minimal body weight on Wroth's back, there is no evidence from which a jury could conclude that officers applied their full body weight, let alone to Wroth's neck. *See Vos*, 892 F.3d at 1028. Given these differences in the level and duration of force in *Drummond*, it would not have apprised a reasonable officer of the constitutional risk here.

Accordingly, the Officer Defendants are entitled to qualified immunity if Plaintiffs' claim proceeds under a deliberate indifference theory.

### 3. Conclusion

In sum, the Officer Defendants are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim under either standard, albeit for different reasons. If the purpose to harm test applies, there is no triable issue of fact whether officers acted with an improper purpose unrelated to law enforcement objectives. Alternatively, if the deliberate indifference standard applies, the Officer Defendants are entitled to qualified immunity because there is no clearly established law on point.

---

139 S. Ct. 500, 503 (2019) (per curiam) ("Assuming without deciding that a court of appeals decision may constitute clearly established law for purposes of qualified immunity . . . ."); *Sheehan*, 135 S. Ct. at 1776; *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (per curiam). Like the Supreme Court, this Court need not resolve that question because Plaintiffs' reliance on *Drummond* fails on its own terms.

**B.      Rohnert Park**

Although the Officer Defendants are entitled to summary judgment, Rohnert Park remains potentially liable because a jury could find that the Officer Defendants violated Plaintiffs' constitutional rights under a deliberate indifference standard.  *See Pauluk v. Savage*, 836 F.3d 1117, 1126 (9th Cir. 2016).

### 1.      *Monell* Liability

A local government may be held "liable for an injury under § 1983 under three possible theories."  *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018).  Under the first, "a local government may be liable if 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury.'"  *Id.* (alteration in original) (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978)).  Second, a local government's failure to train its employees may rise to the level of actionable "deliberate indifference" where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).  Finally, a § 1983 plaintiff may prevail where "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it."  *Id.* at 802-03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013)).

### 2.      Failure to Train

#### a.      Legal Standard

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  To prevail on this claim, Plaintiffs must establish that "city policymakers [we]re on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights."  *Id.*  This is a purely objective standard.  *Castro*, 833 F.3d at 1076 (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)).

Because an inadequate training claim requires notice, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." *Connick*, 563 U.S. at 62 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). But "in a narrow range of circumstances," a single incident may suffice where "the unconstitutional consequences of failing to train" are "'patently obvious' and the violation of a protected right [is] a 'highly predictable consequence' of the decision not to train." *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016) (en banc) (quoting *Connick*, 563 U.S. at 61-62).

Finally, "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." *City of Canton*, 489 U.S. at 391.

### b.    Analysis

Plaintiffs contend that Rohnert Park provided inadequate training regarding the risks of positional asphyxiation, pointing out that Rohnert Park has no official policies or guidelines regarding restraint techniques and positional asphyxia. ECF No. 74 at 25-29. Moreover, Plaintiffs stress, the only mention of positional asphyxia in any Rohnert Park training materials produced in discovery is a slide from a weaponless defense presentation that states: "There is little scientific evidence to support the notion that prone restraint results in life-threatening respiratory compromise or asphyxia. . . . Cannot quantify the exact amount of weight, but it is faulty to theorize weight on back, in the prone position creates asphyxia sufficient to cause death." ECF No. 74-2 at 19. The Court agrees that summary judgment is inappropriate on this claim.

First, Plaintiffs raise triable issues of fact whether officers were adequately trained. Rohnert Park does not identify any specific training that it provided officers regarding the interaction of restraint techniques and asphyxia, and the fact that officers generally received additional medical training, ECF No. 70 ¶¶ 28-30, is largely irrelevant without a showing that it addressed this particular issue.

Rohnert Park also relies on training that the Officer Defendants received in police academies prior to employment, as well as their compliance with statewide mandated California Peace Officer Standards and Training ("POST"). ECF No. 65 at 29. This training is relevant to

24

the extent that it appears that the Officer Defendants received some instruction on these concepts during the police academy. *See, e.g.*, ECF No. 74-1 at 13. But the mere fact that officers complied with POST requirements does not relieve Rohnert Park of its constitutional obligations if that training was inadequate. *See L.M. v. City of Redding*, No. 2:14-CV-00767-MCE-AC, 2017 WL 5293764, at *5 (E.D. Cal. Nov. 13, 2017) (denying summary judgment on failure to train claim based on restraint asphyxia despite city's argument that "each of the officers involved in the subject incident passed a POST certified police academy prior to beginning their career as police officers, and the City maintains it provides training to its officers in all aspects of law enforcement that meets or exceeds POST standards"). If Rohnert Park was on notice that its officials were likely to violate constitutional rights based on gaps in their state-mandated training, it was required to supplement it. But to the extent that Rohnert Park provided any training to these officers, that training actually appears to have undermined awareness of positional asphyxia. ECF No. 74-2 at 19.

Moreover, the Officer Defendants' deposition testimony raises disputed factual issues as the adequacy of the training they received from Rohnert Park and other sources such as academy training. Officers expressed varying degrees of awareness of the risks of positional asphyxiation, and a jury could reasonably draw different inferences from their testimony. *See, e.g.*, ECF No. 74-1 at 23, 35-36. Most significantly, Officer Wattson, who directly applied pressure to Wroth for the longest period of time, testified that he had did not "know any of the details or particulars to" positional asphyxiation, but had "heard that in certain instances someone can asphyxiate if they're left in a face down position for 10 plus minutes." ECF No. 66-2 at 118:15-20. A reasonable jury could find that Wroth asphyxiated in far less time.

Second, although Plaintiffs do not provide evidence of a pattern of similar violations, there are disputes of fact whether the constitutional violations asserted were a "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (quoting *Brown*, 520 U.S. at 409). This Court has previously concluded that a claim based on Fourth Amendment violations during a roadside cavity search could proceed under this exception because "[l]aw

enforcement officers know that the concealment by suspects of narcotics and other materials will sometimes require the use of body cavity searches," which are inherently "intrusive and potentially embarrassing." *Dizon v. City of S. San Francisco*, No. 18-CV-03733-JST, 2018 WL 5023354, at *4 (N.D. Cal. Oct. 16, 2018). It seems likely that Wroth's situation occurs more frequently, and its dangers are more acute. As another court in this district recently observed, "[i]t is beyond dispute that police officers are often required to subdue suspects and handle them while they are handcuffed." *Martinez*, 2019 WL 1102375, at *7. The Court agrees that a jury could therefore "reasonably conclude it is highly foreseeable that [Rohnert Park's] failure to provide guidance on the proper duration and amount of force to apply . . . . to the back of a prone and handcuffed suspect, would result in" constitutional violations. *Id.*; *see also Neuroth v. Mendocino County*, No. 15-CV-03226-RS, 2018 WL 4181957, at *17 (N.D. Cal. Aug. 31, 2018) (denying summary judgment on *Monell* claim where "a reasonable juror could conclude that inmates [affected by drug intoxication and mental illness] are likely to end up in an altercation with custodial staff, and that injury to the inmate is a highly predictable result of inadequate training with respect to restraint methods that may interfere with a person's breathing").

Finally, viewing the record in Plaintiffs' favor, a jury could reasonably find a causal relationship between inadequate training and the constitutional violation. For instance, a jury could infer that, if Wattson had been trained that positional asphyxiation presented a risk of death in significantly less time than ten minutes, he would have released his knee from Wroth sooner. Similarly, although Defendants suggest that the Court must focus solely on officers who actually applied their weight to Wroth, a jury could reasonably infer that any adequately trained officer present would have been able to intervene.

Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' failure to train claim.

### 3. Ratification

The Court addresses Plaintiffs' ratification theory only briefly. In their motion, Defendants argue that they are entitled to summary judgment on this claim because no underlying constitutional violation occurred. ECF No. 65 at 28-29. Because, as explained above, a

reasonable jury could disagree with that contention, Defendants are not entitled to summary judgment on a ratification theory.[15]

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to the Officer Defendants and denies the motion as to Rohnert Park.

**IT IS SO ORDERED.**

Dated: April 22, 2019



JON S. TIGAR
United States District Judge

---

[15] On reply, Defendants suggest for the first time that Plaintiffs have failed to provide evidence of ratification. The Court declines to consider this argument. *See Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2017 WL 2797810, at *7 (N.D. Cal. June 28, 2017) (citing *Ass'n of Irritated Residents v. C & R Vanderham Dairy*, 435 F. Supp. 2d 1078, 1089 (E.D. Cal. 2006)).

United States District Court
Northern District of California